**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Petitioner*

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN PAUL DE AYORA, an individual, on behalf of himself, the general public, and those similarly situated,<br><br>                    Petitioner,<br><br>    v.<br><br>INSPIRE BRANDS, INC. and ARBY'S RESTAURANT GROUP, INC.,<br><br>                    Respondents. | Case No:<br><br>PETITION TO CONFIRM ARBITRATION AWARD |

## **INTRODUCTION**

1.       Petitioner Benjamin Paul de Ayora, by and through his undersigned counsel, brings this action to confirm an arbitral award against Respondent Inspire Brands LLC and Arby's Restaurant Group, Inc. (collectively, "Respondent") pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9. The arbitral award was made in the San Francisco office of the Judicial Arbitration and Mediation Services ("JAMS").

2.       For background, Petitioner's underlying claims concern Respondent's egregious privacy violation and breach of consumer trust in blatant violation of California law. Respondent owns and operates several websites (specifically, www.arbys.com, www.inspirebrands.com, www.baskinrobbins.com,   www.dunkindonuts.com,   and   order.sonicdrivein.com;   each   a

"Website" and collectively referred to as the "Websites"), which allow visitors to, among other things, view and order food served in Respondent's fast food restaurant chains. Like most internet websites, Respondent designed the Websites to include resources and programming scripts from third parties that enable those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data.

3.    Unlike many internet websites, however, Respondent's Websites purport to offer all visiting consumers the choice to browse the Websites without being tracked, followed, and targeted by third party data brokers and advertisers. The Websites do this by displaying a pop-up cookie consent banner to Website visitors, which expressly tells visitors that they can decline cookies. Each of the Websites makes substantially similar representations in the cookie pup up banner. An exemplar of Respondent's initial pop-up cookie banner on the Arby's Website[1], from 2023, is included below:



4.    Many of the millions of visitors to Respondent's Websites, including Petitioner, did just that – they declined or rejected **all** cookies and proceeded to browse the Websites. Unfortunately, Respondent's privacy promises were outright lies, designed to lull users into a false sense of security. Unbeknownst to the users, and contrary to their express rejection of all such cookies, Respondent nonetheless caused cookies to be stored on the visitors' devices. In doing so, Respondent caused the transmission of users' personal data to undisclosed third parties, contrary to Respondent's representations.

_____

[1] A substantially similar banner was displayed on each of the Websites.

5.	Many of the third-party cookies that Respondent wrongfully caused to be placed on Petitioner's and other consumers' devices are designed to track consumers' behavior across websites for marketing purposes. These third-party cookies can enable third parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. Third parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits; and performing targeted advertising and marketing analytics. Further, the third parties share user data and/or user profiles to unknown parties to further their financial gain. This type of tracking and data sharing is exactly what Petitioner and the other consumers who declined and rejected cookies sought to avoid. In disregarding Petitioner and the express refusal of visitors to the Websites to consent to such cookies, Respondent violated state statutes and its common law duties to Petitioner and those visitors to the Websites.

6.	Prior to asserting claims on behalf of himself and a class of similarly harmed individuals, Petitioner obtained an arbitral award finding that Petitioner is not subject to Respondent's arbitration and class action waiver provisions in the Website's Terms of Use. Petitioner now seeks to confirm that arbitral award so that he can pursue class claims against Respondent for its breach of consumer trust and wanton privacy violations.

## PARTIES

7.	Benjamin Paul de Ayora is, and at all times alleged herein was, an individual and a resident of California. Petitioner intends to remain in California and makes his permanent home there.

8.	Respondent Inspire Brands LLC is a Delaware corporation with its principal place of business in Georgia. Inspire Brands has substantial contacts with and receives substantial benefits and income from California and throughout the United States.

9.     Respondent Arby's Restaurant Group, Inc. is a Delaware corporation with its principal place of business in Georgia.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Petitioner and Respondent, and the amount in controversy (that is, the value of the arbitral award), exclusive of interest and costs, exceeds $75,000.

11.     As set forth in the arbitral award (*see* Exhibit A), Petitioner is not subject to Respondent's Terms of Use. Petitioner thus may assert claims in court on behalf of a putative class, for Respondent's privacy violations, misrepresentations, unjust enrichment, and trespass to chattels. Such a class action would seek injunctive relief as well as statutory damages of $5,000 *per violation* (and there were numerous violations, occurring each time Respondent caused the placement or transmission of third-party cookies on a Website visitor's device or browser after that person had declined such cookies on Respondent's Websites), punitive damages, compensatory damages and/or restitution. Accordingly, the value of the award— finding that Petitioner is not limited to an individual arbitration—exceeds $75,000.

12.     This Court has personal jurisdiction over Respondent for the limited purpose of confirming the arbitration award because Respondent agreed to arbitrate in San Francisco, California, and fully participated in the arbitration in San Francisco, thereby consenting to jurisdiction in California and purposefully availing itself of the privilege of conducting activities (and, in particular, litigating the issues decided in the award) in California. This petition arises out of Respondent's arbitration activities in California, and it is reasonable for the Court to exercise jurisdiction over Respondent for purposes of confirming the award.

13.     In addition, Respondent regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Respondent has engaged, and continues to engage, in substantial and continuous business practices in the State of California. Indeed, Respondent has many Arby's stores located in the state of California that sell food to California

consumers. California's long-arm statute permits the exercise of jurisdiction to the limits of due process. *See* Cal. Civ. Proc. Code § 410.10.

14. Venue is proper in this District pursuant to 9 U.S.C. § 9, which provides that "[i]f no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made." Here, the parties agreed to arbitrate gateway issues of arbitrability in San Francisco, there was no pre-dispute agreement between the parties specifying where the award must be confirmed, and the arbitration was held and the award was made in the San Francisco office of the American Arbitration Association.

15. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events (that is, the arbitration) giving rise to this Petition occurred within this District.

16. Petitioner accordingly alleges that jurisdiction and venue are proper in this Court.

## LEGAL STANDARD

17. Confirmation of an arbitration award "is a summary proceeding that converts a final arbitration award into a judgment of the court." *Ministry of Def. & Support v. Cubic Def. Sys.*, 665 F.3d 1091, 1094 n.1 (9th Cir. 2011); *accord Int'l Petroleum Prods. & Additives Co. v. Black Gold, S.A.R.L.*, 418 F. Supp. 3d 481, 487 (N.D. Cal. 2019). Judicial review of an arbitration award, including on arbitrability issues, is both limited and highly deferential. *PowerAgent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 (9th Cir. 2004). "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review" of an arbitration award under the Federal Arbitration Act ("FAA"). *Kyocera Corp. v. Prudential-Bache T Servs.*, 341 F.3d 987, 994 (9th Cir. 2003) (en banc).

18. Under 9 U.S.C. § 10(a), there are only four, extremely limited grounds to vacate an arbitration award:

- where the award was procured by corruption, fraud, or undue means;
- where there was evident partiality or corruption in the arbitrators, or either of them;

- where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

- where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

19. In addition, the "burden of establishing grounds for vacating an arbitration award is on the party seeking [vacatur]." *U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010).

## SUBSTANTIVE ALLEGATIONS

20. On April 29, 2024, Petitioner filed a demand for arbitration in San Francisco with JAMS.

21. Arbitrator Gary Nadler was assigned as the arbitrator.

22. Following an initial conference on November 6, 2024, the Arbitrator ordered briefing regarding his jurisdiction and arbitrability.

23. On November 7, 2024, Petitioner filed an amended demand for arbitration. See Ex. B.

24. After receiving briefing and supporting evidence from the parties, the Arbitrator issued a Determination of Motion on Non-Arbitrability of Claims, dated February 24, 2025, concluding: (a) Petitioner did not waive his right to contest arbitrability; (b) the Arbitrator had authority to decide threshold arbitrability issues; and (c) the Arbitrator did not have jurisdiction to hear the case. See Ex. A.

25. JAMS subsequently issued a closing letter, dated April 4, 2025, confirming that it had closed the arbitration. See Ex. C.

26. The FAA provides that a court "must" confirm an arbitration award if any party to the arbitration applies for an order confirming the award within one year after the award is made, "unless the award is vacated, modified, or corrected." 9 U.S.C. § 9.

27. The award was not procured by corruption, fraud, or undue means.

28. There was no evident partiality or corruption in the arbitrator.

29. The arbitrator was not guilty of any misconduct in refusing to postpone a hearing, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior prejudicial to the rights of Respondent.

30. The arbitrator did not exceed his powers, or so imperfectly execute them that a mutual, final, and definite award upon the subject matter submitted was not made.

31. Because the award has not been vacated and there is no ground to vacate the award, it must be confirmed.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that the Court confirm the arbitral award and provide Petitioner with any further relief as the Court deems proper.

Dated: April 18, 2025

**GUTRIDE SAFIER LLP**

*/s/Seth A. Safier/s/*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Petitioner*

# EXHIBIT A

Benjamin Paul De Ayora,                          Arbitration No: 5100001564

    Claimant

    v.                                               **Determination of Motion re Non-**
                                              **Arbitrability of Claims**

Inspire Brands, LLC

    Respondents,

---

        Claimant's MOTION RE NON-ARBITRABILITY OF CLAIMS was heard on February 6, 2025. Appearing on behalf of Claimant Benjamin Paul De Ayora ("Claimant") was Gutride Safier LLP by and through Kali R. Backer. Representing Respondents Inspire Brands, Inc. and Arby's Restaurant Group, Inc. ("Respondents") was Baker & Hostetler LLP by and through Bethany G. Lukitsch and Kamran B. Ahmadian.

I.

<u>INTRODUCTION</u>

        Claimant here moves for an order that the matter before the Arbitrator is not arbitrable. He argues that he never consented to the Terms of Use, including arbitration of his claims. Claimant essentially argues that there was no consent to arbitration, and as such, the arbitration terms are unenforceable.

        Claimant's "AMENDED COMPLAINT AND DEMAND FOR ARBITRATION" (hereinafter "Amended Complaint") alleges a "privacy violation and total breach of consumer trust in blatant violation of California law." Pertinent specific allegations include as follows:

1. That Respondents' Websites are configured to allow the website user to select a "DECLINE" button as to cookies, with the intent to reject all such cookies when browsing the Websites. (*Id.* at ¶ 1).

2. That contrary to the express rejection of such cookies, Respondents nonetheless caused their cookies, and those from third parties, to be stored on Claimant's device. (*Id.* at ¶ 1).

3. That Respondent Inspire Brands, Inc. owns and operates the website "arbys.com" which allows visitors to the website to view content related to Arby's menus and locations. (*Id.* at ¶ 7).

