**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

Patrick J. Branson (*pro hac vice*)
patrick@gutridesafier.com
305 Broadway, 7th Floor
New York, NY 10007
Telephone: 415-639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

BENJAMIN PAUL DE AYORA, CHRISTINE WILEY, MIKHAIL GERSHZON, AND GEORGE NINO as individuals, on behalf of themselves, the general public, and those similarly situated,

Plaintiffs,

v.

INSPIRE BRANDS, INC., ARBY'S RESTAURANT GROUP, INC., JIMMY JOHN'S FRANCHISOR SPV, LLC, SONIC INDUSTRIES SERVICES, LLC, DUNKIN' BRANDS, INC.,

Defendants.

CASE NO. 25-cv-3645-AGT

**CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; UNJUST ENRICHMENT; AND TRESPASS TO CHATTELS**

JURY TRIAL DEMANDED

**TABLE OF CONTENTS**

INTRODUCTION ........ 1

THE PARTIES ........ 3

JURISDICTION AND VENUE ........ 4

AYORA RELATED ARBITRATION PROCEEDINGS ........ 4

WILEY RELATED ARBITRATION PROCEEDINGS ........ 5

SUBSTANTIVE ALLEGATIONS ........ 6

A. Defendants Programmed the Websites to Include Third-Party Resources that Utilize Cookie Trackers. ........ 6

B. Defendants Falsely Informed Users that They Could Decline the Websites' Use of Cookies. ........ 11

C. The Private Communications Collected as a Result of Third Party Cookies Transmitted when Visiting Defendants' Websites. ........ 20

1. Google Cookies ........ 20

2. Facebook Cookies ........ 26

3. TikTok Cookies ........ 29

4. Microsoft Clarity Cookies ........ 33

5. Additional Third-Party Cookies ........ 35

D. The Private Communications Collected Are Valuable. ........ 36

PLAINTIFFS' EXPERIENCES ........ 38

AYORA TOLLING ........ 48

WILEY TOLLING ........ 50

CLASS ALLEGATIONS ........ 51

CAUSES OF ACTION ........ 53

First Cause of Action: Invasion of Privacy ........ 53

Second Cause of Action: Intrusion Upon Seclusion ........ 56

Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ........ 58

Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ........ 63

Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation.............. 64
Sixth Cause of Action: Unjust Enrichment........................................................ 67
Seventh Cause of Action: Trespass to Chattels ................................................ 68

Plaintiffs Benjamin Paul de Ayora, Christine Wiley, Mikhail Gershzon, and George Nino (collectively, "Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Inspire Brands, Inc. Arby's Restaurant Group, Inc., and Jimmy John's Franchisor SPV, LLC, Sonic Industries Services, LLC, and Dunkin' Brands, Inc. (collectively, "Defendants" or "Inspire"). Plaintiffs' allegations against Defendants are based upon information, belief, and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law. When consumers visit Defendants' ecommerce websites (www.arbys.com, or the "Arby's Website"; www.inspirebrands.com, or the "Inspire Brands Website"; www.baskinrobbins.com, or the "Baskin Robbins Website"; www.dunkindonuts.com, or the "Dunkin Website"; www.jimmyjohns.com, or the "Jimmy John's Website;" and order.sonicdrivein.com, or the "Sonic Drive-In Website," each a "Website" and, collectively, the "Websites"), Defendants display[1] to them a popup cookie consent banner, which is similar in appearance, form, and function across the Websites. Defendants' cookie banner discloses that the Websites use cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendants assure visitors that they can choose to "Decline" all cookies, as shown in the following exemplar screenshot from the Arby's Website:




2. Like most internet websites, Defendants designed the Websites to include resources and programming scripts from third parties that cause those parties to place cookies

[1] Except where noted otherwise, the structure and operation of each of the Websites is substantially similar for the purposes of the allegations of this Complaint. Accordingly, the term "Website," though singular, shall refer to each of the Websites unless otherwise indicated.

and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike other websites, however, Defendants' Websites offer consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers. But, Defendants' promises are outright lies, designed to lull users into a false sense of security. Even after users elect to "Decline" all cookies, Defendants surreptitiously cause several third parties – including Google LLC (DoubleClick and Google Analytics), Meta Platforms, Inc. (Facebook), ByteDance Ltd. (TikTok), Microsoft Corporation (Microsoft Clarity), Snap Inc. (SnapChat), and Pinterest, Inc. (Pinterest) (collectively, the "Third Parties") – to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Websites.

3. Contrary to their express rejection of cookies and tracking technologies on the Websites, Defendants nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding visitors' behaviors and communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

4. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Californians, Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5. This type of tracking and data sharing is exactly what the Websites' visitors who clicked or selected the "Decline" button on the Websites' cookie consent banners sought to avoid. Defendants falsely told their Websites' users that it respected their privacy and that they

could avoid tracking and data sharing when they browsed the Websites. Despite receiving notice of consumers' express declination of consent, Defendants defied it and violated state statutes, tort duties, and also breached their contractual duties and the implied covenant of good faith and fair dealing with Plaintiffs and those similarly situated users of the Websites.

## THE PARTIES

6. Plaintiff Benjamin Paul de Ayora is, and was at all relevant times, an individual and resident of Los Angeles, California. Plaintiff intends to remain in California and makes his permanent home there.

7. Plaintiff Christine Wiley is, and was at all relevant times, an individual and resident of Long Beach, California. Plaintiff intends to remain in California and makes her permanent home there.

8. Plaintiff Mikhail Gershzon is, and was at all relevant times, an individual and resident of San Francisco, California. Plaintiff intends to remain in California and makes his permanent home there.

9. Plaintiff George Nino is, and was at all relevant times, an individual and resident of Roseville, California. Plaintiff intends to remain in California and makes his permanent home there.

10. Defendant Inspire Brands, Inc. ("Inspire Brands") is a Delaware corporation with its headquarters and principal place of business in Atlanta, Georgia.

11. Defendant Arby's Restaurant Group, Inc. ("Arby's Restaurant Group") is a Delaware corporation with its headquarters and principal place of business in Atlanta, Georgia. Defendant Arby's Restaurant Group operates the Arby's Website.

12. Defendant Jimmy John's Franchisor SPV, LLC ("Jimmy John's Franchisor") is a Delaware corporation with its headquarters and principal place of business in Champaign, Illinois. Defendant Jimmy John's Franchisor operates the Jimmy John's Website.

13. Defendant Dunkin' Brands, Inc. ("Dunkin'") is a Delaware corporation with its headquarters and principal place of business in Canton, Massachusetts. Defendant Dunkin' operates both the Dunkin' Website and the Baskin Robbins Website.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendants are citizens of different states.

15. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendants have engaged, and continues to engage, in substantial and continuous business practices in the State of California, including operating brick-and-mortar restaurants in California, which make online sales to consumers in California.

16. Further, some of the Private Communications and data which are caused to be transmitted to Third Parties when users visit the Websites are routed through servers located in California. And Baskin Robbins, one of Defendants' brands, was founded in California, and California remains the state with the most Baskin Robbins locations. All of the Defendants operate restaurants in California.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

18. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

**AYORA RELATED ARBITRATION PROCEEDINGS**

19. The Arby's Website's Terms of Use contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendants before the Judicial Arbitration and Mediation Services ("JAMS").