4. That this website, along with others owned and operated by Inspire Brands, Inc., were integrated with cookies from third parties which, among other things, track users'

behavior on the websites. (*Id.* at ¶¶ 8-9).

5. That Respondents are liable for claims of invasion of privacy and statutory claims.

Respondents argue as follows:

1. By voluntarily initiating and filing his claims in arbitration, Claimant consented to the arbitrability of his claims and waived any objection to enforceability of the arbitration provision here in question.

2. Even if there was no waiver, any decision regarding whether an arbitration clause is applicable must be made by the court, and not the Arbitrator.

3. Even if the Arbitrator determines that he can decide the issue of arbitrability, discovery is sought regarding the issue of jurisdiction prior to the determination of this motion.

II.

FACTUAL BACKGROUND

In his declaration, Claimant provides that he visited the Arby's website in 2023. He further testifies that when visiting the website, "he did not know that [his] continued use of the Website was subject to arbitration." He "also did not see a link at the bottom of the Website to the Terms of Use" and that his understanding was that the Website owner and he only agreed that his "continued use of the Website would not be tracked based on the cookie banner."

The "DECLARATION OF SETH A. SAFIER IN SUPPORT OF CLAIMANT'S MOTION RE NON-ARBITRABILITY" provides a "true and correct copy of the Cookie Banner from the Website", and "a true and correct copy of the Website once a user scrolls to the bottom of the Webpage".

Allegations in the Amended Complaint, include:

"43. When Claimant visited the Arby's Website, he was presented with a cookie popup banner and was given the option to click the button reading "DECLINE."

44. Consistent with Claimant's typical practice, he clicked the "DECLINE" button, indicating his choice/agreement to decline and/or reject all cookies. Respondent's cookie banner and the "DECLINE" button led Claimant, and those similarly situated, to believe that they declined or rejected all unnecessary cookies.

45. Claimant believed that selecting the "DECLINE" button would keep his communications with the Website private and that Respondents would not share his communications with the Arby's Website with third parties.

46. By declining cookies, Claimant gave Respondents notice that he did not consent to the placement of such third-party cookies on his device(s) from the Arby's Website. In reliance on Respondents' representations and promises, only then did Claimant continue browsing the Arby's Website."

Respondents submitted a "DECLARATION OF KAMRAN B. AHMADIAN, ESQ. IN SUPPORT OF RESPONDENTS INSPIRE BRANDS, INC. AND ARBY'S RESTAURANT GROUP, INC.'S OPPOSITION TO CLAIMANT'S MOTION RE NON-ARBITRABILITY". The declaration attaches various copies of "Terms of Use" associated with multiple websites. However, no claim is made to refute the description offered by Claimant as to the layout of the Website that is the subject of this motion. Specifically, nothing is presented refuting the assertion by Claimant that he never saw the Terms of Use, or even a hyperlink which may have led to notice of acceptance of any terms of use.

III.
ISSUES PRESENTED

A.  Claimant

In his motion, Claimant asserts that in 2023, he visited the Arby's Website and was immediately presented with a popup Cookie Banner which allowed one of three options. As to the "Cookie Settings" option, he was allowed to either "Accept" or "Decline". According to Claimant, none of these options had any reference to, nor required any assent to, any "Terms and Conditions". Claimant asserts that he clicked the "Decline" button indicating his choice to reject all cookies except those that were strictly necessary. Claimant argues that Respondents caused such cookies to be placed on his device anyway in violation of law.

Claimant argues that there was no agreement to arbitrate, and as such, the matter should proceed in court.

B.  Respondents

Respondents first assert that Claimant waived any objection to enforceability of the arbitration provision contained on the Website by voluntarily initiating and filing his claims in the arbitration.

Even if the Arbitrator determines that there was no such waiver of the right to object to the enforceability of the arbitration provision, Respondents argue that any further question of arbitrability should be deferred to the courts.

Finally, Respondents provide that should the Arbitrator reject the foregoing arguments, limited pre-arbitration discovery should be permitted as there is a factual dispute as to the applicability of an arbitration provision.

IV.
WAIVER OF OBJECTION TO ARBITRATION

A threshold issue is whether Claimant waived objection to arbitration by initiating his claims in the arbitration process. In Claimant's initial filing of his "Complaint and Demand for Arbitration", he included footnote "1" stating that "Claimant files this Complaint and Demand for Arbitration without waiver of any right or argument, including without limitation, that Claimant did not assent to Respondent's [sic] arbitration agreement and/or that the purported arbitration agreement is unlawful and/or unenforceable." The amended pleading continued to assert that there

was no waiver intended.

There is no evidence that Claimant first, or even simultaneously, filed a civil action in court.

As conceded by both parties, waiver occurs only upon an intentional relinquishment or abandonment of a known right. *United States v. Olano* (1993) 507 U.S. 733. Respondents assert that in this instance, Claimant did *not* file his action in court in the first instance resulting in waiver of the right to object to arbitrability. It is conceded that the initial complaint, and amended complaint following, included footnote "1". Further, there is awareness that Claimant immediately pursued the instant motion seeking a determination of non-arbitrability.

Nonetheless, Respondents assert that since it was Claimant who voluntarily initiated this arbitration, such constitutes an intentional waiver of Claimant's right to object to arbitration. Noting that a waiver may not be found based on limited participation and immediate ongoing objections to arbitration, Respondents assert that such cases typically involve initiation of arbitration by the opposing party.

In *Nagrampa v. MailCoups, Inc.* 469 F.3d 1257, 1278 (9th Cir. 2006), cited by Respondents, the court noted that Nagrampa objected in advance to the arbitration but then engaged minimally, "limited to procedural issues and undertaking certain actions to preserve her rights." The court described the participation as follows:

> "Nagrampa's 'participation' in the arbitration proceedings thereafter was minimal … Nagrampa's 'participation' consisted of a letter to seek a ninety-day continuance, a letter objecting to the validity of the arbitration provision (specifically its venue and fee clauses), one conference call that resulted in a scheduling order, an unsuccessful attempt to file a counter-demand that was not accepted when she could not afford to pay the fee demanded by the arbitrator, and one set of discovery requests. Both the counter-demand and discovery requests were filed to avoid losing her right to do so in the event the venue, fee, and costs issues were amicably resolved before the proceeding reached the merits of the contract dispute." [Footnote omitted].

The court determined that there was no evidence that Nagrampa's limited involvement in preliminary matters precluded her from challenging arbitrability. The court addressed cases which involved far more participation resulting in waiver. In *Nghiem v. NEC Electronics, Inc., 25 F.3d 1437, 1440 (9th Cir. 1994)*, plaintiff had "initiated the arbitration, attended the hearings with representation, presented evidence, and submitted a closing brief of fifty pages" before filing suit in state court. *Nagrampa*, *Id.* 469 F.3d 1257 at 1279. In *Fortune, Alsweet & Eldridge, Inc. v. Daniel*, 724 F.2d 1355 (9th Cir.1983) the plaintiff objected to arbitration after attending two hearings on the merits and after his employer had presented all of its evidence. *Id.* at 1356–57. This constituted a waiver resulting from that participation.

In *Nghiem v. NEC Electronics, Inc., 25 F.3d 1437, 1440 (9th Cir. 1994)*, the aggrieved employee (although arguing that he was not bound by an arbitration agreement) engaged in the following: (1) he first wrote a letter to his employer's human resources director requesting to proceed with the arbitration provision; (2) he attended arbitration hearings with representation;

and (3) he presented evidence, and submitted a closing brief of fifty pages. The Court noted that Nghiem filed suit in state court before the arbitrator announced his final decision. "Once a claimant submits to the authority of the arbitrator and pursues arbitration, he cannot suddenly change his mind and assert lack of authority. Nghiem is bound by the arbitrator's decision." … "Furthermore, Nghiem's voluntary initiation of arbitration can be interpreted as waiver of any objection he may have had over the authority of the arbitrator." It is this last quote that is adopted by Respondents. However, it cannot be considered in a vacuum; it appears more as a descriptive conclusion arising from the circumstances described by the court resulting in a finding of waiver.

Respondents reference a District Court case entitled *Roderick v. Mazzetti & Associates, Inc.*, No. C-04-2436 (2004 WL 2554453 (N.D. Cal. Nov. 9, 2004). This matter involved a motion to compel arbitration. The Stock Purchase Agreement contained an arbitration provision, which was signed by the plaintiff. Plaintiff submitted the matter to arbitration; an arbitrator was selected; and at the commencement of the arbitration plaintiff objected to the specific rules of arbitration to be used (without objection to proceeding with the arbitration process). Two months after submitting the matter to arbitration, plaintiff filed suit in the United States District Court. Defendant objected on the grounds, *inter alia*, that plaintiff waived his ability to object to arbitration.

Addressing the issue of waiver of the right to object to arbitration, the District Court addressed *Nghiem v. NEC Electronics, Inc., Id.,* 25 F.3d 1437, 1440 (9th Cir. 1994), noting that "once a party has initiated *and pursued* arbitration, it is bound by the outcome, even where it has filed an identical lawsuit prior to the resolution of claims by the arbitrator." *Roderick, Id.,* at *5 [emphasis added]. The court noted that unlike the party's continued involvement in the arbitration in *Nghiem,* here "the arbitration claims had not proceeded past the earliest stages. Whereas plaintiff Nghiem had already reached closing briefs by the time he filed suit in an alternate forum, the parties in the instant case [had] not begun any arguments on the merits. Indeed, their proceedings in arbitration never completed the earliest stage of determining governing rules and assessing conflicts of interest." Judge Patel went on to state that "[u]nder the *Nghiem* reasoning, however, such a difference is immaterial: it is the initiation of arbitration, not the termination of it, which renders the arbitration process binding on the parties." *Id.,* at *5.