20. On April 29, 2024, Plaintiff Ayora filed a demand for arbitration in San Francisco with JAMS against Defendants. Plaintiff Ayora asserted claims in the arbitration arising from the same conduct alleged herein.

21. Arbitrator Gary Nadler was assigned as the arbitrator.

22. Following an initial conference on November 6, 2024, the Arbitrator ordered briefing regarding his jurisdiction and arbitrability.

23. On November 7, 2024, Plaintiff Ayora filed an amended demand for arbitration. *See* Ex. B.

24. After receiving briefing and supporting evidence from the parties, the Arbitrator issued a Determination of Motion on Non-Arbitrability of Claims, dated February 24, 2025, concluding: (a) Plaintiff Ayora did not waive his right to contest arbitrability; (b) the Arbitrator had authority to decide threshold arbitrability issues; and (c) the Arbitrator did not have jurisdiction to hear the case. *See* Ex. A.

25. JAMS subsequently issued a closing letter, dated April 4, 2025, confirming that it had closed the arbitration. *See* Ex. C.

**WILEY RELATED ARBITRATION PROCEEDINGS**

26. On May 10, 2024, Plaintiff Wiley filed a demand for arbitration in San Francisco with JAMS against Defendants Inspire Brands and Jimmy John's Franchisor. Plaintiff Wiley asserted claims in the arbitration arising from the same conduct alleged herein.

27. Arbitrator Gary Nadler was assigned as the arbitrator.

28. Following an initial conference on September 9, 2024, the Arbitrator ordered briefing regarding his jurisdiction and arbitrability.

29. On October 2, 2024, Plaintiff Wiley filed an amended demand for arbitration. *See* Ex. E.

30. After receiving briefing and supporting evidence from the parties, the Arbitrator issued a Final Award, dated January 3, 2025, concluding: (a) Plaintiff Wiley did not waive her

right to contest arbitrability; (b) the Arbitrator had authority to decide threshold arbitrability issues; and (c) the Arbitrator did not have jurisdiction to hear the case. *See* Ex. D.

31. JAMS subsequently issued a closing letter, dated April 29, 2025, confirming that it had closed the arbitration. *See* Ex. F.

## SUBSTANTIVE ALLEGATIONS

### A. Defendants Programmed the Websites to Include Third-Party Resources that Utilize Cookie Trackers.

32. Every website, including each of the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on any of the Websites, the user's browser sends a "GET" request to that Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server knows where to send the HTTP response.

33. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

34. As a result, Defendants knew that the device or devices used by Plaintiffs and Class members to access the Websites was located in California. Defendants' Websites also allow users to locate restaurants near them by allowing the user to input their city or zip code into a form. For example, if a user inputs "94111," on www.arbys.com/locations/, the website

will provide a list of the closest Arby's to that California zip code. All of the Websites have a similar feature.

35. Defendants voluntarily integrated "third-party resources" from the Third Parties into their Websites' programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendants' use of the third-party resources on the Websites is done so pursuant to agreements between Defendants and those Third Parties.

36. The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

37. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, a Websites' servers). First-party cookies are used to track users when they repeatedly visit the same website.

38. A third-party cookie is set by a third-party domain/webserver (e.g., play.google.com; static.g.doubleclick.net; bam.nr-data.net, etc.). When the user's browser loads a webpage (such as the webpages of the Websites) containing embedded third-party resources, the Third Parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Websites) and across multiple browsing sessions.

39. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Websites are transmitted to those third parties, enabling them to surreptitiously track in real time and collect the Websites' users' personal information, such as their browsing activities and private communications with Defendants, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Websites;
- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;
- **User Input Data**: The information the user entered into the Websites' form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;
- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Websites;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Websites during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

40. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

41. Defendants operate several popular fast food and casual restaurant brands, including Arby's, Baskin-Robbins, Dunkin' Donuts, Jimmy John's, and Sonic Drive-In. Defendants own and operate the Websites, which allow visitors to receive information about the restaurant brands and their menu items. As they interact with the Websites (e.g., by entering data into forms, clicking on links, and making selections), the Websites' users communicate Private Communications to Defendants, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping

behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

42. Defendants chose to install or integrate their Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Websites, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants incorporate into their Websites, or that Defendants cause to be loaded. Because Defendants control the software code of their Websites, and are capable of determining whether a user is accessing the Websites from California, they have complete control over whether first-party and third-party cookies are placed on their California users' devices and/or transmitted to third parties.

43. Defendants explained the third-party cookies it used on the Websites as follows, by way of a similar Privacy Policy that appeared on each of the Websites:[2]

> Arby's websites, apps, emails, and advertisements may use tracking technologies such as cookies, web beacons, and pixel tags. These technologies are used to understand user behavior such as assisting us to see what pages people visit on our sites, protecting against security and fraud, facilitating and measuring the effectiveness of advertisements and web searches. For more information about our use of tracking technologies, please see our Ad and Cookie Policy.[3]

44. For the Arby's Website in particular, Defendants further explained their use of third-party cookies on the Website in a separate "Ad and Cookie Policy:"[4]

> **WE USE TRACKING TOOLS.**
>
> We collect personal information about users over time and across different websites when you use our websites and app. We also have third parties that collect personal information this way. To do this, we use several common tracking tools. They may include browser cookies. We may also use web beacons, flash cookies, and similar technologies . . . Our vendors or third parties may place and use these tools on our

[2] Each of Defendants' Websites has their own Privacy Policy. Although the exact phrasing of each Privacy Policy differs from Website to Website, the nature of the disclosures and representations made, especially concerning cookies and tracking technologies is substantially similar on each Website's Privacy Policy.

[3] The Arby's Website Privacy Policy (Last updated: July 2024) (available at https://www.arbys.com/privacy-policy/) (the "Arby's Privacy Policy").

[4] Not all of Defendants' Websites include a separate "Ad and Cookie Policy."

> sites or apps. In this policy, "we" and "us" refers to Inspire Brands and our brands and affiliates. It also includes our vendors and third parties who place tools on our sites and apps.
>
> **WHY WE USE TRACKING TOOLS**
>
> We use tracking tools for many reasons, including to engage in interest-based advertising. Interest-based advertising or "online behavioral advertising" is serving advertising content to you based on information gathered from you over time across multiple sites and other platforms. It includes serving ads to you after you leave our website, encouraging you to return. It also includes serving ads we think are relevant based on your browsing habits or online activities. These ads might be served on websites or on apps. They might also be served in emails. We might serve these ads, or third parties may serve ads . . .
>
> **HOW WE GATHER INFORMATION FOR INTEREST-BASED ADVERTISING**
>
> We use information you make available to us when you interact with us, our affiliates, and other third parties to decide what content is relevant to you. We gather this information using the tracking tools described above. For example, we or our partners might look at your purchases or browsing behaviors. We or our partners might also look at your location. We might look at these activities on our platforms or the platforms of others. We work with third parties who help gather this information. These third parties might link your name or email address to other information they collect. That might include past purchases made offline or online. Or, it might include online usage information.