Respondents offer *Pension Plan for Pension Trust Fund for Operating Engineers v. Weldway Const., Inc.* (N.D. Cal. 2013) 920 F.Supp.2d 1034 ("*Pension Plan*"). In this district court decision, the court first summarized arbitration waiver cases:

> "Participation in arbitration may, in some circumstances, waive the right to object to arbitration *See Ficek,* 338 F.2d at 657 ("[a] claimant may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrators to act") *Daniel,* 724 F.2d at 1356–1357 (Plaintiff could not reject arbitration after Plaintiff's representative attended two hearings, heard all of the union's evidence, presented some evidence, and requested two continuances, including one continuance to "secure witnesses to refute the evidence presented by the union"); *Nghiem,* 25 F.3d at 1440 (Plaintiff could not challenge the authority of the arbitrator because Plaintiff 'initiated the arbitration, attended the hearings with representation, presented evidence, and submitted a

closing brief of fifty pages'); *Roderick,* 2004 WL 2554453 at *4–*5, 2004 U.S. Dist. LEXIS 22911 at *14–*15 (Plaintiff could not challenge the authority of the arbitrator where the party initiated arbitration but then objected to the arbitrator's procedural decisions). However, not all participation in arbitration waives a party's objection to arbitration. *See Nagrampa,* 469 F.3d at 1278 (Plaintiff did not waive her objection to arbitration where she objected to arbitration at the outset, requested a continuance, sent a letter objecting to the validity of the arbitration (specifically its venue and fee clauses), participated in one conference call that resulted in a scheduling order, and filed a counter-demand and a discovery request to avoid losing the right to do so); *Textile Unlimited, Inc. v. A..BMH and Co., Inc.,* 240 F.3d 781, 784, 788 (9th Cir.2001) (Plaintiff did not waive its objection to arbitration by submitting a letter challenging the arbitration itself, reserving the right to challenge jurisdiction, and stating that nothing in the letter should be deemed a waiver).

"In *Nagrampa,* the Ninth Circuit characterized the relevant inquiry as whether the party 'intentionally relinquished or abandoned [its] right to arbitration.' *Nagrampa,* 469 F.3d at 1278–1279 (citing *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). The court elaborated that 'merely arguing the arbitrability issue to the arbitrator does not indicate a clear willingness to arbitrate that issue.' *Id.* at 1279 (citing *First Options,* 514 U.S. at 946, 115 S.Ct. 1920, 131 L.Ed.2d 985 (considering whether objecting party had consented to arbitration))." Id., 920 F.Supp.2d 1034 at 1047–1048.

The *Pension Plan* court determined that there was no waiver of the right to object to arbitrability:

"Plaintiffs have not waived their objection to arbitration. Plaintiffs' participation in arbitration was limited. In chronological order, Plaintiffs participated in selecting an arbitrator, submitted an answering statement with a counterclaim, agreed to wait for the selected arbitrator to be available, submitted a letter addressing incorrect factual allegations made in Defendants [sic]answer, and participated in a telephonic case management conference. … The Plaintiffs' answer in the arbitration contested the arbitrator's jurisdiction. … According to the letter from the AAA, Plaintiffs would have lost their right to participate in selecting an arbitrator and to make their answering statement, in which they included their counterclaim, had they not done so by [a certain date].…. At the case management conference, Plaintiffs argued that the arbitrator lacked jurisdiction and that the issue of jurisdiction should be decided prior to any proceedings on the merits. …. In any event, as a result of the case management conference, the parties agreed to a briefing schedule to address only the issue of bifurcation….". *Id*. At 1278.

"This case is much closer to *Nagrampa* than it is to those where the Ninth Circuit has found that the plaintiff waived its objection to arbitration. As in *Nagrampa,* Plaintiffs 'forcefully objected to arbitrability' at the outset. *See Negrampa,* 469 F.3d at 1280. There is no indication that Plaintiffs ever withdrew their objection. *See id.* Moreover, Plaintiffs did not proceed to arbitration on the

merits of any issue. *See* id. Rather, Plaintiffs' participation was limited to procedural issues and actions necessary to preserve their rights. *See id.* at 1278."

The scenario here presented leads to the conclusion that Claimant did *not* waive his right to object to arbitration as he clearly and expressly asserted that he was *not* waiving his right to object. This occurred as part of the initial Demand for Arbitration, the Amended Demand, and again during the preliminary hearing on the matter. Claimant requested a briefing schedule as to the issue of arbitrability, and nothing factually substantive was determined by the Arbitrator. There were no hearings on the merits, other than as to the issue of arbitrability; the only determinations made by the Arbitrator concerned preliminary procedural steps including a briefing schedule for this motion along with future dates for the taking of evidence. Mr. De Ayora "was not indicating his unmistakable intent to arbitrate by filing an arbitration demand, he was merely preserving his right to relief…." *Openshaw v. FedEx Ground Package System, Inc.* (C.D. Cal. 2010) 731 F.Supp.2d 987 at 999.

On this record, the Arbitrator finds that Claimant has not intentionally relinquished or abandoned his right to object to arbitration.

V.

PREJUDICE TO RESPONDENTS

Respondents claim that they have sustained prejudice since they have had to pay arbitration fees. However, the existence or non-existence of prejudice is not determinative of whether Claimant intentionally waived his right to object to arbitrability.

VI.

DETERMINATION OF ARBITRABILITY

Respondents next argue that should the Arbitrator determine the issue of waiver in favor of Claimant, determination of the question of arbitrability must be reserved for the court. Relying primarily on *Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 ("*Coinbase*"), Respondents provide that where determination of arbitrability involves conflicting dispute resolution methods, the issue of arbitrability is reserved for the courts.

Claimant seeks a determination that his claims are not arbitrable; Respondents seek to continue with the arbitration process as described in their applicable website.

Rule 11(b) of the "JAMS Comprehensive Arbitration Rules & Procedures" (applicable in this arbitration context) provides as follows:

"Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought … shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter."

*Coinbase*, *Inc. v. Suski,* 602 U.S. 143 (2024) involved execution of two contracts which substantively differed. The Supreme Court presented the issue as follows: "[t]his case thus presents the following question: When two such contracts exist, who decides the arbitrability of a contract-

related dispute between the parties—an arbitrator or the court?" The court relied upon principles of contract law, and provided that a court needs to determine "which contract controls" before either forum selection clause can be enforced. *Id.,* 602 U.S. 143 at p.145.

> "In prior cases, we have addressed three layers of arbitration disputes: (1) merits, (2) arbitrability, and (3) who decides arbitrability. This case involves a fourth: What happens if parties have multiple agreements that conflict as to the third-order question of who decides arbitrability? As always, traditional contract principles apply." *Id.,* 602 U.S. 143 at p. 149.

Here, Claimant pled only that he visited and viewed content on the Arby's Website. Amended Complaint and Demand for Arbitration at ¶¶ 42-44. Likewise, in his declaration, Claimant testified only that he visited the Arby's Website. During oral argument, counsel for Respondents argued that the originally filed COMPLAINT AND DEMAND FOR ARBITRATION named only "INSPIRE BRANDS, LLC" as Respondent. However, even this pleading alleged that Claimant visited the Arby's Website. There is no apparent conflict as to multiple agreements such as existed in *Coinbase.*

It is determined that the question of arbitrability shall be determined by the Arbitrator without the involvement of the court. There is only one arbitration clause at issue, and no more.

VII.

RESPONDENTS' REQUEST FOR LIMITED DISCOVERY

In support of his motion, Claimant provides a declaration declaring that (1) he visited the Arby's Website in 2023; (2) he did not make any purchases; (3) he did not know that his continued use of the Website would subject him to arbitration; (3) he did not see a link at the bottom of the Website to the Terms of Use; and (4) he only agreed that that any continued use of the Website would not be tracked based on the cookie banner.

Respondents seek additional limited discovery prior to determination of arbitrability.

Respondents' opposition asserts that "the Demand" and Claimant's motion "is bereft of any factual allegations regarding his visit" to the Website. However, Claimant's declaration under penalty of perjury in support of his motion contains just that. The issue is whether there is a reasonable basis shown to the Arbitrator for requiring such discovery.

It is noted that Respondents did *not* dispute that the cookie banner presented to Claimant failed to mention the Terms of Use containing the arbitration provision, and did not argue that a hyperlink to the Terms of Use was presented on the Arby's Website, as it was not. There is no showing of any reasonable basis for allowing the pre-Arbitration discovery requested.

Respondents point to, *inter alia*, *Knapke v. PeopleConnect, Inc.,* 38 F.4th 824 (9th Cir. 2022) in support of the request for discovery. The issue there presented was whether an attorney was subject to an arbitration agreement, which in turn required inquiry as to whether an attorney-client relationship had been formed. The District Court noted that it was unclear whether the individuals had such a relationship, and thus an agent-principal relationship. The court noted that the record did not establish whether this relationship had been formed, and that this was material to

determining whether the attorney was bound by the client's agreement to the Terms of Service. On these facts, discovery was permitted. Other cases offered in support seek to ascertain factual evidence affecting the determination of arbitrability.

The instant matter differs from *Knapke* and related cases. Pre-Arbitration discovery would not be required to determine whether Claimant was bound by the Terms of Use. Indeed, there is no evidence presented by Respondents which would support that *any* visit to the website here involved might lead to *any* knowledge of the Terms of Use.

VIII.

<u>CONCLUSION</u>

Based on the foregoing, it is determined that the Arbitrator is without jurisdiction to proceed with the above-referenced Arbitration.

Dated: February 24, 2025

Hon. Gary Nadler (Ret.)
Arbitrator

# EXHIBIT B

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Claimant*

## JAMS

## SAN FRANCISCO REGIONAL OFFICE

| | |
|---|---|
| BENJAMIN PAUL DE AYORA, an individual, on behalf of himself, the general public, and those similarly situated,<br><br>     Claimant,<br><br> v.<br><br>INSPIRE BRANDS, INC. and ARBY'S RESTAURANT GROUP, INC.,<br><br>     Respondents. | Arbitration Case No. 5100002073<br><br>**AMENDED COMPLAINT AND DEMAND FOR ARBITRATION** |

   Claimant Benjamin Paul de Ayora ("Claimant") brings this action on behalf of himself, the general public, and all others similarly situated against Inspire Brands Inc. and Arby's Restaurant Group, Inc. (collectively, "Respondent" or "Inspire").[1] Claimant's allegations are based upon information and belief and upon investigation of Claimant's counsel, except for allegations specifically pertaining to Claimant, which are based upon Claimant's personal knowledge.

---

[1] Claimant files this Amended Complaint and Demand for Arbitration without waiver of any right or argument, including without limitation, that Claimant did not assent to Respondent's arbitration agreement and/or that the purported arbitration agreement is unlawful and/or unenforceable.

**INTRODUCTION**

1.     This Amended Complaint and Demand for Arbitration concerns an egregious privacy violation and total breach of consumer trust in blatant violation of California law. Respondent's websites (specifically, www.arbys.com, www.inspirebrands.com, www.baskinrobbins.com, www.dunkindonuts.com, and order.sonicdrivein.com; each a "Website" and collectively referred to as the "Websites") are configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Websites. At least until it was put on notice, Respondent presented all visitors to the Websites with a popup cookies banner that gave users the option to "DECLINE" cookies. Hundreds of thousands of visitors to these Websites did just that—they selected the "DECLINE" button and proceeded to browse the Websites. But, unbeknownst to them, and contrary to the express rejection of ***all such cookies***, Respondent nonetheless caused cookies—both from Respondent and third parties with notorious privacy records, including Google/DoubleClick and Pinterest—to be stored on Claimant's device and those similarly situated. In doing so, Respondent caused the transmission of broad swaths of data about Claimant, and those similarly situated, to undisclosed third parties, contrary to Respondent's representations and Claimant's and other consumers' express directions.