**B. <u>Defendants Falsely Informed Users that They Could Decline the Websites' Use of Cookies.</u>**

45. When Plaintiffs and other consumers in California visited the Websites, each of the Websites immediately displayed to them a popup cookie consent banner that was similar in appearance, form, and function across each of the Websites. As shown in the screenshots below, the cookie consent banners stated, on each of the Websites, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." The banners also indicated that, rather than choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies, and the banners purported to provide users the opportunity to "Decline" cookies or otherwise manage their "Cookie Settings[,]" as shown in the following screenshots from:

a. The Arby's Website:




b. The Inspire Brands Website:




c. The Baskin Robbins Website:




d. The Dunkin Website:




e. The Jimmy John's Website:




f. The Sonic Drive-In Website:




46. Plaintiffs and other users of the Websites who clicked or selected the "Decline" button, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Websites could then continue to browse the Websites, as the popup cookie consent banners disappeared.

47. Defendants' popup cookie consent banners led Plaintiffs, and all California users of the Websites similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those associated with the Third Parties and targeted advertising, among other activities and practices, as more fully described in Defendants' several Privacy Policies. The banners further reasonably led Plaintiffs and those users of the Websites similarly situated to believe that Defendants would not allow third parties, through cookies, to access their Private Communications with the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Decline" button.

48. Defendants' representations, however, were false. In truth, Defendants did not abide by Plaintiffs' and other users' wishes. When Plaintiffs and other users clicked or selected the "Decline" button, they provided notice to Defendants that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Websites. Nevertheless, Defendants caused the Third-Party tracking cookies to be placed on users' browsers and devices and/or transmitted to the Third Parties along with user data.

49. In particular, when users clicked or selected the "Decline" button, Defendants nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, causing them to collect user data in real time that discloses Website visitors' Private Communications with the Websites, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by declining cookies, Defendants failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

50. Some aspects of the operations of the Third Parties' cookies on the Websites can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following exemplar screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a user's device and browser to the Third Parties even after the user clicked or selected the "Decline" button on each of the Websites' popup cookie consent banners:

a. From the Arby's Website:



b. From the Arby's Website:






c. From the Inspire Brands Website:




d. From the Baskin Robbins Website:




e. From the Dunkin Website:



f. From the Jimmy John's Website:




g. From the Sonic Drive-In Website:



51. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendants' Websites at www.arbys.com, www.inspirebrands.com, www.baskinrobbins.com, www.dunkindonuts.com, www.jimmyjohns.com, and order.sonicdrivein.com, respectively. The screenshots depict only network traffic occurring ***after*** the user declined all cookies using the "Decline" button on the cookie banner. As shown above, despite the user's declination of cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like play.google.com, static.g.doubleclick.net, bam.nr-data.net, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Websites caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected cookies and tracking technologies by clicking or selecting the "Decline" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination or rejection of cookies.

52. Plaintiffs' and other users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

53. As users interact with the Websites, even after clicking or selecting the "Decline" button, thereby declining or rejecting the use of cookies and similar technologies including for targeted advertising purposes as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendants wrongfully allows to be stored on users' devices and browsers, and to be transmitted

to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Websites. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

54. The Third Party code that the Websites cause to be loaded and executed by the user's browser becomes a wiretap when it is executed because it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C. The Private Communications Collected as a Result of Third Party Cookies Transmitted when Visiting Defendants' Websites.**

**1. Google Cookies**

55. Defendants cause third party cookies to be transmitted to and from users' browsers and devices on the Websites, even after users decline or reject all cookies to and from the **google.com**, **doubleclick.net**, and **www.google-analytics.com** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis,

user retargeting, and analytics.[5] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[6] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[7]

56. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[8] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

57. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[9] "To measure a website . . . [one] add[s] a small piece of

---

[5] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[6] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[7] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[8] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[9] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect . . . information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[10]

58. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data —including whether a user is located in California.[11]

59. For example, the Google software code that Defendants cause to be stored on and executed by the user's device when the user visits the Arby's website causes the following type of cookie data to be sent to Google's domain, at https://www.google-analytics.com:

---

[10] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[11] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| v | 2 |
| tid | G-MC1V90WEKG |
| gtm | 45je42c0v885456990z8832957763za200 |
| _p | 1707859547847 |
| gcd | 13l3l3l3l3 |
| npa | 1 |
| dma | 0 |
| cid | 1210184517.1707859310 |
| ul | en-us |
| sr | 2240x1260 |
| uaa | arm |
| uab | 64 |
| uafvl | Not%20A(Brand;99.0.0.0\|Google%20Chrome;121.0.6167.160\|Chromium;121.0.6167.160 |
| uamb | 0 |
| uam | |
| uap | macOS |
| uapv | 13.5.0 |
| uaw | 0 |
| are | 1 |
| pscdl | noapi |
| _s | 6 |
| sid | 1707858272 |
| sct | 1 |
| seg | 1 |
| dl | https://www.arbys.com/menu/ |
| dt | Arby's \| We Have The Meats® |
| en | user_properties |
| ep.is_web_oa | true |
| _et | 75 |
| tfd | 134516 |

60. The "cid" parameter above refers to "Client ID." It contains a unique identifier for the user's browser and device, that causes Google to link the user to their interactions with the website.[12]

[12] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/

61. The "dl" and "dt" parameters tells Google which URL the user is visited, and the title of the page. Here, the url corresponds to the King's Hawaiian Fish Deluxe Medium Meal webpage.

62. Along with this data, the Google software code that Defendants cause to be stored on and executed by the user's device causes the following cookies to be sent to Google's domain:

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| NID | 511=dMm00vjFE3Oiuqx14rscONMy8k38FyKgRMuRuli_-XWB5dAmLXpz_ciQcxsxS_0SFpFV4CJLqgpdqlOlJ7bPSlf24_jCKdNk0mn-NrbhbCAgyAGVXZ-Geapgv387ndzyaRoukr1Lzg82220nvogEaskvVgHbvclPfcpbQT7LiaivZ3e_Wyy5z2aMjQ_JdLa4bgPDDheGbw |
| 1P_JAR | 2024-02-13-21 |

63. According to Google documentation, the The 1P_JAR cookie is used by google for advertising purposes, on its Google Ads platform.[13]

64. The "NID" cookie is also used for Google advertising. Specifically, it is used to show Google ads to users.[14]

65. Further, along with all of this data, the Google software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google, which informs Google of the user's exact operating system and browser.

66. Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

67. The data that Defendants cause to be sent to Google after users visit the Arby's website and reject cookies is representative of the data Defendants cause to be sent to Google when users visit the other Websites and reject cookies. Each of the websites causes cookies and tracking data to be sent to Google, after users reject cookies.

[13] https://business.safety.google/adscookies/.

[14] https://policies.google.com/technologies/cookies?hl=en-US

68. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

69. Thus, the Google cookies used on the Websites cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[15]

70. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to

[15] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[16] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**2. Facebook Cookies**

71. When users browse the Arby's Website, Defendants cause third party cookies to be transmitted to and from users' browsers and devices to and from the **facebook.com** domain, even after users elect to decline or reject all cookies. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[17] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

72. The facebook.com cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Website causes the following data to be sent to Meta when the user views a page:

[16] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[17] https://www.facebook.com/privacy/policies/cookies/.