2.     Many of the third-party cookies that Respondent wrongfully caused to be stored on Claimant's and other consumers' devices are designed to track consumers' behavior across websites for marketing purposes. They are invasive because they allow third parties to track and collect, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; buttons the consumers click; the exact date and time of the website visits; consumers' devices, browsers, and IP addresses; product page visits; and/or data entered by Claimant into forms on the Websites.

3.     Respondent allowed these companies access to Claimant's and other consumers' communications with Respondent and enabled those third parties to collect data on consumers for use for their own purposes, including building profiles of consumers' interests and targeting advertising to them. This type of monitoring and data sharing is exactly what the consumers who

declined cookies sought to avoid. Despite receiving notice of consumers' declination of consent, Respondent defied it and violated privacy statutes, state consumer protection statutes, tort duties, and also breached its contractual duties with Claimant and those similarly situated.[2]

## PARTIES

4.   Claimant Benjamin Paul de Ayora is, and was at all relevant times, an individual and resident of California.

5.   Respondent Inspire Brands, Inc. is a Delaware corporation with its principal place of business in Georgia.

6.   Respondent Arby's Restaurant Group, Inc. is a Delaware corporation with its principal place of business in Georgia.

## SUBSTANTIVE ALLEGATIONS

7.   Respondent owns and operates the website located arbys.com, which allows visitors to, among other things, view content related to Arby's menus and locations (herein referred to as the "Arby's Website").

8.   Inspire Brands, Inc. further owns and operates separate and distinct websites for its several restaurants. At issue in this Amended Complaint and Demand for Arbitration are its Websites for Arby's (at arbys.com, the "Arby's Website"), Inspire Brands (at inspirebrands.com, the "Inspire Brands Website"), Baskin Robbins (at baskinrobbins.com, the "Baskin Robbins Website"), Dunkin Donuts (at dunkindonuts.com, the "Dunkin Donuts Website"), and Sonic Drive-In (at order.sonicdrivein.com, the "Sonic Drive-In Website").

9.   Respondent chose to integrate each of these Websites with cookies from third parties, which, among other things, track users' behavior on the Websites.

10.   Cookies are small text files that website servers can cause to be placed on an Internet user's device when that user's browser interacts with the website through its servers. First-party cookies are those that are placed on the user's browser directly by the webserver with

---

[2] Claimant has not included class allegations in this Amended Complaint and Demand for Arbitration but reserves the right to do so in an amended complaint once the Arbitrator has decided all threshold issues related to this Arbitration, including without limitation jurisdiction, scope, and applicability.

AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

which the user is knowingly communicating (in this case, any and all of these Websites). Third-party cookies are those that are set by other webservers (e.g., doubleclick.net, google.com, etc.). When a consumer visits any of the Websites, both first-party cookies and third-party cookies are placed on that consumer's device. All of this is caused by software code that Respondent incorporates into its Websites, or that Respondent causes to be loaded on its Websites. Because Respondent controls the software code of its Websites, it has complete control over whether first-party and third-party cookies are set on users' devices.

11. Third-party cookies, including those on the Websites, are typically designed to enable companies to track and record an Internet user's communications and activities when visiting Internet websites. Third-party cookies typically work in furtherance of data collection, analytics, behavior profiling, and targeted advertising.

12. Cookies are the backbone of digital advertising. Because cookies enable third parties to track users' behavior across the Internet and correlate data collected to specific users, advertisers and purveyors of websites can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their profiles.

13. As a research director at the Electronic Frontier Foundation put it, third-party cookies allow these companies "to be a silent third-party watching whatever you're doing."[3]

14. Every website is hosted by a server that sends and receives communications with Internet users and their web browsers to display web pages on users' devices.

15. Users communicate with websites by sending HTTP requests, such as "GET" or "POST" requests. For example, when a user clicks on a hyperlink within a website, the user sends an HTTP request to the server hosting the website to which the user is sending the communication. The HTTP request command tells the website server what information is being requested and instructs the website's server to send the information back to the user.

---

[3] Jefferson Graham, Facebook spies on us but not by recording our calls. Here's how the social network knows everything, USA Today (March 4, 2020 4:52 am), https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/.

16.     When a website has third-party cookies, those cookies are simultaneously placed on the user's device. This allows the third-party cookie company to track the Internet user's communication with the website and to correlate the user with data such as the URLs being browsed by the user; the webpage title; button clicks; photo and video views; and the date and time of the website visit.

17.     URLs, for instance, both identify an internet resource and describe its location or address. They often contain the name of the website, folder and sub-folders on the server and the name of the file requested. "[W]hen users enter URL addresses into their web browser using the 'http' web address format, or click on hyperlinks, they are actually telling their web browsers . . . which resources to request and where to find them." *In re Zynga Privacy Litig.,* 750 F.3d 1098, 1101 (9th Cir. 2014). "Thus, the URL provides significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020).

[SPACE LEFT INTENTIONALLY BLANK]

**A.     Respondent's Cookie Pop Up Banners Falsely Informed Consumers They Could Decline Cookies on the Website.**

18.     When users visit the Websites, each Website, immediately displays an identical cookie pop up banner to users. As shown in the screenshot below, the pop up banner states: "We use cookies on our website. By clicking Accept you consent to the use of all cookies. You can access our **Privacy Policy** and change your preferences by clicking the Cookie Settings link." The banner provides users the option to accept or decline cookies as shown on the Arby's Website below:



19.     Each of the Websites makes substantially similar representations in the cookie pop up banner. The Inspire Brands Website, Baskin Robbins Website, Dunkin Donuts Website, and Sonic Drive-In Website all feature the same scheme of prominently displaying a cookie pop

up banner claiming that users can choose whether to accept or decline cookies as shown in the following screenshots:

a.      From the Inspire Brands Website:



AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

b.     From the Baskin Robbins Website:



AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

c.    From the Dunkin Donuts Website:



AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

d.     From the Sonic Drive-In Website:



AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

20.     The Websites' cookie popup banners cause reasonable users to believe that they could decline and reject/opt out of *all* cookies, or at least all marketing and advertising cookies, and that their communications with Respondent would remain private and not be shared with other third parties. They also led reasonable users to believe that by declining and thereby rejecting/opting-out of cookies, Respondent would not share information about their use of the Websites with third parties. Those beliefs, however, are false.

21.     In truth, Respondent did not (and still does not) abide by its users' wishes. Even though Respondent received notice that certain users did not consent to third-party and other cookies when they click the "DECLINE" button, Respondent nonetheless placed third-party cookies on the devices of all users who visit the Websites.

22.     In particular, when users clicked the "DECLINE" button in the cookies banner, Respondent nonetheless continued to cause such third-party cookie data to be transmitted to and from consumers' devices, including cookies from Google/DoubleClick, Pinterest, and more.

23.     The following screenshots show some of the cookies utilized and placed on a users' device after that Website user clicked the "DECLINE" button, indicating their choice/agreement to decline or reject all unnecessary cookies:

AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

a.     From the Arby's Website:



b.     From the Inspire Brands Website:



AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

c.     From the Baskin Robbins Website:



d.     From the Dunkin Donuts Website:



AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

e.    From the Sonic Drive-In Website:



24.    Along with the cookie data, the Websites cause a large amount of other data to be sent to third parties. This data includes, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; button clicks; the exact date and time of the website visits; the IP address of consumers' devices; device and browser type; consumers' geolocation; product page visits; and data consumers supply to the Websites, such as data entered into forms on the Websites; and often identifier data. The identifier data sent to the third party with this information allows that third party to correlate the data to the user or the user's device. As such, third parties can—and almost invariably do—use it to develop and enrich profiles on consumers, like Claimant, and target them with advertising.

25.    The cookies on the Website enable third parties, like Google/DoubleClick and Pinterest, to link individual Website users and devices with data regarding specific browsing activity on the Website.

26.    The cookies that Respondent wrongfully places on users' devices enable third parties to track users' browsing history on the Websites. Every time a Website user visits a new

AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

page on the Websites, even after declining all cookies, more data regarding users' browsing activity is sent to third parties, alongside the cookie data. Google/Double-Click, for instance, sends consumer data to Google's servers each time a consumer clicks on a new page on the Websites, even if that user rejects all cookies.

**B.      Third Parties Exploit Data Received from the Cookies on the Websites**.

27.     The more webpages a Website user browses the Website, the more data third parties amass about the user. The third-party cookies that Respondent wrongfully causes users' browsers to store on users' devices enable third parties to compile a vast repository of users' browsing histories, including Claimant's, and to receive access to information that is otherwise unknowable. These third parties leverage the information collected to their advantage, as they use it to compile browsing histories and habits into personal profiles on consumers, like Claimant, which are sold to advertisers to generate revenue and target advertising to users like Claimant. In particular, third-party cookies, such as those from these Websites, allow third parties to draw inferences from information collected about users' browsing and search history on the Websites to create profiles about consumers reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

28.     For example, DoubleClick (which is owned by Google) is the largest provider of Internet advertising. DoubleClick cookies, among other things, collect data about the user, such as user demographics and/or user behaviors, to create and update a profile of the user which it uses to target advertising to fit the preferences of the particular user.

29.     The data that the third-party cookie companies collect from Website users is valuable to Respondent as well. Data about users' browsing history enables Respondent to spot patterns in users' behavior on the Websites and their interests in, among other things, specific food products.

30.     Tracking cookies, such as the cookies that Respondent falsely claimed that Claimant and other users of the Websites could decline and reject/opt out of, are particularly useful for advertising. For instance, if Respondent wanted to market certain products to users,

Respondent could use tracking cookies to monitor what webpages consumers visit that relate to the specific items. Respondent can then advertise additional products related to the items perused by those particular users across the Internet.

31.     Respondents own Privacy Policy (as of May 5, 2023) admits as much. It states, among other things: "We collect information passively. We use tracking tools to collect site usage and demographic information. Tracking tools include browser cookies and web beacons. We do this on our websites and in emails that we send to you. We collect information about users over time when you use our websites or apps. **We have third parties collect personal information this way.** We collect information about you from third parties. We collect contact, demographic, and site usage information from our business partners. Social media platforms give us information about you. We purchase demographic information from third parties. We may collect information about you from other Inspire Brands companies." (Emphasis added.)