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| id | 3154817584831198 |
| ev | PageView |
| dl | https://www.arbys.com/menu/ |
| rl | |
| if | false |
| ts | 1707859680257 |
| sw | 2240 |
| sh | 1260 |
| v | 2.9.146 |
| r | stable |
| a | tmSimo-GTM-WebTemplate |
| ec | 2 |
| o | 4126 |
| fbp | fb.1.1707859680257.1314916916 |
| ler | empty |
| cdl | API_unavailable |
| it | 1707859548720 |
| coo | false |
| exp | e1 |
| rqm | FGET |

73. Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the PageView event above:

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| ps_n | 0 |
| sb | 0NLHZVa1OA_mkWrWrlE8Y1ZO |
| datr | 0NLHZVaP5JsYweXoHvN_6XUC |
| locale | en_US |
| c_user | 1345507951 |
| xs | 16%3A_Su0wKTDXj24Xg%3A2%3A1707594493%3A-1%3A2633 %3A%3AAcU_cV9iVRXJ5dBc-3JVu1LJr1DkVSrdb9XH6ae_ZQ |
| fr | 1Rrwi81UWeHs8swuY.AWXhyryGk- VXKtlrqKgUb0ZTlK8.Bly94C..AAA.0.0.Bly94C.AWWRilHTqo0 |

74. The c_user cookie shown above causes Facebook to identify a specific user when they are logged in to their account. The c_user cookie stores a user's unique ID, which is associated with their Facebook profile. This ID causes Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking

"Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

75. In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies cause Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[18] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[19]

76. The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses), which allow Facebook to know that a user is located in California.[20]

77. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide

---

[18] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect

[19] https://allaboutcookies.org/what-data-does-facebook-collect.

[20] *Id.*

data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

**3. TikTok Cookies**

78. Defendants also cause third party cookies to be transmitted to and from the Jimmy John's Website users' browsers and devices, even after users elect to decline or reject all cookies, to and from the **tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing. [21] The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[22]

79. TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[23] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies cause TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

80. These cookies cause TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including

[21] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[22] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[23] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

*email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address, which allow TikTok to know that a user is located in California.[24]

81. For example, the TikTok software code that Defendants cause to be stored on and executed by the Jimmy John's Website user's device causes the following data to be sent to TikTok's domain, at https://analytics.tiktok.com:


```
{
  "event": "",
  "message_id":
  "messageId-1715115331534-3192398725239-CISLOCRC77U6AMT0C4K0",
  "event_id": "",
  "is_onsite": false,
  "timestamp": "2024-05-07T20:55:31.534Z",
  "context": {
    "ad": {
      "sdk_env": "external",
      "jsb_status": 2
    },
    "user": {
      "anonymous_id": "e2DH1EH_gULNfBzcLjfyJyM-Jqb"
    },
    "pixel": {
      "code": "CISLOCRC77U6AMT0C4K0",
      "runtime": "1",
      "codes": "CISLOCRC77U6AMT0C4K0"
    },
    "page": {
      "url": "https://www.jimmyjohns.com/menu/sides",
      "referrer": "https://www.jimmyjohns.com/menu",
      "load_progress": "2"
    },
    "library": {
      "name": "pixel.js",
      "version": "2.1.33"
    },
    "device": {
```


[24] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

```
      "platform": "pc"
    },
    "session_id": "891ac6ac-0cb3-11ef-8a54-08c0eb4a1822::x4KweRdJVZeJipMRAThe",
    "pageview_id": "pageId-1715115324941-3646031125883-CISLOCRC77U6AMT0C4K0",
    "variation_id": "control_1",
    "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/123.0.0.0 Safari/537.36",
    "index": 16
  },
  "_inspection": {},
  "signal_diagnostic_labels": {
    "raw_email": {
      "label": "missing"
    },
    "raw_auto_email": {
      "label": "missing"
    },
    "raw_phone": {
      "label": "missing"
    },
    "raw_auto_phone": {
      "label": "missing"
    },
    "hashed_email": {
      "label": "missing"
    },
    "hashed_phone": {
      "label": "missing"
    }
  },
  "properties": {
    "scroll_times": 7,
    "doc_height": 3126,
    "max_scroll_height": 3125.5
  }
}
```


82. The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[25]

83. The data further indicates, among other things, that the user has viewed the page on the Defendants' website at the url https://www.jimmyjohns.com/menu/sides.

84. Along with this data, the TikTok software code that Defendants cause to be stored on and executed by the user's device causes the "_ttp" and "ttwid" cookies to be sent to TikTok's domain:

[25] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| _ttp | 2b0lelxoLWjT77Rhw4oMCbiahPw |
| passport_csrf_token | 26ab460adad7f907ac0642c6b5519b9e |
| ttwid | 1%7C9gWjm0YzUtfEg_eeKtGJx6imkiTgoiCxzdGG7Fk3Als%7C1711480368%7C54de8174b8e959d578459a1adb6b53b2e64e18c600f7cf39b41b941b1008014a |
| s_v_web_id | verify_lu8r80kn_KsaUonC6_XJtX_4gxm_B2S8_7QMyAkdP6b6X |

85. According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[26]

86. According to TikTok's documentation, "[t]he 'ttwid' first-party cookie is for analytics and web optimisation."[27]

87. Along with all of this data, the TikTok software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok.

88. Finally, the data sent to TikTok includes the user's IP address—including whether a user is located in California.

89. By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[28]

90. Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced

---

[26] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[27] https://www.tiktok.com/legal/page/global/tiktok-website-cookies-policy/en

[28] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

Matching will capture information from those fields . . . . TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[29]

**4. Microsoft Clarity Cookies**

91. Defendants also cause third party cookies to be transmitted to and from the Arby's Website users' browsers and devices, even after users elect to decline or reject all cookies, to and from the **clarity.ms** domain. This domain is associated with Clarity, Microsoft's "cutting-edge behavioral analytics tool that helps you understand user interaction with your website or app".[30] Clarity is a Microsoft Advertising tool, which "crucial for successful marketing."[31] "Clarity's tracking code . . . uses a cookie to obtain user session data."[32]

92. Clarity allows Defendants to "watch live users in action" via "recordings of live user interactions" on the website, including a user's "clicks or taps, scrolling, navigation, and more."[33] Indeed, Clarity boasts that it "tracks all visitor clicks and scrolls on mobile, desktop,




[29] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

[30] https://learn.microsoft.com/en-us/clarity/setup-and-installation/about-clarity.

[31] https://about.ads.microsoft.com/en/blog/post/october-2021/introducing-microsoft-clarity-insights-for-microsoft-advertising.

[32] https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-consent.

[33] https://clarity.microsoft.com/session-recordings.

and tablet[.]" These "session recordings" track each and every consumer's individual actions on the website.[34]

93. Further, Clarity permits Defendants to aggregate individual users' session recordings into "heatmaps" for Defendants' financial gain. Heatmaps are "visualization tool[s]" aimed at "aggregat[ing] information about how users interact with the website." [35] This allows Defendants to "See at a glance which areas on [web site owner's] page drive the most engagement," a crucial element to increasing advertising revenue.[36] Clarity also permits Defendants to "track a specific subset of users," including tracking metrics like what browser users visited from, what type of device, the date, and more. Clarity even permits the use of specific "Clarity user ID[s]" which permits Clarity to track users across their devices, and identify when the same user visits multiple times to the website.[37] Businesses use Clarity to "make data-driven decisions" to "improve overall conversion rates" of clicks, engagement, or sales.[38] Microsoft notes in a Clarity case study that Clarity cookies permitted businesses to see a "substantial increase" in "purchases."[39] In one instance, "following just five days after implementing Clarity, the [business] saw an uplift of 19% in conversion rate."[40] Businesses consider Clarity a "must-have tool for any business serious about optimizing their website and increasing online revenue."[41]

---

[34] https://clarity.microsoft.com/session-recordings.