**C.     The Intercepted Data Is Valuable.**

32.     The information that the third-party cookie companies intercept, collect, and track about users through the third-party cookies Respondent causes to be placed on users' devices carries significant economic value. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium." *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004). Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

33.     The value of the users' personal information provided to third parties through the cookies Respondent wrongfully placed can be quantified. For instance, in one study, researchers evaluated the value that one hundred eighty (180) Internet users placed on keeping personal data secure. Participants valued web browsing history at $52.00 per year. Similarly, they valued web search history at $57.00 per year.



**Revealed Value of Personal Data**

| | US$/Year |
|---|---|
| Your social security number / government ID | $240 |
| Credit card information | $150 |
| Digital communication history (chat logs, text messages, emails) | $59 |
| Web search history | $57 |
| Physical location history (your phone or car GPS records) | $55 |
| Web browsing history | $52 |
| Health history (medical records, diet, health routines) | $38 |
| Online advertising click history | $5.7 |
| Online purchasing history | $5.7 |
| Social Profile (hobbies, interests, religious and political views) | $4.6 |
| Contact information (phone number, email or mailing address) | $4.2 |
| Demographic information | $3.0 |

US$/Year, median value, n=180

34.     The value of user-correlated web browsing history can be quantified because companies are willing to pay users for the exact type of data that the third parties here intercepted and collected (without permission) through the cookies on the Websites. For example, Google Inc. had a panel called "Google Screenwise Trends" which, according to Google, is designed "to learn more about how everyday people use the Internet."

35.     As part of the program, panel participants add a browser extension that shares with Google the websites that users visit and how the panelist use those websites. The panelists **consented** to Google tracking this information in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

36.     Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at $5, demonstrates conclusively that Internet industry participants understand the enormous value in Internet users' browsing habits. Google subsequently chose to pay Screenwise users up to $3 per week to be tracked.

37.     Other platforms have appeared where consumers can and do directly monetize their own data. Killi, for instance, is a data exchange platform that allows consumers to own and

earn income from their data.[4] Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[5]

38.    The Nielsen Company is another example. Nielsen has extended its reach to computers and mobile devices through Nielsen Computer and Mobile Panel. When users install Nielsen's application on their computers, phones, tablets, e-readers, or other mobile devices, Nielsen tracks users' activity and enters users into sweepstakes with monetary benefits, in which users can earn points worth up to $50 per month.[6]

39.    Technology companies recognize the monetary value of users' sensitive, personal information insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[7]

40.    The California Consumer Privacy Act ("CCPA") recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers who opt out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA further provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

---

[4] https://killi.io/about-us/
[5] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").
[6] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.
[7] Kari Paul, Google launches app that will pay users for their data, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Saheli Roy Choudhury and Ryan Browne, Facebook pays teens to install an app that could collect all kinds of data, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, Facebook will now pay you for your voice recordings, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-pronunciations-app.

AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

41.     Through its false representations and unlawful data collection and dissemination, Respondent is unjustly enriching itself at the cost of consumer choice, when the consumer would otherwise have the ability to choose how they could monetize their own data.

## CLAIMANT'S EXPERIENCES

42.     During the last year, Claimant visited the Arby's Website and viewed content available on the website.

43.     When Claimant visited the Arby's Website, he was presented with a cookie pop up banner and was given the option to click the button reading "DECLINE."

44.     Consistent with Claimant's typical practice, he clicked the "DECLINE" button, indicating his choice/agreement to decline and/or reject all cookies. Respondent's cookie banner and the "DECLINE" button led Claimant, and those similarly situated, to believe that they declined or rejected **all unnecessary cookies**.

45.     Claimant believed that by selecting the "DECLINE" button would keep his communications with the Website private and that Respondent would not share his communications with the Arby's Website with third parties.

46.     By declining cookies, Claimant gave Respondent notice that he did not consent to the placement of such third-party cookies on his device(s) from the Arby's Website. In reliance on Respondent's representations and promises, only then did Claimant continue browsing the Arby's Website.

47.     Despite the fact that Claimant clicked the "DECLINE" button, expressly indicating his choice/agreement to reject all cookies except those strictly necessary for the Website's function, unbeknownst to him, Respondent nonetheless continued to cause the placement of such third-party cookies, including those from Google/DoubleClick and/or Pinterest, along with others, on his device. In doing so, Respondent caused the transmission of private communications and data to third parties as Claimant browsed the Arby's Website.

48.     Respondent's representations that consumers could decline cookies was untrue. Had Claimant known this fact, he would not have used the Arby's Website. Moreover, Claimant reviewed the cookie popup banner prior to using the Arby's Website. Had Respondent disclosed

that it would continue to cause third party cookies to be stored on Website users' devices even when they choose to decline cookies, Claimant would have noticed it and would not have used the Arby's Website or, at a minimum, would have interacted with it differently.

49. Claimant continues to desire to browse the Arby's Website and would like to browse other, similar websites (including the other Websites), but only those that do not misrepresent that users can decline and reject/opt out of all cookies. If the Arby's Website was reconfigured to honor users' request to decline and reject/opt out of such cookies, Claimant would likely browse the Arby's Website again in the future but will not do so until then. Claimant regularly visits websites that feature content similar to that of the Arby's Website. Because Claimant does not know how the Arby's Website are configured, which can change over time, and cannot test whether the Arby's Website honors users' requests to decline and reject/opt out of all cookies, Claimant will be unable to rely on Respondent's representations when browsing the Arby's Website in the future absent an injunction that prohibits Respondent from making misrepresentations on the Arby's Website, and the other Websites.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Invasion of Privacy Under California's Constitution

50. Claimant realleges and incorporates the paragraphs of this Amended Complaint as if set forth herein.

51. California's constitution creates a right to privacy, and further creates a right of action against private entities such as Respondent.

52. The principal purpose of this constitutional right is to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Respondent.

53. Article I, Section 1 of the California Constitution provides:

All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property and pursuing and obtaining safety, happiness, and privacy.

54.     The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

> The right of privacy is the right to be left alone . . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.[8]

55.     This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data collection activity in contemporary society. Its proponents meant to afford individuals more measure of protection against this most modern threat to personal privacy:

> Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.[9]

56.     In recognizing these privacy rights, the California Constitution provides insight into and serves to define the nature of the reasonable expectation of privacy of an objectively reasonable California resident.

57.     To plead a California constitutional privacy claim, Claimant must show an invasion of (i) a legally protected privacy interest; (ii) where Claimant had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Respondent constituting a serious invasion of privacy.

58.     Respondent has intruded upon the following legally protected privacy interests of Claimant: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts

---

[8] Ballot Pamp., Proposed Stats. & Amends. To Cal. Const. With Arguments to Voters. Gen. Election *26 (Nov. 7, 1972).
[9] *Id.*

AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Claimant's Fourth Amendment right to privacy. Claimant has a reasonable expectation of privacy in the conduct of his life, including his Internet browsing activities and in the electronic communications and exchange of personal data with Respondent, since, among other things, Respondent affirmatively promised Claimant that he could decline and reject/opt out of cookies. Claimant directed his electronic devices to access the Arby's Website, and when he was presented with the cookie popup banner on the website, he reasonably expected that his choice to decline all cookies would be honored. That is, he reasonably believed that Respondent would not cause the placement of such cookies on his device while he browsed the Arby's Website. Claimant also reasonably expected that, if he declined all cookies, Respondent would not share his communications and data with third parties or collect such data itself. Claimant further reasonably expected that the Arby's Website would not cause his browser to store and send cookies and other data to third parties, which then used that data to track Claimant's activity, such as the URLs being browsed by Claimant as well as the referrer URL; webpage title; webpage keywords; the exact date and time of the Arby's Website visits; the IP address of Claimant's computer; product page visits; and/or data that Claimant supplied to the Arby's Website. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an Internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

59.   Respondent, in violation of Claimant's reasonable expectation of privacy, allows third-party cookie companies to collect, track and compile the web browsing activity and communications of Claimant and those similarly situated. The data that Respondent allows third parties to collect enables third parties, such as Google/DoubleClick and Pinterest, to assemble comprehensive profiles of Claimant's life. Those profiles can be, and are, used to further invade Claimant's privacy, by, *inter alia*, allowing third parties to learn intimate details of Claimant's life, and target him for advertising and other purposes as described herein, thereby harming

Claimant through the abrogation of Claimant's autonomy and ability to control dissemination and use of information about himself.

60. Respondent's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications) and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

61. Respondent's intrusion into Claimant's privacy was also highly offensive to a reasonable person in that Respondent violated criminal and civil laws designed to protect individual privacy and against theft.

62. The surreptitious and unauthorized disclosure of the internet activity and communications of thousands, if not millions, of consumers constitutes an egregious breach of social norms.

63. Respondent lacked a legitimate business interest in causing the placement of third-party cookies that allowed third-party companies to track, intercept, receive, and collect data about users and their browsing history without their consent.

64. Claimant has been damaged by Respondent's invasion of his privacy and is entitled to just compensation, including disgorgement of profits related to the unlawful tracking, and injunctive relief.

### SECOND CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act

### California Penal Code § 631

65. Claimant realleges and incorporates by reference all paragraphs alleged herein.

66. California Penal Code § 631(a), which prohibits wiretapping, provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so

AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . .[10]

67.    To establish liability under § 631(a), a Claimant need only establish that a Respondent, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

Cal. Penal Code § 631(a).

68.    Respondent is a "person" within the meaning of California Penal Code § 631.

69.    Under § 631(a), Respondent must show it had the consent of all parties to a communication.

70.    Respondent did not have the consent of all parties to learn the contents of or record Claimant's private communications. Respondent also did not have consent to allow third parties to learn the contents of or record Claimant's private communications.

---

[10] Pursuant to California Penal Code § 637.2, Plaintiff has been injured by the violations of California Penal Code § 631, and each may seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief, attorneys' fees and costs.

71.     Respondent utilizes software code on its Websites, including the Arby's Website, that allows third parties to intercept Claimant's private communications and web activity on the Websites.

72.     The Websites cause the user's browser to store cookies on the user's device from third parties, and to transmit those cookies alongside other data—such as button clicks, and specific URL visits—to the third party. By configuring the Websites in this manner, Respondent intentionally accessed, intercepted, read, learned, and/or collected the electronic communications of Claimant, and aided and abetted the third-party cookie companies such as Google/DoubleClick, Pinterest, among others, to access, intercept, read, learn, and/or collect the electronic communications of Claimant as well.