[35] https://learn.microsoft.com/en-us/clarity/heatmaps/heatmaps-overview.

[36] https://clarity.microsoft.com/heatmaps.

[37] https://clarity.microsoft.com/insights; https://learn.microsoft.com/en-us/clarity/setup-and-installation/identify-api.

[38] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.

[39] *Id.*

[40] *Id.*, emphasis in original.

[41] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.

94. Microsoft collects data from Clarity,[42] which "Microsoft retains . . . for as long as necessary[.]"[43] Clarity cookies allow Microsoft to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) interests and preferences; (iv) shopping behavior; (v) device information; (vi) demographic data; (vii) geolocation data; (viii) referring URL; and (ix) session information. [44]

**5. Additional Third-Party Cookies**

95. Defendants also cause third-party cookies to be transmitted to and from users' browsers and devices on the Websites, even after users elect to decline or reject all cookies, to and from other domains, including (i) snapchat.com; (ii).pinterest.com; and (iii) bam.nr-data.net.

96. The subdomain **tr.snapchat.com** is associated with Snap Inc. (SnapChat), a social media company that uses its cookies to measure users' conduct across distinct websites to help advertisers target ads.[45] SnapChat uses tr.snapchat.com cookies to collect data on browsing history, choices, and interactions with advertisements.[46] This data helps Snapchat personalize ad content and track users across the internet.[47]

97. The **pinterest.com** domain is associated with Pinterest, Inc., a popular social media platform that allows users to discover, save, and share ideas as pins in the form of photos and videos. Businesses can upload and showcase their products through "Shop the Look" pins or Product Pins that directly link to e-commerce websites. Businesses install the Pinterest tag on their websites to track ad conversions. As Pinterest explains, "The Pinterest tag is a piece of code that you add to your website. It lets Pinterest track visitors to your site, as well as the actions they take on your site after seeing your Pinterest ad. This means you can measure how effective your Pinterest ads are by understanding the actions people take on your website after seeing or

---

[42] https://www.microsoft.com/en-us/privacy/privacystatement.

[43] *Id.*

[44] https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-data.

[45] *See* https://snapdiscoveries.com/what-is-tr-snapchat-com-is-used-for.

[46] *Id.*

[47] *Id.*

engaging with your ad."[48] Pinterest cookies can be used to identify and track people who purchase products, add items to a shopping cart, visit specific pages on the website, and/or search for specific items on the website.[49]

98. These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data.

**D. The Private Communications Collected Are Valuable.**

99. As part of their regular course of business, Defendants target California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendants' and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendants cause to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendants knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

100. The Private Communications that the Third Parties track and collect by way of the cookies on the Websites are valuable to Defendants as well as the Third Parties. Defendants can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendants wanted to market certain of their restaurant brands or menu options to consumers in California, Defendants could use the data collected by the Third Parties to monitor the location of users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendants

---

[48] Pinterest Help Center: Install the Pinterest Tag (available at https://help.pinterest.com/en/business/article/install-the-pinterest-tag).

[49] *See, e.g.*, Pinterest Help Center: Add event codes (available at https://help.pinterest.com/en/business/article/add-event-codes); Pinterest Help Center: View tag parameters and cookies (available at https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies).

to target online advertisements to users when they visit ***other*** websites, even those completely unrelated to Defendants and their brands.

101. Data about users' browsing history enables Defendants to spot patterns in users' behavior on the Websites and their interests in, among other things, Defendants' restaurant brands and menu options. On a broader scale, it enables Defendants to gain an understanding of trends happening across their brands and across the fast food and casual restaurant market. All of this helps Defendants further monetize their Websites and maximize revenue by collecting and analyzing user data.

102. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Websites can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[50] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

103. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

104. Through their false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Websites using third-party cookies, Defendants are unjustly enriching themselves at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

---

[50] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

## PLAINTIFFS' EXPERIENCES

**Benjamin Paul de Ayora**

105. Plaintiff Ayora visited the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites to seek information about Defendants' products, while located in California, on one or more occasions during the last four years.

106. Plaintiff Ayora's visits to the Websites were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Ayora is not a consumer advocate, a "tester," or a compliance auditor that visited the Websites to test or evaluate Defendants' privacy practices.

107. When Plaintiff Ayora visited the Arby's Website, the Website detected that he was a visitor in California and immediately presented him with Defendants' popup cookie consent banner, which provided the option to select the "Decline" button . Plaintiff Ayora viewed Defendants' representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Ayora also viewed Defendants' additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

108. Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Ayora selected and clicked the "Decline" button. Plaintiff Ayora believed that selecting the "Decline" button on the popup cookie consent banner found on the Arby's Website would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks for the purpose of providing targeted advertising, among other things).

109. In selecting the "Decline" button, Plaintiff Ayora gave Defendants notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Arby's Website. Further, Plaintiff Ayora specifically rejected, based on Defendants' representations in the Arby's Privacy Policy and elsewhere, those cookies used for targeted advertising and those that share user information with third parties for targeted advertising and

other purposes. In reliance on these representations and promises, only then did Plaintiff Ayora continue browsing the Arby's Website.

110. Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiff Ayora's devices and/or transmitted to the Third Parties along with user data, without Plaintiff Ayora's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Ayora that he could decline the use and/or placement of all cookies and tracking technologies while he browsed the Arby's Website was false. Contrary to what Defendants made Plaintiff Ayora believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendants had already caused that to happen.

111. Then, as Plaintiff Ayora continued to browse the Arby's Website in reliance on the promises Defendants made in the cookie consent banner, Arby's Website Privacy Policy, and elsewhere, and despite Plaintiff Ayora's clear rejection of the use and/or placement of cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of such cookies along with user data, including those involved in providing targeted advertising from the Third Parties, on his devices. In doing so, Defendants caused the Third Parties to track and collect Plaintiff Ayora's Private Communications as he browsed the Arby's Website.

112. Defendants' representations that consumers could "Decline" all cookies while Plaintiff Ayora and users browsed the Arby's Website, or at least "Decline" those cookies and tracking technologies involved in providing targeted advertising, were untrue. Had Plaintiff Ayora known this fact, he would not have used the Arby's Website. Moreover, Plaintiff Ayora reviewed the popup cookie consent banner prior to using the Arby's Website. Had Defendants disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline cookies, Plaintiff Ayora would have

noticed it and would not have used the Arby's Website or, at a minimum, he would have interacted with the Arby's Website differently.

113. Plaintiff Ayora continues to desire to browse content featured on the Websites. Plaintiff Ayora would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Ayora would likely browse the Websites again in the future, but he will not do so until then. Plaintiff Ayora regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Ayora does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to decline all cookies and tracking technologies, Plaintiff Ayora will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Ayora is not a software developer and has not received training with respect to HTTP network calls.