73.     Section 631(a) is not limited to phone lines, but also applies to "new technologies," such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

74.     The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and even if they do not, Respondent's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner"): (i) the Websites, including the software code modules therein that are designed to cause the transmission of consumers' communications and web activity to third parties; (ii) the third-party cookies on the Websites; (iii) Respondent's computer servers, including the software code modules installed on and/or served by those servers, used to place cookies and/or intercept, aid and abet others to intercept, receive, transmit, read, track, and analyze Claimant's communications; and (iv) the plan Respondent carried out to place cookies and/or intercept, aid

AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

and abet others to intercept, collect, transmit, read, and track Claimant's communications, even though Claimant explicitly declined such actions (collectively, the "Inspire Instruments").

75. The private communications that were intercepted, collected, transmitted, received, tracked, and analyzed by the "machine[s], instrument[s], or contrivance[s]" alleged above included the following:

- internet IP address of the consumer's device;
- the URLs being browsed by the consumer as well as the referrer URL;
- the title of webpage viewed;
- webpage keywords;
- the exact date and time of the website visits;
- device identifiers; and
- data entered into forms on the Websites.

(Collectively, the information listed in the bullet points above shall be referred to as "Private Communications.")

76. By enabling the Inspire Instruments to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications without Claimant's consent, and by aiding and abetting third parties to intercept, collect, transmit, receive, track, and analyze the Private Communications, Respondent violated Section 631(a) of CIPA. In particular, Respondent:

- intentionally tapped, electrically or otherwise, the lines and/or instruments of internet communication being used by consumers like Claimant to access the Websites;
- intentionally made unauthorized connections, electrically or otherwise, with the lines and/or instruments of internet communication being used by consumers like Claimant to access the Websites and allowed third parties to do so;
- willfully, and without the consent of consumers like Claimant, read and learned the contents and/or meaning of Claimant's messages and communications containing Private Communications, while the

AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

same was in transit or passing over lines of internet communication, or was being sent from and received at locations in California and allowed third parties to do so;

- used Claimant's Private Communications to increase Respondent's profits;

- allowed third parties to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications; and

- aided, agreed with, and conspired with other persons (including, without limitation, Google/DoubleClick, Pinterest, and other third-party companies) to unlawfully do, permit, and cause to be done the above-listed activities.

77. Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

78. Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because Claimant frequently uses the Internet to view content related to restaurants such as those owned and operated by Respondent. Claimant continues to desire to use the Internet for that purpose. Claimant has no practical way to know if his choice to decline cookies will be honored and/or whether his actions on the Websites will be monitored or recorded by Respondent and/or third party companies.

79. Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

### THIRD CAUSE OF ACTION

**Violation of the California Invasion of Privacy Act**

**California Penal Code § 635**

80. Claimant realleges and incorporates by reference all paragraphs alleged herein.

81. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of

eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

82. California Penal Code § 635 provides as follows:

Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another, or any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless telephone and a landline telephone in violation of Section 632.6 , shall be punished by a fine not exceeding two thousand five hundred dollars.

83. Respondent intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished one or more wiretap devices (i.e., the Inspire Instruments, including the software code modules therein) primarily or exclusively designed or intended for eavesdropping upon the communication of another (i.e., Claimant).

84. In particular, the Inspire Instruments contain software code modules that are primarily or exclusively designed to enable third parties to intercept, collect, transmit, receive, and track communications that users reasonably (but erroneously) believed would be sent directly and exclusively to Respondent. Further, although Claimant intended to decline and reject all cookies, the software code modules of the Inspire Instruments were designed to (and in fact did) cause the placement of such cookies and software code which were used to intercept, collect, transmit, receive, track, analyze, and sell users' Private Communications to third parties.

85. Claimant did not consent to any of Respondent's actions in implementing the wiretaps.

86. Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

87. Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because he frequently uses the Internet to view content related to restaurants. Claimant continues to desire to use the Internet for that purpose. Claimant has no

practical way to know if his request to decline cookies will be honored and/or whether his actions on the Arby's Website, or other Websites, will be monitored or recorded by Respondent and/or third parties.

88. Claimant seeks all relief available to him and the general public under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

## FOURTH CAUSE OF ACTION

**Violation of the California Comprehensive Computer Data Access and Fraud Act**

**California Penal Code § 502**

89. Claimant realleges and incorporates by reference all paragraphs alleged herein.

90. Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Devices with web browsers are "computers" within the meaning of the statute.

91. Respondent violated Cal. Penal Code § 502(c) by, among other things, (i) knowingly causing Claimant's and other users' devices to be accessed through third-party cookies and third-party software code that causes the transmission of users' data to be transmitted to third-party cookie companies; (ii) knowingly accessing and without permission using Claimant's and other users' data and devices to devise or execute any scheme or artifice to defraud and/or deceive, and wrongfully obtain data; and (iii) knowingly accessing and without permission making use of data from Claimant and other users' computers as well as allowing third parties to do so.

92. Despite Respondent's false representations to the contrary, Respondent was unjustly enriched by acquiring Claimant's sensitive and valuable personal information without permission and using it for Respondent's own financial benefit. Claimant retains a stake in the profits Respondent earned from Claimant's personal browsing history and other data because, under the circumstances, it is unjust for Respondent to retain those profits.

93.     Respondent allowed third parties and itself to access, copy, take, analyze, and use data from Claimant's devices while he was in the State of California. Accordingly, Respondent is deemed to have accessed Claimant's devices in California.

94.     As a direct and proximate result of Respondent's unlawful conduct within the meaning of Cal. Penal Code § 502, Respondent has caused loss to Claimant and has been unjustly enriched.

95.     Claimant seeks compensatory damages and/or disgorgement, and declarative, injunctive, or other equitable relief.

96.     Claimant is entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Respondent's violations were willful and, upon information and belief, Respondent is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

97.     Claimant is also entitled to recover reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

## **FIFTH CAUSE OF ACTION**

### **Violation of the California False Advertising Law,**

### **Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL")**

98.     Claimant realleges and incorporates by reference all paragraphs alleged herein.

99.     Beginning at an exact date unknown to Claimant, but within four (4) years preceding the filing of this Amended Complaint, Respondent, with the intent to directly or indirectly perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before the public and Claimant statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Respondent knew, or in the exercise of reasonable care should have known, were untrue or misleading, in violation of the FAL. In particular, Respondent made untrue, false, deceptive, and/or misleading statements in connection with its Websites' cookies pop up banners.

100.    Respondent's cookie banners assert facts about its services that are untrue and likely to deceive and mislead the public and reasonable consumers. In particular, Respondent

made representations and statements (by omission and commission) that consumers could decline all cookies on the Websites. These representations led reasonable customers to believe that they could reject/opt out of cookies and, in doing so, Respondent would not cause consumers' browsers to place third-party cookies on consumers' devices, nor could third parties collect, receive, intercept, and compile data about users' browsing activity and Private Communications from the Websites. Respondent had a duty to disclose that, despite consumers' election to decline cookies, the Websites would nonetheless cause the user's browser to store cookies and send data to third parties, who can then use that data to track the user's activity.

101.    Claimant, and those similarly situated, relied to their detriment on Respondent's false, misleading, and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Relying on Respondent's misrepresentations about its services—specifically its false and misleading representation that users could decline and reject all cookies on the Websites—Claimant used the Arby's Website.

102.    Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of Claimant's personal information and communications.

103.    Respondent's representations that consumers could decline and reject all cookies if they selected the "DECLINE" button was untrue. Again, had Claimant known these facts, he would not have used the Arby's Website. Moreover, Claimant reviewed the cookie banner prior to using the website. Had Respondent disclosed that it caused such third-party cookies to be stored on consumers' devices even when they choose to decline cookies, Claimant would have noticed it and would not have used these websites.

104.    Respondent's acts and omissions are likely to deceive the general public.

105.    Respondent engaged in these false, misleading, and deceptive advertising and marketing practices to increase its profits. Respondent generated revenue by using the information wrongfully collected to, among other things, engage in targeted advertising.

106.    Accordingly, Respondent has engaged in false advertising, as defined and prohibited by Section 17500, *et seq.* of the California Business and Professions Code.

107.     The aforementioned practices, which Respondent used, and continues to use to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Respondent's competitors as well as injury to the general public.

108.     Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his Private Communications and data.

109.     Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and communications.

110.     Claimant seeks, on behalf of himself and those similarly situated, a declaration that the above-described practices constitute false, misleading, and deceptive advertising.

111.     Claimant seeks full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Respondent from Claimant, and those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

112.     Claimant seeks, on behalf of himself and those similarly situated, an injunction to prohibit Respondent from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Respondent, unless and until enjoined and restrained, will continue to cause injury in fact to the general public and the loss of money and property in that Respondent will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Respondent to which they are not entitled. Claimant, those similarly situated, and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## SIXTH CAUSE OF ACTION

### Violation of the California Unfair Competition Law,

### Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")

113. Claimant realleges and incorporates by reference all paragraphs alleged herein.

114. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging in the practices aforementioned, Respondent has violated the UCL.

115. Respondent is a "person" under Cal. Bus. & Prof. Code § 17201.

116. Respondent created and implemented a scheme to obtain and share the Private Communications and private web activity from web users through a pervasive pattern of false and misleading representations and omissions. Respondent misrepresented to Claimant and other web users that they could decline and reject cookies when, in fact, Respondent caused consumers' browsers to place cookies on consumers' devices, even after users declined cookies. Respondent concealed and failed to disclose to Claimant and other users that it would cause cookies and software code to be stored on consumers' devices which would cause the interception and transmission of data about users' activity on the Websites in general, and the Arby's Website in particular, as well as Private Communications to third parties and Respondent, despite users' clear refusal of such cookies. Further, Respondent failed to disclose to Claimant and web users that these third-party cookies enable third parties to track consumers' behavior across each of the Websites and use that data to compile profiles of consumers for targeted advertising and marketing purposes. In particular, the third-party cookies that Respondent wrongfully places on consumers' devices enables third parties and Respondent to track and collect consumers' Private Communications and browsing history on the Websites. With this information, third parties can (and almost invariably do) develop and enrich profiles on consumers, like Claimant, to, among other things, target advertising to them.

117. These representations and omissions were misleading and deceptive.

118. Respondent's conduct was unfair and unconscionable, particularly because Respondent allowed third parties to intrude on communications that users reasonably believed

to be private and not shared with third parties, despite representing to users of its Websites, and its Arby's Website in particular, that users could decline and reject *all* cookies.

119.     Respondent's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers. Reasonable consumers, including Claimant, would have found it material to their decisions to use the Websites, and the Arby's Website in particular, that Respondent would intercept, collect, transmit, receive, track, and analyze consumers' Private Communications against their wishes and without their consent, and make those Private Communications available to third parties via cookies despite their clear refusal of such cookies. Knowledge of these facts would have been a substantial factor in the consumers' decisions to use the Website.