**Christine Wiley**

114. Plaintiff Wiley visited Jimmy John's, Baskin Robbins', and Dunkin's Websites to seek information about Defendant's products, while located in California, on one or more occasions during the last four years.

115. Plaintiff Wiley's visits to the Websites were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Wiley is not a consumer advocate, a "tester," or a compliance auditor that visited the Websites to test or evaluate Defendant's privacy practices.

116. When Plaintiff Wiley visited the Jimmy Johns Website, the Website detected that she was a visitor in California and immediately presented her with Defendant's popup cookie consent banner, which provided the option to select the "Decline" button. Plaintiff Wiley viewed Defendants' representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Wiley also viewed Defendants' additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

117. Consistent with her typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Wiley selected and clicked the "Decline" button. Plaintiff Wiley believed that selecting the "Decline" button on the popup cookie consent banner found on the Jimmy John's Website would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks for the purpose of providing targeted advertising, among other things).

118. In selecting the "Decline" button, Plaintiff Wiley gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Jimmy John's Website. Further, Plaintiff Wiley specifically rejected, based on Defendants' representations in the Jimmy John's Privacy Policy and elsewhere, those cookies used for targeted advertising and those that share user information with third parties for targeted advertising and other purposes. In reliance on these representations and promises, only then did Plaintiff Wiley continue browsing the Jimmy John's Website.

119. Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiff Wiley's devices and/or transmitted to the Third Parties along with user data, without Plaintiff Wiley's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Wiley that she could decline the use and/or placement of all cookies and tracking technologies while he browsed the Jimmy John's Website

was false. Contrary to what Defendants made Plaintiff Wiley believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendants had already caused that to happen.

120. Then, as Plaintiff Wiley continued to browse the Jimmy John's Website in reliance on the promises Defendants made in the cookie consent banner, Jimmy John's Website Privacy Policy, and elsewhere, and despite Plaintiff Jimmy John's clear rejection of the use and/or placement of cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising from the Third Parties, on her devices. In doing so, Defendants caused the Third Parties to track and collect Plaintiff Wiley's Private Communications as she browsed the Jimmy John's Website.

121. Defendants' representations that consumers could "Decline" all cookies while Plaintiff Wiley and users browsed the Jimmy John's Website, or at least "Decline" those cookies and tracking technologies involved in providing targeted advertising, were untrue. Had Plaintiff Wiley known this fact, she would not have used the Jimmy John's Website. Moreover, Plaintiff Wiley reviewed the popup cookie consent banner prior to using the Jimmy John's Website. Had Defendants disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline cookies, Plaintiff Wiley would have noticed it and would not have used the Jimmy John's Website or, at a minimum, she would have interacted with the Jimmy John's Website differently.

122. Plaintiff Wiley continues to desire to browse content featured on the Websites. Plaintiff Wiley would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Wiley would likely browse the Websites again in the future, but he will not do so until then. Plaintiff Wiley regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Wiley does not know how the Websites are programmed, which can change over time, and because she does not have the

technical knowledge necessary to test whether the Websites honor users' requests to decline all cookies and tracking technologies, Plaintiff Wiley will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Wiley is not a software developer and has not received training with respect to HTTP network calls.

**Mikhail Gershzon**

123. Plaintiff Gershzon visited the Baskin Robbins and Arby's Websites to seek information about Arby's products, while located in California, on one or more occasions during the last four years.

124. Plaintiff Gershzon's visit(s) to the Website was consistent with a typical Website user's visits seeking information about Baskin Robbins and Arby's products. Specifically, Plaintiff Gershzon is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendants' privacy practices.

125. When Plaintiff Gershzon visited the Arby's Website, the Website detected that he was a visitor in California and immediately presented him with Defendants' popup cookie consent banner, which provided the option to select the "Decline" button. Plaintiff Gershzon viewed Defendants' representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Gershzon also viewed Defendants' additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

126. Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Gershzon selected and clicked the "Decline" button. Plaintiff Gershzon believed that selecting the "Decline" button on the

popup cookie consent banner found on the Arby's Website would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks for the purpose of providing targeted advertising, among other things).

127. In selecting the "Decline" button, Plaintiff Gershzon gave Defendants notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Arby's Website. Further, Plaintiff Gershzon specifically rejected, based on Defendants' representations in the Arby's Privacy Policy and elsewhere, those cookies used for targeted advertising and those that share user information with third parties for targeted advertising and other purposes. In reliance on these representations and promises, only then did Plaintiff Gershzon continue browsing the Arby's Website.

128. Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiff Gershzon's devices and/or transmitted to the Third Parties along with user data, without Plaintiff Gershzon's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Gershzon that he could decline the use and/or placement of all cookies and tracking technologies while he browsed the Arby's Website was false. Contrary to what Defendants made Plaintiff Gershzon believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendants had already caused that to happen.

129. Then, as Plaintiff Gershzon continued to browse the Arby's Website in reliance on the promises Defendants made in the cookie consent banner, Arby's Website Privacy Policy, and elsewhere, and despite Plaintiff Gershzon's clear rejection of the use and/or placement of cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising from the Third Parties, on his devices. In doing so, Defendants caused the

Third Parties to track and collect Plaintiff Gershzon's Private Communications as he browsed the Arby's Website.

130. Defendants' representations that consumers could "Decline" all cookies while Plaintiff Gershzon and users browsed the Arby's Website, or at least "Decline" those cookies and tracking technologies involved in providing targeted advertising, were untrue. Had Plaintiff Gershzon known this fact, he would not have used the Arby's Website. Moreover, Plaintiff Gershzon reviewed the popup cookie consent banner prior to using the Arby's Website. Had Defendants disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline cookies, Plaintiff Gershzon would have noticed it and would not have used the Arby's Website or, at a minimum, he would have interacted with the Arby's Website differently.

131. Plaintiff Gershzon continues to desire to browse content featured on the Websites. Plaintiff Gershzon would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Gershzon would likely browse the Websites again in the future, but he will not do so until then. Plaintiff Gershzon regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Gershzon does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to decline all cookies and tracking technologies, Plaintiff Gershzon will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to

whom. Plaintiff Gershzon is not a software developer and has not received training with respect to HTTP network calls.

**George Nino**

132. Plaintiff Nino visited each of the following Websites: www.arbys.com; www.baskinrobbins.com; www.dunkindonuts.com, www.jimmyjohns.com, and order.sonicdrivein.com, to seek information about each restaurant's products, while located in California, on one or more occasions during the last four years.

133. Plaintiff Nino's visit(s) to the Websites was consistent with a typical Website user's visits seeking information about Defendants' fast food products and restaurant locations near him. Specifically, Plaintiff Nino is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendants' privacy practices.

134. When Plaintiff Nino visited the Websites, the Website detected that he was a visitor in California and immediately presented him with Defendants' popup cookie consent banner, which provided the option to select the "Decline" button . Plaintiff Nino viewed Defendants' representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Nino also viewed Defendants' additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

135. Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Nino selected and clicked the "Decline" button. Plaintiff Nino believed that selecting the "Decline" button on the popup cookie consent banner found on the Websites would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks for the purpose of providing targeted advertising, among other things).