120.     Respondent's acts and practices constitute a continuing and ongoing unfair business activity defined by the UCL. Respondent's conduct is contrary to the public welfare as it transgresses civil and criminal statutes of the State of California designed to protect individuals' constitutional and statutory rights to privacy, violates established public policy, and has been pursued to attain an unjustified monetary advantage for Respondent by creating personal disadvantage and hardship to users of its Websites. As such, Respondent's business practices and acts have been immoral, unethical, oppressive, and unscrupulous, having caused injury to consumers far greater than any alleged countervailing benefit. Moreover, the harm to consumers, which includes the interception of their communications by third parties, the wrongful collection and tracking of consumers' Private Communications, and the construction of profiles about consumers that third parties and Respondent use for their monetary gain, far outweigh the value of Respondent's conduct (i.e., the wrongful placement of third-party cookies on consumers' devices even when consumers decline cookies).

121.     Further, Respondent's "unfair" acts and practices include its violation of property, economic, and privacy interests protected by the statutes identified above. To establish liability under the unfair prong, Claimant need not establish that these statutes were actually violated, although the claims pleaded herein do so.

122.    Respondent owed Claimant a duty to disclose these facts because they were exclusively known and/or accessible to Respondent, who had superior knowledge of its activities with respect to the Private Communications of Claimant and users; because Respondent actively concealed the facts; and because Respondent intended for consumers to rely on the omissions in question. Moreover, Respondent's omissions were contrary to representations that Respondent actually made to consumers that they could decline and reject cookies.

123.    Claimant, and other users, relied on Respondent's misrepresentations and omissions. Reasonable consumers would have relied on Respondent's promise that they could decline and reject *all* cookies, and, in light of that promise, would have relied on the omissions, particularly because Respondent made representations to the contrary and consumers were not informed that Respondent would cause third-party cookies to be stored on consumers' devices, despite consumers' clear choice to decline third-party cookies.

124.    Respondent's conduct was also unlawful in that it violated the following statutes: the California Invasion of Privacy Act, Cal. Penal Code §§ 502, 630–638; the FAL; and the CLRA. Respondent's conduct also breached the promises Respondent made in its cookie banners.

125.    Moreover, Respondent's conduct was unlawful and violated California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100, *et seq.*, which sets strict standards regarding the collection, use, retention, sharing, and sale of "personal information," including but not limited to, §§ 1798.100(a), (b), (c), (e), 1798.110, 1798.115, 1798.120, 1798.130.

126.    For instance, Respondent violated Cal. Civ. Code § 1798.100(a) and § 1798.115 by (a) informing consumers that they could decline and reject all cookies, but, nonetheless, causing cookies to be placed on users' devices and causing the transmission of consumers' Private Communications when users declined cookies; (b) failing to inform consumers that third-parties would collect their Private Communications; and (c) failing to inform consumers that third-party cookie companies would use data collected to compile profiles on consumers. Respondent further violated Cal. Civ. Code § 1798.100(e) because Respondent collects consumers' personal information and did not implement reasonable security procedures and

practices appropriate to the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Cal. Civ. Code § 1798.81.5. Such security procedures Respondent would have implemented could have been to simply honor consumers' requests to decline and reject cookies.

127.  Respondent also violated Cal. Civ. Code § 1798.120 because it received direction from Claimant and other users to not sell their personal information when they chose to decline and reject cookies, but Respondent nonetheless caused such third-party cookies to be placed on consumers' devices, and thereby selling their Private Communications to third-parties.

128.  Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

129.  Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and communications.

130.  Respondent's representation that consumers could decline and reject cookies if they selected the "DECLINE" button was untrue. Again, had Claimant known these facts, he would not have used the Arby's Website. Moreover, Claimant reviewed the Arby's Website cookie banner prior to using the website. Had Respondent disclosed that it causes third-party cookies to be stored on consumers' devices even after they choose to "DECLINE" cookies, Claimant would have noticed it and would not have used the Arby's Website.

131.  The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Respondent's business. Respondent's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, in the State of California.

132.  Claimant, on behalf of himself and the general public, seeks restitution, injunctive relief, and reasonable attorneys' fees, as well as any other relief deemed proper.

**SEVENTH CAUSE OF ACTION**

**Violation of the Consumers Legal Remedies Act**

**California Civil Code §§ 1750, *et seq.* ("CLRA")**

133. Claimant realleges and incorporates by reference all paragraphs alleged herein.

134. Respondent's actions, representations and conduct described herein have violated, and continue to violate, the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

135. Claimant, and other users, are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

136. The Websites and Respondent's online platform services are "services" under the CLRA.

137. Respondent's representations, set forth in this Amended Complaint, led users of its Websites in general, and the Arby's Website in particular, to falsely believe that they could decline cookies by clicking the "DECLINE" button, and in doing so, Respondent would not cause third-party cookies and third-party software code to be placed on consumers' devices that cause the transmission of consumers' web activity and Private Communications to third parties and allow Respondent and third parties to track consumers' behavior on the Websites. By engaging in the actions, representations, and conduct set forth in this Amended Complaint, Respondent has violated, and continues to violate, § 1770(a)(5), § 1770(a)(7), and § 1770(a)(9) of the CLRA.

138. In violation of California Civil Code § 1770(a)(5), Respondent's acts and practices constitute improper representations that its Websites' services have sponsorship, approval, characteristics, uses, or benefits, which they do not have. In violation of California Civil Code § 1770(a)(7), Respondent's acts and practices constitute improper representations that its Websites' service is of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code § 1770(a)(9), Respondent has advertised services with intent not to sell them as advertised.

139.     Claimant requests that Respondent be enjoined from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Respondent is not restrained from engaging in these types of practices in the future, Claimant and users will continue to suffer harm. Claimant and those similarly situated have no adequate remedy at law to stop Respondent's continuing practices.

140.     On or about May 5, 2023, Respondent was provided with notice and a demand to correct, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Respondent failed to do so. Among other things, it failed to identify consumers, notify them of their right to remedies under the CLRA, and/or to provide that remedy. Accordingly, Claimant seeks, pursuant to California Civil Code § 1780(a)(3), compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Respondent's acts and practices.

141.     Claimant also requests that he be awarded his costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## EIGHTH CAUSE OF ACTION

### Intrusion Upon Seclusion

142.     Claimant realleges and incorporates by reference all paragraphs alleged herein.

143.     To assert a claim for intrusion upon seclusion, a Claimant must plead (i) that the Respondent intentionally intruded into a place, conversation, or matter as to which Claimant had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

144.     By causing third-party cookies to be stored on consumers' devices, which enabled third parties to intercept, collect, transmit, receive, track, and analyze consumers' Internet activity and Private Information in violation of Respondent's representations that consumers could reject/opt out of such cookies, Respondent intentionally intruded upon the solitude or seclusion of users, Respondent effectively placed third-parties, including Google/DoubleClick, Pinterest, among others, in the middle of communications to which they were not invited, welcomed, or authorized.

145.     The tracking and access caused by the cookies that Respondent caused to be stored on consumers' devices was not authorized by Claimant, and, in fact, Claimant specifically declined and rejected all cookies.

146.     Claimant had an objectively reasonable expectation of privacy surrounding his communications and web browsing activity on the Arby's Website based on Respondent's clear and unequivocal promise that users could decline and reject cookies, as well as state criminal and civil laws designed to protect individual privacy.

147.     Respondent's intentional intrusion into Claimant's internet communications and web browsing history would be highly offensive to a reasonable person given that Respondent represented that consumers could decline and reject cookies when, in fact, it caused cookies to be stored on consumers' devices even when consumers declined and rejected cookies. Indeed, Claimant reasonably expected, based on Respondent's false representations, that Respondent would not cause such third-party cookies to be stored on consumers' devices or cause the transmission of Claimant's Internet activities to third parties.

148.     Respondent's conduct was intentional and intruded on Claimant's communications which constitute private searches, web browsing activity, and other data.

149.     Claimant has been damaged as a direct and proximate result of Respondent's invasion of his privacy and is entitled to just compensation. Respondent's invasion of privacy caused Claimant to suffer damages, including but not limited to:

    a.     Nominal damages;

    b.     General damages for invasion of his privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

    c.     Sensitive and confidential information that Claimant intended to remain private is no longer private; and

    d.     Respondent and the third-party cookie companies took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value.

150.     Claimant seeks appropriate relief for that injury, including but not limited to, damages that will reasonably compensate him for the harm to his privacy interests as well as disgorgement of profits made by Respondent as a result of its intrusions upon Claimant's privacy.

## NINTH CAUSE OF ACTION

### Breach of Contract

151.     Claimant realleges and incorporates by reference all paragraphs alleged herein.

152.     Respondent's relationship with its users is governed by, among other documents, the Websites' cookie banners, which contain enforceable promises that Respondent made to Claimant, including but not limited to the following provisions:

- "We use cookies on our website. By clicking Accept you consent to the use of all cookies. You can access our **Privacy Policy** or change your preferences by clicking the Cookie Settings link." (The Websites' Cookie Banners).

- Giving Website users' an option to click the ACCEPT or DECLINE button on the Websites' Cookie Banners

153.     Respondent breached these duties and violated these promises by causing third-party cookies and software code to be stored on consumers' devices that caused the transmission of Claimant's and other users' private web activity and Private Communications to third parties and Respondent, even though Respondent represented that Claimant could decline and reject cookies, and Claimant, in fact, chose to decline and reject cookies by clicking on the "DECLINE" button on the Arby's Website's cookie banner.

154.     Respondent further violated these provisions because Respondent did not honor users' requests to opt-out of the selling and sharing of online data through the use of cookies and similar technologies, as described above, and because Respondent shared users' information with third parties even when users did not consent to such sharing.

155.     At all relevant times and in all relevant ways, Claimant performed his obligation under the contract(s) in question or was excused from performance of such obligations through the unknown and unforeseen conduct of others.

156.     As a direct and proximate result of Respondent's breach of contract, Claimant did not receive the full benefit of the bargain, and instead received services from Respondent that were less valuable than described in their contract. Claimant, therefore, was damaged in an amount at least equal to the difference in value between that which was promised and Respondent's partial, deficient, and/or defective performance.

157.     Respondent's breach caused Claimant the following damages:

    a.     Nominal damages;

    b.     The diminution in value of Claimant's personal information;

    c.     The loss of privacy due to Respondent making sensitive and confidential information that Claimant intended to remain private no longer private;

    d.     Respondent took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value; and

    e.     Claimant suffered an invasion of privacy. Claimant seeks compensatory damages for the invasion of his privacy.