136. In selecting the "Decline" button, Plaintiff Nino gave Defendants notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the

Websites. Further, Plaintiff Nino specifically rejected, based on Defendants' representations in Defendants' Privacy Policies and elsewhere, those cookies used for targeted advertising and those that share user information with third parties for targeted advertising and other purposes. In reliance on these representations and promises, only then did Plaintiff Nino continue browsing the Websites.

137. Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiff Nino's devices and/or transmitted to the Third Parties along with user data, without Plaintiff Nino's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Nino that he could decline the use and/or placement of all cookies and tracking technologies while he browsed the Websites was false. Contrary to what Defendants made Plaintiff Nino believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendants had already caused that to happen.

138. Then, as Plaintiff Nino continued to browse the Websites in reliance on the promises Defendants made in the cookie consent banner, Website's Privacy Policies, and elsewhere, and despite Plaintiff Nino's clear rejection of the use and/or placement of cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising from the Third Parties, on his devices. In doing so, Defendants caused the Third Parties to track and collect Plaintiff Nino's Private Communications as he browsed the Websites.

139. Defendants' representations that consumers could "Decline" all cookies while Plaintiff Nino and users browsed the Websites or at least "Decline" those cookies and tracking technologies involved in providing targeted advertising, were untrue. Had Plaintiff Nino known this fact, he would not have used the Websites. Moreover, Plaintiff Nino reviewed the popup cookie consent banner prior to using the Websites. Had Defendants disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even

after they choose to decline cookies, Plaintiff Nino would have noticed it and would not have used the Websites or, at a minimum, he would have interacted with the Websites differently.

140. Plaintiff Nino continues to desire to browse content featured on the Websites. Plaintiff Nino would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Nino would likely browse the Websites again in the future, but he will not do so until then. Plaintiff Nino regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Nino does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to decline all cookies and tracking technologies, Plaintiff Nino will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Nino is not a software developer and has not received training with respect to HTTP network calls.

## AYORA TOLLING

141. The delayed discovery rule applies to Plaintiff Ayora's claims. Plaintiff Ayora was unaware that even though he declined all cookies on the Arby's Website, Defendants caused cookies, including the Third Parties' cookies, to be sent to his browsers, stored on his devices, and transmitted to the Third Parties along with his private user data until on or around October 15, 2023 when he learned of Defendants' privacy violations from his counsel. As alleged above, Plaintiff Ayora does not have the expertise to test whether the Arby's Website honored users' requests to opt out of cookies and tracking technologies.

142. On or about October 30, 2023, Plaintiff Ayora notified Defendant Inspire Brands, Inc. that he alleged that its Websites caused third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the Websites despite consumers' clear rejection or declination of such third-party cookies. Plaintiff Ayora further represented that he intended to pursue his claims on behalf of himself and other similarly situated class members.

143. The Arby's Website's Terms of Use contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendants before the JAMS.

144. Accordingly, Plaintiff Ayora subsequently filed an arbitration demand against Defendants Inspire Brands and Arby's Restaurant Groups with the JAMS, in which he provided Defendants with further notice of the claims asserted in this Complaint and his intent to pursue those claims on behalf of himself and other similarly situated class members.

145. The JAMS issued a closing later (dated April 4, 2025), after the Arbitrator issued a final order/award (dated February 24, 2025) concluding: (a) Plaintiff Ayora did not waive his right to contest arbitrability; (b) the Arbitrator had authority to decide threshold arbitrability issues; and (c) the Arbitrator did not have jurisdiction to hear the case. Exhibit A.

146. Despite exercising reasonable diligence, Plaintiff Ayora was unaware of Defendants' fraudulent and unlawful conduct alleged herein due to their active concealment of material facts, which prevented Plaintiff Ayora from discovering his claims within the statute of limitations. Further, Plaintiff Ayora's claims were equitably tolled by his demand letter and his filing of the JAMS arbitration proceeding because Defendants had notice of the claims (and Plaintiff Ayora's intent to pursue them in court as a putative class action). Defendants were not prejudiced in their ability to gather evidence for Plaintiff Ayora's claims since his claims asserted in this Complaint are substantially similar to those raised in the demand letter and arbitration proceeding. These extraordinary circumstances, including Defendants' intentional misrepresentations and Plaintiff Ayora's pursuit of his claims in the arbitration proceeding,

warrant tolling of the statute of limitations to allow Plaintiff Ayora to pursue his claims in this forum. Plaintiff Ayora acted in good faith and engaged in reasonable conduct in filing his Complaint in this action.

**WILEY TOLLING**

147. The delayed discovery rule applies to Plaintiff Wiley's claims. Plaintiff Wiley was unaware that even though she declined all cookies on the Jimmy John's Website, Defendants caused cookies, including the Third Parties' cookies, to be sent to her browsers, stored on her devices, and transmitted to the Third Parties along with her private user data until on or around July 22, 2023 when she learned of Defendants' privacy violations from her counsel. As alleged above, Plaintiff Wiley does not have the expertise to test whether the Jimmy John's Website honored users' requests to opt out of cookies and tracking technologies.

148. On or about February 13, 2024, Plaintiff Wiley notified Defendant Inspire Brands, Inc. that she alleged that its Websites caused third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the Websites despite consumers' clear rejection or declination of such third-party cookies. Plaintiff Wiley further represented that she intended to pursue her claims on behalf of herself and other similarly situated class members.

149. The Jimmy John's Website's Terms of Use contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendants before the JAMS.

150. Plaintiff Wiley subsequently filed an arbitration demand against Defendant Inspire Brands, Inc. and Defendant Jimmy John's Franchisor SPV, LLC with the JAMS on May 10, 2024, in which she provided them with further notice of the claims asserted in this Complaint and her intent to pursue those claims on behalf of herself and other similarly situated class members.

151. The Arbitrator issued a final order/award (dated January 3, 2025) concluding: (a) Plaintiff Wiley did not waive her right to contest arbitrability; (b) the Arbitrator had authority to

decide threshold arbitrability issues; and (c) the Arbitrator did not have jurisdiction to hear the case. *See* Ex. D. JAMS subsequently issued a closing letter, dated April 29, 2025, confirming that it had closed the arbitration. *See* Ex. F.

152. Despite exercising reasonable diligence, Plaintiff Wiley was unaware of Defendants' fraudulent and unlawful conduct alleged herein due to their active concealment of material facts, which prevented Plaintiff Wiley from discovering her claims within the statute of limitations. Further, Plaintiff Wiley's claims were equitably tolled by her demand letter and her filing of the JAMS arbitration proceeding because Defendants had notice of the claims (and Plaintiff Wiley's intent to pursue them in court as a putative class action). Defendants were not prejudiced in their ability to gather evidence for Plaintiff Wiley's claims since her claims asserted in this Complaint are substantially similar to those raised in the demand letter and arbitration proceeding. These extraordinary circumstances, including Defendants' intentional misrepresentations and Plaintiff Wiley's pursuit of her claims in the arbitration proceeding, warrant tolling of the statute of limitations to allow Plaintiff Wiley to pursue her claims in this forum. Plaintiff Wiley acted in good faith and engaged in reasonable conduct in initiating this action.

## CLASS ALLEGATIONS

153. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed any of the Websites in the State of California after clicking or selecting the "Decline" button in the popup cookies consent banner from April 29, 2021 to present.