158.     As a direct consequence of the breaches of contract and violations of promises described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, and any other just relief.

## TENTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

159.     Claimant realleges and incorporates by reference all paragraphs alleged herein.

160.     Respondent's relationship with its users is governed by, among other documents, the Websites' cookie banners.

161.     The Websites' cookie banners contain enforceable promises that Respondent made to Claimant and users, including but not limited to the following provisions:

- "We use cookies on our website. By clicking Accept you consent to the use of all cookies. You can access our **Privacy Policy** or change your preferences by clicking the Cookie Settings link." (The Websites' Cookie Banners).
- Giving Website users' an option to click the ACCEPT or DECLINE button on the Websites' Cookie Banners

162. Respondent breached these duties and violated these promises by causing third-party cookies and software code to be stored on consumers' devices that causes the transmission of Claimant's and other users' private web activity and Private Communications to third parties and Respondent, even though Respondent represented that Claimant could decline and reject cookies, and Claimant, in fact, chose to decline and reject cookies.

163. California law recognizes the implied covenant of good faith and fair dealing in every contract.

164. In dealing between Respondent and its users, Respondent is invested with discretionary power affecting the rights of its users.

165. Respondent purports to respect and protect its users' privacy.

166. Despite its contractual promises to allow consumers to decline and reject cookies, Respondent took actions outside that contractual promise to deprive Claimant of benefits of his contract with Respondent.

167. Respondent's own tracking and its allowance of third parties to track and intercept internet communications was objectively unreasonable given its privacy promises.

168. Respondent's unauthorized disclosure of users' personal information to third parties was objectively unreasonable given Respondent's privacy promises.

169. Respondent's conduct in tracking and causing third parties to intercept and track the internet communications of users who declined and rejected cookies evaded the spirit of the bargain made between Respondent and Claimant since it caused Claimant to surrender more data than he otherwise bargained for.

170.     As a result of Respondent's misconduct and breach of its duty of good faith and fair dealing, Claimant suffered damages. Claimant did not receive the benefit of the bargain for which he contracted and for which he paid valuable consideration in the form of his personal information, which, as alleged above, has ascertainable value.

171.     As a direct consequence of the breach of the implied covenant of good faith and fair dealing described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, and any other just relief.

## ELEVENTH CAUSE OF ACTION

### Common Law Fraud, Deceit, and/or Misrepresentation

172.     Claimant realleges and incorporates by reference all paragraphs alleged herein.

173.     Respondent has fraudulently and deceptively informed Claimant that he could decline and reject cookies when, in fact, Respondent causes third-party cookies and software code to be stored on users' devices—including Claimant's—that cause the transmission of Claimant's private web activity and Private Communications to third parties and Respondent when consumers visit the Websites, even after consumers declined and rejected cookies.

174.     These misrepresentations and omissions were known exclusively to, and actively concealed by, Respondent, not reasonably known to Claimant, and material at the time they were made. Respondent knew or should have known how the Websites and cookies on the Websites functioned, through testing the Websites or otherwise, and knew, or should have known, that the Websites placed third party cookies on users' devices—including Claimant's—even after users turned off and rejected such cookies. Respondent's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Claimant as to whether to use the Arby's Website. In misleading Claimant and not so informing him, Respondent breached its duty to him. Respondent also gained financially from, and as a result of, its breach.

175.     Claimant relied to his detriment on Respondent's misrepresentations and fraudulent omissions.

176.     Claimant has suffered an injury-in-fact, including the loss of money and/or property, as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the

unauthorized disclosure and taking of his personal information which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

177. Respondent's actions caused damage to, and loss of, Claimant's property right to control the dissemination and use of his personal information and communications.

178. Respondent's representation that consumers could decline and reject cookies was untrue. Again, had Claimant known these facts, he would not have used the Arby's Website. Moreover, Claimant reviewed the cookie banner prior to using the website. Had Respondent disclosed that it causes third party cookies to be stored on consumers' devices even when consumers declined cookies, Claimant would have noticed it and would not have used the website.

179. By and through such fraud, deceit, misrepresentations, and/or omissions, Respondent intended to induce Claimant, and those similarly situated, to alter their position to their detriment. Specifically, Respondent fraudulently and deceptively induced Claimant, and those similarly situated, to, without limitation, use the the Arby's Website under the mistaken belief that Respondent would not collect data itself or share Claimant's personal data with third parties through cookies when consumers chose to decline and reject cookies.

180. Claimant justifiably and reasonably relied on Respondent's misrepresentations and omissions, and, accordingly, was damaged by Respondent.

181. As a direct and proximate result of Respondent's misrepresentations and/or omissions, Claimant has suffered damages, as alleged above.

182. Respondent's conduct, as described herein, was wilful and malicious and was designed to maximize Respondent's profits even though Respondent knew that it would cause loss and harm to Claimant and other web users.

## TWELFTH CAUSE OF ACTION

### Negligent Misrepresentation

183. Claimant realleges and incorporates by reference all paragraphs alleged herein.

AMENDED COMPLAINT AND DEMAND FOR ARBITRATION

184. Respondent represented to Claimant a fact that was not true, namely, that users could decline and reject cookies. In truth, Respondent caused third-party cookies and software code to be stored on consumers' devices which caused the transmission of users' private web activity and Private Communications to third parties and Respondent, even after users declined cookies.

185. These representations were material at the time they were made. They concerned material facts that were essential to the decisions of Claimant and other users regarding whether to visit and use the Websites.

186. Respondent made identical misrepresentations and omissions to Claimant regarding users' ability to decline and reject all cookies.

187. Respondent should have known its representations were false, and that it had no reasonable grounds for believing them to be true when it made them.

188. Respondent intended that Claimant and users of its Websites, including the Arby's Website, rely on the representations.

189. By and through such negligent misrepresentations, Respondent intended to induce Claimant, and those similarly situated, to alter their positions to their detriment. Specifically, Respondent negligently induced Claimant, and those similarly situated, without limitation, to browse the Arby's Website under the mistaken belief that Respondent would not collect data itself or cause the sharing of Claimant's personal data with third parties when he, and those similarly situated, chose to decline and reject cookies.

190. Claimant, and those similarly situated, reasonably relied on Respondent's representations.

191. Claimant, and those similarly situated, were harmed as set forth above.

192. Claimant's, and those similarly situated, reliance on Respondent's representation was a substantial factor in causing the harm.

## THIRTHEENTH CAUSE OF ACTION

### Trespass to Chattels

193. Claimant realleges and incorporates by reference all paragraphs alleged herein.

194.    At all times relevant, Claimant owned, leased, and/or controlled his devices.

195.    Respondent, intentionally and without consent or other legal justification, caused cookies to be stored on Claimant's browsers and devices, which enabled third parties and Respondent to track Claimant's activity on the Arby's Website and use the data collected for their own advantage, as described above.

196.    Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could decline and reject cookies and its failure to disclose that it causes third-party cookies and software code to be stored on consumers' devices, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent even after consumers decline and reject cookies.

197.    Respondent's intentional and unjustified placing of cookies designed to track Claimant's internet activities and actual tracking of Claimant's activities interfered with his use of the following personal property owned by Claimant: (a) his computers and other electronic devices; and (b) his personally identifiable information.

198.    Respondent's trespass of Claimant's computing devices resulted in harm to Claimant and caused Claimant the following damages:

    a.      Nominal damages for trespass;

    b.      Reduction of storage, disk space, and performance of Claimant's devices; and

    c.      Loss of value of Claimant's devices.

## FOURTEENTH CAUSE OF ACTION

### Unjust Enrichment

199.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

200.    Respondent created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

201.    Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could decline and reject cookies and its failure to disclose that it causes third-party cookies and software code to be stored on consumers' devices, which

cause the transmission of users' private web activity and Private Communications to third parties and Respondent even after consumers decline cookies.

202.    Respondent received a measurable benefit at the expense of Claimant in the form of the additional data Claimant surrendered at his expense.

203.    Respondent appreciated, recognized, and chose to accept the monetary benefits that Claimant conferred onto Respondent to his detriment. These benefits were the expected result of Respondent acting in its pecuniary interest at the expense of Claimant.

204.    It would be unjust for Respondent to retain the value of Claimant's property and any profits earned thereon.

205.    There is no justification for Respondent's enrichment. It would be inequitable, unconscionable, and unjust for Respondent to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct. Claimant is entitled to restitution of the benefits Respondent unjustly retained and/or any amounts necessary to return Claimant to the position he occupied prior to having his Private Communications obtained by Respondent.

## **PRAYER FOR RELIEF**

WHEREFORE, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

A.    An award of compensatory damages, including statutory damages where available, to Claimant against Respondent for all damages sustained as a result of Respondent's wrongdoing, including both pre- and post-judgment interest thereon;

B.    An order for full restitution;

C.    An order requiring Respondent to disgorge revenues and profits wrongfully obtained;

D.    An order temporarily and permanently enjoining Respondent from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Amended Complaint;

E.    For reasonable attorneys' fees and the costs of suit incurred; and

F.    For such further relief as may be just and proper.

Dated: _____, 2024

**GUTRIDE SAFIER LLP**

_/s/Seth A. Safier/s/_
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

_Attorneys for Claimant_

# EXHIBIT C



**NOTICE OF CLOSING FILE**

NOTICE TO ALL PARTIES                                                      April 4, 2025

RE:     **Paul De Avora, Benjamin vs. Inspire Brands, LLC**
        Reference #: 5100002073

Dear Parties:

This letter is to confirm the above referenced matter is closed as of April 4, 2025.

Please contact me should you have any questions.


Sincerely,
/S/ Camryn Garcia
Camryn Garcia
Case Manager
CGarcia@jamsadr.com



# Document Retention Policy

Please note that **30 CALENDAR DAYS** after termination of any case JAMS will destroy the following documents submitted by parties unless parties specifically notify JAMS that they wish to collect their documents:

- **Briefs**
- **Exhibits**
- **Evidence**
- **Transcripts**

Parties should collect their documents as soon as possible after the termination of a case. Otherwise, they will be destroyed 30 days thereafter. Please note that JAMS does not maintain a duplicate file of documents, which are normally forwarded to the Neutral upon receipt. Any items marked with notes, comments or suggestions by the Neutral will automatically be destroyed upon closing of the file.

"Termination" of a case is defined as any of the following:

- **Resolution of a matter, e.g., either through settlement or issuance of an award**
- **Mutual agreement to close the matter**
- **Withdrawal from ADR Process**
- **Time Period of one year elapses without any resolution and no future dates on calendar**
- **Notice from JAMS that the matter has been terminated**