154. This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

155. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

156. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendants would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to decline all cookies and tracking technologies on the Websites, nor would Defendants permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

157. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendants' actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

158. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited one or more of the Websites, declined all cookies, and had their confidential Private Communications intercepted by the Third Parties.

159. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of

Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendants' liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

160. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

161. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

162. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendants constituting a serious invasion of privacy.

163. Defendants have intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

164. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendants affirmatively promised users they could "Decline" all cookies and tracking technologies before proceeding to browse the Websites. Plaintiffs and other Class members directed their electronic devices to access the Websites and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members declined cookies and reasonably expected that their declination of cookies and tracking technologies would be honored. That is, they reasonably believed that Defendants would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Websites. Plaintiffs and Class members also reasonably expected that, if they declined cookies and/or tracking technologies, Defendants would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Websites.

165. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

166. Defendants, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendants allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

167. Defendants' actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

168. Defendants' intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

169. Defendants lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

170. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

171. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

172. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**<u>Second Cause of Action</u>: Intrusion Upon Seclusion**

173. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

174. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

175. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendants' representations otherwise in the popup cookie consent banner, Defendants intentionally intruded upon the solitude or seclusion of their Websites' users. Defendants effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

176. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Websites using third-party cookies that Defendants caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Websites' users specifically chose to "Decline" cookies.

177. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Websites based on Defendants' promise that users could "Decline" cookies, as well as state criminal and civil laws designed to protect individual privacy.

178. Defendants' intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendants represented that their Websites' users could "Decline" cookies, when, in fact, Defendants caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers declined cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendants' false representations, that when they declined all cookies and tracking technologies, Defendants would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

179. Defendants' conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Websites.

180. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

181. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well

as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

182. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**<u>Third Cause of Action</u>: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

183. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

184. California Penal Code § 631(a) provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

185. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

186. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360–61 (emphasis supplied; internal citations omitted).

187. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192–93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendants, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

188. CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

189. Each Defendant is a "person" within the meaning of California Penal Code § 631.

190. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

191. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendants' deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

192. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendants, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

193. Under § 631(a), Defendants must show they had the consent of all parties to a communication.

194. At all relevant times, the Websites caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Websites in this manner, Defendants willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

195. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of

electronic communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

196. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, that the Third Parties automatically intercepted directly communicates the Websites' user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

197. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

198. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendants aiding, agreeing with, employing, permitting, or otherwise causing the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to decline all cookies in the consent banner.

199. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Websites and where the Third Parties—as caused by Defendants—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after

downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

200. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

201. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendants' violations of CIPA § 631(a), as well as injunctive relief.

202. Unless enjoined, Defendants will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to fast food and casual restaurants. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to decline cookies and tracking technologies will be honored and/or whether Defendants will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Further, Defendants have already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

203. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

204. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

205. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

206. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

207. The Third Parties' cookies and the corresponding software code installed by Defendants on their Websites are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

208. At all relevant times, Defendants caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15–16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5–11 (N.D. Cal. Oct. 21, 2024).

209. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute

the content of Plaintiffs' and the Class members' electronic communications with the Websites. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication . . .") (cleaned up).

210. Plaintiffs and Class members did not provide their prior consent to Defendants' use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendants that they did not consent to the Websites' use of third-party cookies by clicking or selecting the "Decline" button in the cookie consent banner.

211. Defendants did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

212. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

213. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendants' violations of § 638.51(a).

**<u>Fifth Cause of Action</u>: Common Law Fraud, Deceit and/or Misrepresentation**

214. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

215. Defendants fraudulently and deceptively informed Plaintiffs and Class members that they could "Decline" all cookies.

216. However, despite Defendants' representations otherwise, Defendants caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected the "Decline" button in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Decline" cookies.

217. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendants, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendants knew, or should have known, how the Websites functioned, including the Third Party's resources it installed on the Websites and the third-party cookies in use on the Websites, through testing the Websites, evaluating their performance metrics by means of their accounts with the Third Parties, or otherwise, and knew, or should have known, that the Websites' programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to "Decline" cookies, which Defendants promised their Websites' users they could do. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Websites. In misleading Plaintiffs and Class members and not so informing them, Defendants breached their duty to Plaintiffs and Class members. Defendants also gained financially from, and as a result of, their breach.

218. Plaintiffs and Class members relied to their detriment on Defendants' misrepresentations and fraudulent omissions.

219. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendants' unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

220. Defendants' actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

221. Defendants' representation that consumers could "Decline" all cookies (including those cookies associated with targeted advertising) if they clicked or selected the "Decline" button was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Websites. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Websites. Had Defendants disclosed that it caused third-party cookies to be stored on the Websites' visitors' devices that are related to targeted advertising and/or share information with third parties even after they choose to decline cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Websites.

222. By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Websites under the mistaken belief that Defendants would not permit third parties to obtain users' Private Communications when consumers chose to decline cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

223. Plaintiffs and Class members justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants' conduct.

224. As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

225. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and

Plaintiffs' and Class members' declination of the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**<u>Sixth Cause of Action</u>: Unjust Enrichment**

226. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

227. Defendants created and implemented a scheme to increase their own profits through a pervasive pattern of false statements and fraudulent omissions.

228. Defendants were unjustly enriched as a result of their wrongful conduct, including through their misrepresentation that users could "Decline" all cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members declined cookies.

229. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendants.

230. Defendants have been unjustly enriched at the expense of Plaintiffs and Class members, and Defendants have unjustly retained the benefits of their unlawful and wrongful conduct.

231. Defendants appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendants at their detriment. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of Plaintiffs and Class members.

232. It would be unjust for Defendants to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

233. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

234. Plaintiffs and Class members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

235. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

**Seventh Cause of Action: Trespass to Chattels**

236. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

237. Defendants, intentionally and without consent or other legal justification, caused cookies to be stored on Plaintiffs' and Class members' browsers and devices, which caused the Third Parties and Defendants to track and collect Plaintiffs' and Class members' Private Communications and use the data collected for their own advantage, as described above.

238. Defendants were unjustly enriched as a result of their wrongful conduct, including through their misrepresentation that users could decline all cookies and tracking technologies, and through their failure to disclose that Defendants causes third-party cookies to be stored on consumers' devices and browsers, which cause the Third Parties and Defendants to track and collect Plaintiffs' and Class members' Private Communications even after consumers chose to decline cookies.

239. Defendants intentionally caused third party software code to be stored onto Plaintiffs' and Class members' devices, knowing that the code would be executed by those devices. The software code then placed and/or transmitted cookies along with Plaintiffs' and Class members' Private Communications to the Third Parties. These intentional acts interfered with Plaintiffs' and Class members' use of the following personal property owned, leased, or

controlled by Plaintiffs and other users: (a) their computers and other electronic devices; and (b) their personally identifiable information.

240. Defendants' trespass of Plaintiffs' and other users' computing devices resulted in harm to Plaintiffs and other users and caused Plaintiffs and other users the following damages:

a. Nominal damages for trespass;

b. Reduction of storage, disk space, and performance of Plaintiffs' and other users' computing devices; and

c. Loss of value of Plaintiffs' and other users' computing devices.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendants as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendants to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Dated: August 18, 2025

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

Patrick J. Branson (*pro hac vice*)
patrick@gutridesafier.com
305 Broadway, 7th Floor
New York, NY 10007
Telephone: 415-639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*