**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

Patrick J. Branson (*pro hac vice*)
patrick@gutridesafier.com
305 Broadway, 7th Floor
New York, NY 10007
Telephone: 415-639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BENJAMIN PAUL DE AYORA, CHRISTINE WILEY, MIKHAIL GERSHZON, AND GEORGE NINO as individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INSPIRE BRANDS, INC., ARBY'S RESTAURANT GROUP, INC., JIMMY JOHN'S FRANCHISOR SPV, LLC, SONIC INDUSTRIES SERVICES, LLC, DUNKIN' BRANDS, INC.,<br><br>Defendants. | CASE NO. 25-cv-3645-AGT<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT**<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS


INTRODUCTION ........ 1

THE PARTIES ........ 3

JURISDICTION AND VENUE ........ 4

AYORA RELATED ARBITRATION PROCEEDINGS ........ 5

WILEY RELATED ARBITRATION PROCEEDINGS ........ 6

SUBSTANTIVE ALLEGATIONS ........ 6

A. Defendants Programmed the Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ........ 6

B. The Arby's Website (Plaintiffs Ayora, Gershzon, and Nino) ........ 10

i. Defendants Arby's and Inspire Programmed the Arby's Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ........ 10

ii. Defendants Arby's and Inspire Falsely Informed Users that They Could Decline the Arby's Website's Use of Cookies. ........ 12

C. The Baskin Robbins Website (Plaintiffs Ayora, Wiley, Gershzon, and Nino) ........ 17

i. Defendants Dunkin and Inspire Programmed the Baskin Robbins Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ........ 17

ii. Defendants Dunkin and Inspire Falsely Informed Users that They Could Decline the Baskin Robbins Website's Use of Cookies ........ 18

D. The Dunkin Website (Plaintiffs Ayora, Wiley, and Nino) ........ 22

i. Defendants Dunkin and Inspire Programmed the Dunkin Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ........ 22

ii. Defendants Dunkin and Inspire Falsely Informed Users that They Could Decline the Dunkin Website's Use of Cookies. ........ 24

E. The Jimmy John's Website (Plaintiffs Ayora, Wiley, and Nino) ........ 28

i. Defendants Jimmy John's and Inspire Programmed the Jimmy John's Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ........ 28

ii. Defendants Jimmy John's and Inspire Falsely Informed Users that They Could Decline the Jimmy John's Website's Use of Cookies. ........ 29

F. The Sonic Website (Plaintiff Nino) ........ 34

i. Defendants Jimmy John's and Inspire Programmed the Jimmy John's Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. .......... 34

ii. Defendants Sonic and Inspire Falsely Informed Users that They Could Decline the Sonic Website's Use of Cookies. .......... 35

G. The Private Communications Intercepted and Collected Through Third Party Cookies on Defendants' Websites. .......... 39

i. Google Cookies .......... 39

ii. Facebook Cookies .......... 45

iii. TikTok Cookies .......... 48

iv. Microsoft Clarity Cookies .......... 52

v. Additional Third-Party Cookies .......... 54

H. The Third Parties Intercept User Communications While in Transit .......... 55

I. The Private Communications Collected Are Valuable. .......... 60

PLAINTIFFS' EXPERIENCES .......... 61

AYORA TOLLING .......... 76

WILEY TOLLING .......... 77

CLASS ALLEGATIONS .......... 79

CAUSES OF ACTION .......... 81

First Cause of Action: Invasion of Privacy (all Plaintiffs) .......... 81

Second Cause of Action: Intrusion Upon Seclusion (All Plaintiffs) .......... 83

Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) (Plaintiffs other than Wiley) .......... 85

Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) (Plaintiffs other than Wiley) .......... 90

Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation (All Plaintiffs) .......... 92

Sixth Cause of Action: Unjust Enrichment (All Plaintiffs) .......... 94

Plaintiffs Benjamin Paul de Ayora, Christine Wiley, Mikhail Gershzon, and George Nino (collectively, "Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Inspire Brands, Inc. Arby's Restaurant Group, Inc., and Jimmy John's Franchisor SPV, LLC, Sonic Industries Services, LLC, and Dunkin' Brands, Inc. (collectively, "Defendants" or "Inspire"). Plaintiffs' allegations against Defendants are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge and best recollection.

## INTRODUCTION

1. This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendants' ecommerce websites (www.arbys.com, or the "Arby's Website"); www.baskinrobbins.com, or the "Baskin Robbins Website"; www.dunkindonuts.com, or the "Dunkin Website"; www.jimmyJohn's.com, or the "Jimmy John's Website;" and order.sonicdrivein.com, or the "Sonic Drive-In Website," each a "Website" and, collectively, the "Websites"), Defendants display[1] to them a popup cookie consent banner, which is similar in appearance, form, and function across the Websites and was similar in appearance, form and function during the Class Period. Defendants' cookie banner discloses that the Websites use cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendants assure visitors that they can choose to "Decline" all cookies, as shown in the following exemplar screenshot from the Arby's Website:




[1] Except where noted otherwise, the structure and operation of each of the Websites is substantially similar for the purposes of the allegations of this Complaint. Accordingly, the term "Website" shall refer to each of the Websites unless otherwise indicated.

2. Like most internet websites, Defendants designed the Websites to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendants affirmatively represented that Plaintiffs and other users could browse the Websites without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false. Even after users elect to "Decline" all cookies, Defendants surreptitiously cause several third parties—including Google LLC (DoubleClick and Google Analytics), Meta Platforms, Inc. (Facebook), ByteDance Ltd. (TikTok), Microsoft Corporation (Microsoft Clarity), Snap Inc. (SnapChat), and Pinterest, Inc. (Pinterest), and others (collectively, the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Websites.

3. Contrary to users' express rejection of cookies and tracking technologies, Defendants caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding visitors' behaviors and communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

4. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Californians, Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5. This type of tracking and data sharing is exactly what Websites visitors sought to avoid when they clicked or selected the "Decline" button on the Websites' cookie consent banners sought to avoid. Defendants falsely told their Websites' users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendants ignored those choices and violated state statutes, tort duties, and also breached their contractual duties and the implied covenant of good faith and fair dealing with Plaintiffs and those similarly situated users of the Websites.

## THE PARTIES

6. Plaintiff Benjamin Paul de Ayora is, and was at all relevant times, an individual and resident of Los Angeles, California. Plaintiff intends to remain in California and makes his permanent home there.

7. Plaintiff Christine Wiley is, and was at all relevant times, an individual and resident of Long Beach, California. Plaintiff intends to remain in California and makes her permanent home there.

8. Plaintiff Mikhail Gershzon is, and was at all relevant times, an individual and resident of San Francisco, California. Plaintiff intends to remain in California and makes his permanent home there.

9. Plaintiff George Nino is, and was at all relevant times, an individual and resident of Roseville, California. Plaintiff intends to remain in California and makes his permanent home there.

10. Defendant Inspire Brands, Inc. ("Inspire") is a Delaware corporation with its headquarters and principal place of business in Atlanta, Georgia.

11. Inspire is directly and substantially involved in the operation of each of the Websites, including by providing and managing shared technology infrastructure and services related to user data collection and privacy compliance. Inspire publicly represents that it operates its restaurant brands through integrated, enterprise-wide, technology-enabled platforms. *See*

Inspire's website ("Inspire is tightly integrated around extensible, technology-enabled platforms and capabilities, enabling each brand to benefit from the collective scale of the enterprise.")[2] Consistent with that representation, the privacy policies for each of the Websites direct users with questions or requests regarding privacy to an Inspire-controlled email address, demonstrating Inspire's role in overseeing and administering privacy practices across the Websites.

12. Defendant Arby's Restaurant Group, Inc. ("Arby's") is a Delaware corporation with its headquarters and principal place of business in Atlanta, Georgia. Defendant Arby's Restaurant Group operates the Arby's Website.

13. Defendant Jimmy John's Franchisor SPV, LLC ("Jimmy John's") is a Delaware corporation with its headquarters and principal place of business in Champaign, Illinois. Defendant Jimmy John's Franchisor operates the Jimmy John's Website.

14. Defendant Dunkin' Brands, Inc. ("Dunkin'") is a Delaware corporation with its headquarters and principal place of business in Canton, Massachusetts. Defendant Dunkin' operates both the Dunkin' Website and the Baskin Robbins Website.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendants are citizens of different states.

16. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendants have engaged, and continues to engage, in substantial and continuous business practices in the State of California, including operating brick-and-mortar restaurants in California, which make online sales to consumers in California.

[2] https://inspirebrands.com/about-us/ (last visited January 29, 2026).

17. Further, some of the Private Communications and data that are caused to be transmitted to Third Parties when users visit the Websites are routed through servers located in California. And Baskin Robbins, one of Defendants' brands, was founded in California, and California remains the state with the most Baskin Robbins locations. All of the Defendants operate restaurants in California.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

19. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## AYORA RELATED ARBITRATION PROCEEDINGS

20. The Arby's Website's Terms of Use contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendants before the Judicial Arbitration and Mediation Services ("JAMS").

21. On April 29, 2024, Plaintiff Ayora filed a demand for arbitration in San Francisco with JAMS against Defendants. Plaintiff Ayora asserted claims in the arbitration arising from the same conduct alleged herein.

22. Arbitrator Gary Nadler was assigned as the arbitrator.

23. Following an initial conference on November 6, 2024, the Arbitrator ordered briefing regarding his jurisdiction and arbitrability.

24. On November 7, 2024, Plaintiff Ayora filed an amended demand for arbitration. *See* Ex. B.

25. After receiving briefing and supporting evidence from the parties, the Arbitrator issued a Determination of Motion on Non-Arbitrability of Claims, dated February 24, 2025, concluding: (a) Plaintiff Ayora did not waive his right to contest arbitrability; (b) the Arbitrator had authority to decide threshold arbitrability issues; and (c) the Arbitrator did not have jurisdiction to hear the case. *See* Ex. A.

26. JAMS subsequently issued a closing letter, dated April 4, 2025, confirming that it had closed the arbitration. *See* Ex. C.

## WILEY RELATED ARBITRATION PROCEEDINGS

27. On May 10, 2024, Plaintiff Wiley filed a demand for arbitration in San Francisco with JAMS against Defendants Inspire Brands and Jimmy John's Franchisor. Plaintiff Wiley asserted claims in the arbitration arising from the same conduct alleged herein.

28. Arbitrator Gary Nadler was assigned as the arbitrator.

29. Following an initial conference on September 9, 2024, the Arbitrator ordered briefing regarding his jurisdiction and arbitrability.

30. On October 2, 2024, Plaintiff Wiley filed an amended demand for arbitration. *See* Ex. E.

31. After receiving briefing and supporting evidence from the parties, the Arbitrator issued a Final Award, dated January 3, 2025, concluding: (a) Plaintiff Wiley did not waive her right to contest arbitrability; (b) the Arbitrator had authority to decide threshold arbitrability issues; and (c) the Arbitrator did not have jurisdiction to hear the case. *See* Ex. D.

32. JAMS subsequently issued a closing letter, dated April 29, 2025, confirming that it had closed the arbitration. *See* Ex. F.

## SUBSTANTIVE ALLEGATIONS

### A. Defendants Programmed the Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.

33. Every website, including each of the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it

processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the requires and return the response.

34. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

35. As a result, Defendants knew, or should have known, that the device or devices used by Plaintiffs, as well as Class members, to access the Websites were located in California. Each of the Websites also allows users to locate restaurants near them by allowing the user to input their city or zip code into a form. For example, if a user inputs "94111," on www.arbys.com/locations/, the website will provide a list of the closest Arby's restaurant locations to that California zip code.

36. Defendants voluntarily integrated "third-party resources" from the Third Parties into the Websites' programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendants use of the third-party resources on the Websites is done so pursuant to agreements between Defendants Arby's and Inspire and those Third Parties.

37. Each of the Websites causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests,

enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

38. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating. First-party cookies are used to track users when they repeatedly visit the same website.

39. A third-party cookie is set by a third-party domain/webserver (e.g., play.google.com; static.g.doubleclick.net; bam.nr-data.net, etc.). When the user's browser loads a webpage containing embedded third-party resources, the Third Parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites and across multiple browsing sessions.

40. As described further below, the third-party cookies stored on and/or loaded from Plaintiffs and other Class Members' devices when they interacted with the Websites were transmitted to those third parties, enabling them to surreptitiously track in real time and collect Plaintiffs', as well as other Class members', personal information, such as their browsing activities and private communications with Defendants including the following:

- **Browsing History:** Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Websites;
- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;
- **User Input Data**: The information the user entered into the Websites' form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Websites;
- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Websites during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

41. The Third Parties' cookies set on Plaintiffs' and other Class Members' devices on each of the Websites can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling

sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue data collection and targeted advertising.

**B. The Arby's Website (Plaintiffs Ayora, Gershzon, and Nino)**

**i. Defendants Arby's and Inspire Programmed the Arby's Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

42. Defendants Arby's and Inspire own and operate Arby's fast food restaurants and they own and operate the Arby's Website, which allows visitors to receive information about the restaurant and its menu items and to order food for delivery or pickup. As users interact with the Arby's Website (e.g., by entering data into forms, clicking on links, and making selections), Arby's Website users communicate Private Communications to Defendants Arby's and Inspire, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

43. Defendants Arby's and Inspire chose to install or integrate the Arby's Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Arby's Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants Arby's and Inspire incorporate into the Arby's Website, or that Defendants Arby's and Inspire cause to be loaded. Because Defendants Arby's and Inspire control the Arby's Website's software code, and are capable of determining whether a user is accessing the Arby's Website from California, they have complete control over whether first-party and third-party cookies are placed on their California users' devices and/or transmitted to third parties.

44. Defendants Arby's and Inspire explained the third-party cookies they used on the Arby's Website as follows, in the Arby's Website's Privacy Policy:[3]

[3] Arby's Privacy Policy, last updated July 1, 2024.

> Arby's websites, apps, emails, and advertisements may use tracking technologies such as cookies, web beacons, and pixel tags. These technologies are used to understand user behavior such as assisting us to see what pages people visit on our sites, protecting against security and fraud, facilitating and measuring the effectiveness of advertisements and web searches. For more information about our use of tracking technologies, please see our Ad and Cookie Policy.

45. Defendants further explained their use of third-party cookies on the Arby's Website in a separate "Ad and Cookie Policy:"

> **WE USE TRACKING TOOLS.**
>
> We collect personal information about users over time and across different websites when you use our websites and app. We also have third parties that collect personal information this way. To do this, we use several common tracking tools. They may include browser cookies. We may also use web beacons, flash cookies, and similar technologies . . . Our vendors or third parties may place and use these tools on our sites or apps. In this policy, "we" and "us" refers to Inspire Brands and our brands and affiliates. It also includes our vendors and third parties who place tools on our sites and apps.
>
> **WHY WE USE TRACKING TOOLS**
>
> We use tracking tools for many reasons, including to engage in interest-based advertising. Interest-based advertising or "online behavioral advertising" is serving advertising content to you based on information gathered from you over time across multiple sites and other platforms. It includes serving ads to you after you leave our website, encouraging you to return. It also includes serving ads we think are relevant based on your browsing habits or online activities. These ads might be served on websites or on apps. They might also be served in emails. We might serve these ads, or third parties may serve ads . . .
>
> **HOW WE GATHER INFORMATION FOR INTEREST-BASED ADVERTISING**
>
> We use information you make available to us when you interact with us, our affiliates, and other third parties to decide what content is relevant to you. We gather this information using the tracking tools described above. For example, we or our partners might look at your purchases or browsing behaviors. We or our partners might also look at your location. We might look at these activities on our platforms or the platforms of others. We work with third parties who help gather this information. These third parties might link your name or email address to other information they collect. That might include past purchases made offline or online. Or, it might include online usage information.

**ii. Defendants Arby's and Inspire Falsely Informed Users that They Could Decline the Arby's Website's Use of Cookies.**

46. When Plaintiffs Ayora, Gershzon, and Nino, as well as other Class Members in California visited the Arby's Website, the Arby's Website immediately displayed to them a popup cookie consent banner that was similar in appearance, form, and function during the entire class period. As shown in the screenshot below, the cookie consent banner stated "We use cookies on our website. By clicking Accept you consent to the use of all cookies." The banner also indicated that, rather than choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies, and the banner purported to provide users the opportunity to "Decline" cookies or otherwise manage their "Cookie Settings."




47. Plaintiffs Ayora, Gershzon, and Nino, and other users of the Arby's Website who clicked or selected the "Decline" button, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Arby's Website could then continue to browse the Arby's Website, as the popup cookie consent banner disappeared.

48. Defendants Arby's and Inspire's popup cookie consent banner led Plaintiffs Ayora, Gershzon, and Nino, and all California users of the Arby's Website similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those associated with the Third Parties and targeted advertising. The banner further reasonably led Plaintiffs Ayora, Gershzon, and Nino, and those users of the Arby's Website similarly situated, to believe that Defendants Arby's and Inspire would not allow third parties, through cookies, to access their Private Communications with the Arby's Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Decline" cookies button.

49. Defendants Arby's and Inspire's representations, however, were false. In truth, Defendants Arby's and Inspire did not abide by Plaintiffs Ayora, Gershzon, and Nino's or other

users' wishes. When Plaintiffs Ayora, Gershzon, and Nino, and other users, clicked or selected the "Decline" button, they provided notice to Defendants Arby's and Inspire that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Arby's Website. Nevertheless, even after receiving that notice, Defendants Arby's and Inspire caused the Third-Party cookies to be placed on users' browsers and devices and/or transmitted to the Third Parties along with user data.

50. In particular, when users clicked or selected the "Decline" button, Defendants Arby's and Inspire nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, causing them to collect user data in real time that discloses Arby's Website visitors' Private Communications with the Arby's Website, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs Ayora, Gershzon, and Nino tried to protect their privacy by declining cookies, Defendants Arby's and Inspire failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

51. Some aspects of the operations of the Third Parties' cookies on the Arby's Website can be observed using specialized tools that log incoming and outgoing website network transmissions. The following exemplar screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a user's device and browser to the Third Parties even after the user clicked or selected the "Decline" button on the Arby's Website's popup cookie consent banner.


https://www.arbys.com/menu/meals/
Fairfield – Central Place
MENU
DEALS
LOCATIONS
SIGN IN / SIGN UP
MENU /
Meals
Bourbon BBQ Country Style Rib Sandwich...
$14.09 • 1080 calories
ADD TO BAG
MODIFY
Pecan Chicken Salad Sandwich Meal
$13.09 • 1230 calories
ADD TO BAG
MODIFY
King's Hawaiian® Sweet Heat
King's Hawaiian® Sweet Heat Beef
Elements
Console
Sources
Network
Performance
Memory
Application
Security
Lighthouse
Preserve log
Disable cache
No throttling
Filter
Invert
Hide data URLs
All
Fetch/XHR
JS
CSS
Img
Media
Font
Doc
WS
Name
Status
Domain
Cookies
pay
200
pay.google.com
log?format=json&hasfast=true&authuser=0
play.google.com
collect?t=dc&aip=1&_r=3&v=1&_v=j100&tid=UA-53...
stats.g.doubleclick.net
NRJS-8113c7c00e8b8a83f7d7a=911136446&sa=1...
204
bam.nr-data.net


https://www.arbys.com/menu/meals/kings-hawaiian-fish-deluxe-medium-meal/
Select Location
MENU DEALS LOCATIONS SIGN IN / SIGN UP
MENU / MEALS /
King's Hawaiian® Fish Deluxe Meal
1245 calories
Sprite
FIND AN ARBY'S FOR PRICING, AVAILABILITY, OR TO START AN ONLINE ORDER.
2,000 calories a day is used for general nutrition advice, but calorie needs vary. Additional nutrition information available upon request.
ABOUT THE MEAL
WHAT'S INCLUDED
Crispy Fish Fillet
Elements Console Sources Network Performance Memory Application
Preserve log Disable cache No throttling
Filter Invert Hide data URLs Hide extension URLs All Fetch/XHR
Big request rows
Overview
Name Method Status Domain Cookies
trigger/?id=315481758483... GET 200 www.facebook.com 7
tr/?id=3154817584831198... GET 200 www.facebook.com 7
trigger/?id=315481758483... GET 200 www.facebook.com 7
tr/?id=3154817584831198... GET 200 www.facebook.com 7
trigger/?id=315481758483... GET 200 www.facebook.com 7
tr/?id=3154817584831198... GET 200 www.facebook.com 7
trigger/?id=315481758483... GET 200 www.facebook.com 7
tr/?id=3154817584831198... GET 200 www.facebook.com 7
trigger/?id=315481758483... GET 200 www.facebook.com 7
tr/?id=3154817584831198... GET 200 www.facebook.com 7
collect?v=2&tid=G-MC1V9... POST 204 analytics.google.com 2
collect?v=2&tid=G-MC1V9... POST 204 analytics.google.com 2
collect?v=2&tid=G-MC1V9... POST 204 analytics.google.com 2
collect POST 204 n.clarity.ms 1
collect?v=2&tid=G-MC1V9... POST 204 www.google-analytics.com 1
track.gif?t=170785968073... GET 200 flwfjdti.micpn.com 1
collect POST 204 n.clarity.ms 1
p POST 200 tr.snapchat.com 1
collect POST 204 n.clarity.ms 1
collect POST 204 n.clarity.ms 1
NRJS-8113c7c00e8b8a83... POST 200 bam.nr-data.net 1
NRJS-8113c7c00e8b8a83... POST 200 bam.nr-data.net 1
collect POST 204 n.clarity.ms 1
collect POST 204 n.clarity.ms 1
NRJS-8113c7c00e8b8a83... POST 200 bam.nr-data.net 1
collect POST 204 n.clarity.ms 1
p POST 200 tr.snapchat.com 1
collect POST 204 n.clarity.ms 1
collect?v=2&tid=G-MC1V9... POST 204 www.google-analytics.com 1
collect POST 204 n.clarity.ms 1
collect POST 204 n.clarity.ms 1
collect?v=2&tid=G-MC1V9... POST 204 www.google-analytics.com 1
collect?v=2&tid=G-MC1V9... POST 204 www.google-analytics.com 1
collect?v=2&tid=G-MC1V9... POST 204 www.google-analytics.com 1
track.gif?t=170785968926... GET 200 flwfjdti.micpn.com 1
track.gif?t=170785968873... GET 200 flwfjdti.micpn.com 1
collect POST 204 n.clarity.ms 1


https://www.arbys.com/menu/meals/kings-hawaiian-fish-deluxe-medium-meal/
Select Location
MENU DEALS LOCATIONS SIGN IN / SIGN UP
MENU / MEALS /
King's Hawaiian® Fish Deluxe Meal
1245 calories
Sprite
Elements Console Sources Network Performance Memory Application
Preserve log Disable cache No throttling
Filter Invert Hide data URLs Hide extension URLs All Fetch/XHR
Big request rows
Overview
Name Method Status Domain Cookies
p POST 200 tr.snapchat.com 1
collect?v=2&tid=G-MC1V9... POST 204 www.google-analytics.com 1
collect POST 204 n.clarity.ms 1
collect POST 204 n.clarity.ms 1
collect?v=2&tid=G-MC1V9... POST 204 www.google-analytics.com 1
track.gif?t=170785968525... GET 200 flwfjdti.micpn.com 1
track.gif?t=170785968474... GET 200 flwfjdti.micpn.com 1
p POST 200 tr6.snapchat.com 1
collect POST 204 n.clarity.ms 1
p POST 200 tr.snapchat.com 1

52. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with the Arby's Website. The screenshots depict only network traffic occurring ***after*** the user declined all cookies using the "Decline" button on the cookie banner. As shown above, despite the user's declination of cookies, the user's interactions with the Arby's Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like play.google.com, static.g.doubleclick.net, bam.nr-data.net, facebook.com, tr.snapchat.com, n.clarity.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Arby's Website was programmed to cause third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after Plaintiffs Ayora, Gershzon, and Nino, as well as Class members, declined or rejected cookies and tracking technologies by clicking or selecting the "Decline" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination or rejection of cookies.

53. Plaintiffs Ayora, Gershzon, and Nino's and other users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

54. As Plaintiffs Ayora, Gershzon and Nino, along with other users, interacted with the Arby's Website, even after clicking or selecting the "Decline" button, more data regarding their behavior and communications was sent to third parties, alongside the cookie data. The third-party cookies that Defendants Arby's and Inspire wrongfully allowed to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications,

on the Arby's Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

55. The Third Party code that the Arby's Website cause to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail in Section F *infra*.

## C. The Baskin Robbins Website (Plaintiffs Ayora, Wiley, Gershzon, and Nino)

### i. Defendants Dunkin and Inspire Programmed the Baskin Robbins Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.

56. Defendants Dunkin and Inspire own and operate Baskin Robbins restaurants. Defendants Dunkin and Inspire also own and operate the Baskin Robbins Website, which allows visitors to receive information about the restaurant and its menu items. As users interact with the Baskin Robbins Website (e.g., by entering data into forms, clicking on links, and making selections), Baskin Robbins Website users communicate Private Communications to Defendants Dunkin and Inspire, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

57. Defendants Dunkin and Inspire chose to install or integrate the Baskin Robbins Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Baskin Robbins Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants Dunkin and Inspire incorporate into the Baskin Robbins Website, or that Defendants Dunkin and Inspire cause to be loaded. Because Defendants Dunkin and Inspire control the Baskin Robbins Website's software code, and are capable of determining whether a user is accessing the Baskin Robbins Website from California, they have complete control over whether first-party and third-party cookies are placed on their California users' devices and/or transmitted to third parties.

58. Defendants Dunkin and Inspire[4] explained the third-party cookies it used on the Baskin Robbins Website as follows, in the Baskin Robbins Website's Privacy Policy:[5]

> We collect usage information and demographic information through tracking technologies like cookies, web beacons, and pixel tags on our website or in emails we send. Third parties also collect usage information on our behalf when you use our website or apps.
>
> …
>
> We also provide your information to third parties. When we provide your information to third parties, and they receive the data for their own purposes, the disclosure is considered a "sale" of personal information under some U.S. privacy laws. We do not sell your information for money. Your information we may "sell" includes identifiers, usage information, and transaction history. The categories of third parties we "sell" your personal information to include advertising partners, data analytics providers, social networks, affiliates, franchise organizations, and data brokers. We provide this information to show you relevant and personalized advertisements (targeted advertising) and for analytics, data strategy, consultation on, development or improvement of products and services, marketing, advertising, and related services.

**ii. Defendants Dunkin and Inspire Falsely Informed Users that They Could Decline the Baskin Robbins Website's Use of Cookies.**

59. When Plaintiffs Ayora, Wiley, Gershzon, and Nino, as well as other Class Members in California visited the Baskin Robbins Website, the Baskin Robbins Website

[4] Users with questions related to privacy were required to email an Inspire email address ("you can email us at privacyrequests@inspirebrands.com"). This demonstrates Inspire's involvement with managing privacy preferences on the Baskin Robbins Website.

[5] Baskin Robbins Website Privacy Policy, last updated July 1, 2024.

immediately displayed to them a popup cookie consent banner that was similar in appearance, form, and function during the entire class period. As shown in the screenshot below, the cookie consent banner stated "We use cookies on our website. By clicking Accept you consent to the use of all cookies." The banner also indicated that, rather than choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies, and the banner purported to provide users the opportunity to "Decline" cookies or otherwise manage their "Cookie Settings."




60. Plaintiffs Ayora, Wiley, Gershzon, and Nino, and other users of the Baskin Robbins Website who clicked or selected the "Decline" button, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Baskin Robbins Website could then continue to browse the Baskin Robbins Website, as the popup cookie consent banner disappeared.

61. Defendants Dunkin and Inspire's popup cookie consent banner led Plaintiffs Ayora, Wiley, Gershzon, and Nino, and all California users of the Baskin Robbins Website similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those associated with the Third Parties and targeted advertising. The banner further reasonably led Plaintiffs Ayora, Gershzon, Wiley, and Nino, and those users of the Baskin Robbins Website similarly situated, to believe that Defendants Dunkin and Inspire would not allow third parties, through cookies, to access their Private Communications with the Baskin Robbins Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Decline" button.

62. Defendants Dunkin and Inspire's representations, however, were false. In truth, Defendants Dunkin and Inspire did not abide by Plaintiffs Ayora, Wiley, Gershzon, and Nino's or other users' wishes. When Plaintiffs Ayora, Wiley, Gershzon, and Nino, and other users,

clicked or selected the "Decline" button, they provided notice to Defendants Dunkin and Inspire that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Baskin Robbins Website. Nevertheless, even after receiving that notice, Defendants Dunkin and Inspire caused the Third-Party cookies to be placed on users' browsers and devices and/or transmitted to the Third Parties along with user data.

63. In particular, when users clicked or selected the "Decline" button, Defendants Dunkin and Inspire nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, causing them to collect user data in real time that discloses Baskin Robbins Website visitors' Private Communications with the Baskin Robbins Website, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs Ayora, Wiley, Gershzon, and Nino tried to protect their privacy by declining cookies, Defendants Dunkin and Inspire failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

64. Some aspects of the operations of the Third Parties' cookies on the Baskin Robbins Website can be observed using specialized tools that log incoming and outgoing website



network transmissions. The following exemplar screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a user's device and browser to the Third Parties even after the user clicked or selected the "Decline" button on the Baskin Robbins Website's popup cookie consent banner.

65. The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with the Baskin Robbins Website. The screenshot depicts only network traffic occurring ***after*** the user declined all cookies using the "Decline" button on the cookie banner. As shown above, despite the user's declination of cookies, the user's interactions with the Baskin Robbins Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.google.com, www.google-analytics.com, stats.g.doubleclick.net, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Baskin Robbins Website was programmed to cause third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after Plaintiffs Ayora, Wiley, Gershzon, and Nino, as well as Class members, declined or rejected cookies and tracking technologies by clicking or selecting the "Decline" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination or rejection of cookies.

66. Plaintiffs Ayora, Wiley, Gershzon, and Nino's and other users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

67. As Plaintiffs Ayora, Wiley, Gershzon and Nino, along with other users, interacted with the Baskin Robbins Website, even after clicking or selecting the "Decline" button, more data regarding their behavior and communications was sent to third parties, alongside the cookie

data. The third-party cookies that Defendants Dunkin and Inspire wrongfully allowed to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Baskin Robbins Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

68. The Third Party code that the Baskin Robbins Website cause to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail in Section F *infra*.

## D. The Dunkin Website (Plaintiffs Ayora, Wiley, and Nino)

### i. Defendants Dunkin and Inspire Programmed the Dunkin Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.

69. Defendants Dunkin and Inspire own and operate Dunkin fast food restaurants. Defendants Dunkin and Inspire also own and operate the Dunkin Website, which allows visitors to receive information about the restaurant and its menu items. As users interact with the Dunkin Website (e.g., by entering data into forms, clicking on links, and making selections), Dunkin

Website users communicate Private Communications to Defendants Dunkin and Inspire, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

70. Defendants Dunkin and Inspire chose to install or integrate the Dunkin Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Dunkin Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants Dunkin and Inspire incorporate into the Dunkin Website, or that Defendants Dunkin and Inspire cause to be loaded. Because Defendants Dunkin and Inspire control the Dunkin Website's software code, and are capable of determining whether a user is accessing the Dunkin Website from California, they have complete control over whether first-party and third-party cookies are placed on their California users' devices and/or transmitted to third parties.

71. Defendants Dunkin and Inspire[6] explained the third-party cookies it used on the Dunkin Website as follows, in the Dunkin Website's Privacy Policy:[7]

> Dunkin' websites, apps, emails, and advertisements may use tracking technologies such as cookies, web beacons, and pixel tags. We also use tracking tools:
>
> - to recognize new visitors to our websites. to recognize past customers.
> - to present more personalized content, to improve your website experience, optimize your shopping experience, and provide site and service enhancements.
> - to observe your behaviors and browsing activities over time across multiple websites or other platforms.
> - to better understand our audience, our customers, our website visitors, and their respective interests.
>
> We use information you make available to us when you interact with us, our affiliates, and other third parties to decide what content is relevant to you. We gather this information using the tracking tools described above. For example, we

[6] Defendants Dunkin and Inspire directed users with "questions about your privacy or this policy, please contact us in one of the following ways . . . email us at privacyrequests@inspirebrands.com. This demonstrates Inspires involvement with managing privacy preferences on the Dunkin Website.

[7] Dunkin Website Privacy Policy, last updated July 2024.

> or our partners might look at your purchases or browsing behaviors. We or our partners might also look at your location. We might look at these activities on our platforms or the platforms of others. We work with third parties who help gather this information. These third parties might link your name or email address to other information they collect. That might include past purchases made offline or online. Or, it might include online usage information.

**ii. <u>Defendants Dunkin and Inspire Falsely Informed Users that They Could Decline the Dunkin Website's Use of Cookies.</u>**

72. When Plaintiffs Ayora, Wiley, and Nino, as well as other Class Members in California visited the Dunkin Website, the Dunkin Website immediately displayed to them a popup cookie consent banner that was similar in appearance, form, and function during the entire class period. As shown in the screenshot below, the cookie consent banner stated "We use cookies on our website. By clicking Accept you consent to the use of all cookies." The banner also indicated that, rather than choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies, and the banner purported to provide users the opportunity to "Decline" cookies or otherwise manage their "Cookie Settings."




73. Plaintiffs Ayora, Wiley, and Nino, and other users of the Dunkin Website who clicked or selected the "Decline" button, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Dunkin Website could then continue to browse the Dunkin Website, as the popup cookie consent banner disappeared.

74. Defendants Dunkin and Inspire's popup cookie consent banner led Plaintiffs Ayora, Wiley, and Nino, and all California users of the Dunkin Website similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those associated with the Third Parties and targeted advertising. The banner further reasonably led Plaintiffs Ayora, Wiley, and Nino, and those users of the Dunkin Website similarly situated, to believe that Defendants Dunkin and Inspire would not allow third parties, through cookies, to access their Private Communications with the Dunkin Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and

preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Decline" button.

75. Defendants Dunkin and Inspire's representations, however, were false. In truth, Defendants Dunkin and Inspire did not abide by Plaintiffs Ayora, Wiley, and Nino's or other users' wishes. When Plaintiffs Ayora, Wiley, and Nino, and other users, clicked or selected the "Decline" button, they provided notice to Defendants Dunkin and Inspire that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Dunkin Website. Nevertheless, even after receiving that notice, Defendants Dunkin and Inspire caused the Third-Party cookies to be placed on users' browsers and devices and/or transmitted to the Third Parties along with user data.

76. In particular, when users clicked or selected the "Decline" button, Defendants Dunkin and Inspire nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, causing them to collect user data in real time that discloses Dunkin Website visitors' Private Communications with the Dunkin Website, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs Ayora, Wiley, and Nino tried to protect their privacy by declining cookies, Defendants Dunkin and Inspire failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

77. Some aspects of the operations of the Third Parties' cookies on the Dunkin Website can be observed using specialized tools that log incoming and outgoing website network transmissions. The following exemplar screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a user's device and browser to the Third Parties even after the user clicked or selected the "Decline" button on the Dunkin Website's popup cookie consent banner.




78. The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with the Dunkin Website. The screenshot depicts only network traffic occurring ***after*** the user declined all cookies using the "Decline" button on the cookie banner. As shown above, despite the user's declination of cookies, the user's interactions with the Dunkin Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like stats.g.doubleclick.net, ct.pinterest.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Dunkin Website was programmed to cause third-party cookie data and users' Private Communications to be transmitted to Third Parties, even

after Plaintiffs Ayora, Wiley, and Nino, as well as Class members, declined or rejected cookies and tracking technologies by clicking or selecting the "Decline" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination or rejection of cookies.

79. Plaintiffs Ayora, Wiley, and Nino's and other users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

80. As Plaintiffs Ayora, Wiley, and Nino, along with other users, interacted with the Dunkin Website, even after clicking or selecting the "Decline" button, more data regarding their behavior and communications was sent to third parties, alongside the cookie data. The third-party cookies that Defendants Dunkin and Inspire wrongfully allowed to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Dunkin Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

81. The Third Party code that the Dunkin Website cause to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not

parties. When the Third Parties use their respective wiretaps on users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail in Section F *infra*.

## E. The Jimmy John's Website (Plaintiffs Ayora, Wiley, and Nino)

### i. Defendants Jimmy John's and Inspire Programmed the Jimmy John's Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.

82. Defendants Jimmy John's and Inspire own and operate Jimmy John's fast food restaurants. Defendants Jimmy John's and Inspire also own and operate the Jimmy John's Website, which allows visitors to receive information about the restaurant and its menu items. As users interact with the Jimmy John's Website (e.g., by entering data into forms, clicking on links, and making selections), Jimmy John's Website users communicate Private Communications to Defendants Jimmy John's and Inspire, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

83. Defendants Jimmy John's and Inspire chose to install or integrate the Jimmy John's Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Jimmy John's Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants Jimmy John's and Inspire incorporate into the Jimmy John's Website, or that Defendants Jimmy John's and Inspire cause to be loaded. Because Defendants Jimmy John's and Inspire control the Jimmy John's Website's software code, and are capable of determining whether a user is accessing the Jimmy John's Website from California, they have complete control over whether first-party and third-party cookies are placed on their California users' devices and/or transmitted to third parties.

84. Defendants Jimmy John's and Inspire[8] explained the third-party cookies it used on the Jimmy John's Website as follows, in the Jimmy John's Website's Privacy Policy:[9]

> How we gather your information
>
> We collect information in the following ways:
>
> From you. We collect identifiers, demographic information, payment information, transaction history, account log-in, location or precise location, and professional information directly from you. When you purchase from our stores in-person, on our website, or in our app, we collect identifiers, payment information, and transaction history. If you purchase from a franchised store, the franchisee may collect this information on our behalf. If you create an account, we will collect your account log- in. If you grant us permission on your device, we will collect your location or precise location. If you complete a survey, we may collect demographic data, including protected classifications, and professional information.
>
> From tracking technologies (like cookies). We collect usage information and demographic information through tracking technologies like cookies, web beacons, and pixel tags on our website or in emails we send. Third parties also collect usage information on our behalf when you use our website or apps.
>
> From third parties. We collect identifiers, demographic information, professional information, usage information, and protected classifications from our fellow brands (Arby's, Baskin-Robbins, Buffalo Wild Wings, Dunkin' , and SONIC Drive-In), service providers, social media platforms, and third parties. Categories of service providers and third parties include advertising networks, data analytics providers, data brokers, and other vendors that provide order delivery, payment processing, promotions, contests, gift cards, loyalty program, sweepstakes, communications, marketing, and other services.
>
> We create inferences ourselves and collect inferences from data analytics providers.

**ii. <u>Defendants Jimmy John's and Inspire Falsely Informed Users that</u>**

---

[8] Defendants Jimmy John's and Inspire directed users with questions regarding the Jimmy John's Privacy Policy "reach out to us at privacyrequests@inspirebrands.com." This demonstrates Inspire's involvement with managing privacy preferences on the Jimmy John's Website.

[9] Jimmy John's Website Privacy Policy, last updated September 2025.

**They Could Decline the Jimmy John's Website's Use of Cookies.**

85. When Plaintiffs Ayora, Wiley, and Nino, as well as other Class Members in California visited the Jimmy John's Website, the Jimmy John's Website immediately displayed to them a popup cookie consent banner that was similar in appearance, form, and function during the entire class period. As shown in the screenshot below, the cookie consent banner stated "We use cookies on our website. By clicking Accept you consent to the use of all cookies." The banner also indicated that, rather than choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies, and the banner purported to provide users the opportunity to "Decline" cookies or otherwise manage their "Cookie Settings."




86. Plaintiffs Ayora, Wiley, and Nino, and other users of the Jimmy John's Website who clicked or selected the "Decline" button, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Jimmy John's Website could then continue to browse the Jimmy John's Website, as the popup cookie consent banner disappeared.

87. Defendants Jimmy John's and Inspire's popup cookie consent banner led Plaintiffs Ayora, Wiley, and Nino, and all California users of the Jimmy John's Website similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those associated with the Third Parties and targeted advertising. The banner further reasonably led Plaintiffs Ayora, Wiley, and Nino, and those users of the Jimmy John's Website similarly situated, to believe that Defendants Jimmy John's and Inspire would not allow third parties, through cookies, to access their Private Communications with the Jimmy John's Website, including their browsing history, visit history, website interactions, user input data, demographic

information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Decline" button.

88. Defendants Jimmy John's and Inspire's representations, however, were false. In truth, Defendants Jimmy John's and Inspire did not abide by Plaintiffs Ayora, Wiley, and Nino's or other users' wishes. When Plaintiffs Ayora, Wiley, and Nino, and other users, clicked or selected the "Decline" button, they provided notice to Defendants Jimmy John's and Inspire that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Jimmy John's Website. Nevertheless, even after receiving that notice, Defendants Jimmy John's and Inspire caused the Third-Party cookies to be placed on users' browsers and devices and/or transmitted to the Third Parties along with user data.

89. In particular, when users clicked or selected the "Decline" button, Defendants Jimmy John's and Inspire nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, causing them to collect user data in real time that discloses Jimmy John's Website visitors' Private Communications with the Jimmy John's Website, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs Ayora, Wiley, and Nino tried to protect their privacy by declining cookies, Defendants Jimmy John's and Inspire failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

90. Some aspects of the operations of the Third Parties' cookies on the Jimmy John's Website can be observed using specialized tools that log incoming and outgoing website network transmissions. The following exemplar screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a user's device and browser to the

Third Parties even after the user clicked or selected the "Decline" button on the Jimmy John's Website's popup cookie consent banner.




91. The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with the Jimmy John's Website. The screenshot depicts only network traffic occurring ***after*** the user declined all cookies using the "Decline" button on the cookie banner. As shown above, despite the user's declination of cookies, the user's interactions with the Jimmy John's Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like analytics.google.com, tr.snapchat.com, analytics.tiktok.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Jimmy John's Website was

programmed to cause third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after Plaintiffs Ayora, Wiley, and Nino, as well as Class members, declined or rejected cookies and tracking technologies by clicking or selecting the "Decline" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination or rejection of cookies.

92. Plaintiffs Ayora, Wiley, and Nino's and other users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

93. As Plaintiffs Ayora, Wiley, and Nino, along with other users, interacted with the Jimmy John's Website, even after clicking or selecting the "Decline" button, more data regarding their behavior and communications was sent to third parties, alongside the cookie data. The third-party cookies that Defendants Jimmy John's and Inspire wrongfully allowed to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Jimmy John's Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

94. The Third Party code that the Jimmy John's Website cause to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies

to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail in Section F *infra*.

**F. <u>The Sonic Website (Plaintiff Nino)</u>**

**i. <u>Defendants Jimmy John's and Inspire Programmed the Jimmy John's Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.</u>**

95. Defendants Sonic and Inspire own and operate Sonic fast food restaurants. Defendants Sonic and Inspire also own and operate the Sonic Website, which allows visitors to receive information about the restaurant and its menu items. As users interact with the Sonic Website (e.g., by entering data into forms, clicking on links, and making selections), Sonic Website users communicate Private Communications to Defendants Sonic and Inspire, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

96. Defendants Sonic and Inspire chose to install or integrate the Sonic Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Sonic Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants Sonic and Inspire incorporate into the Sonic Website, or that Defendants Sonic and Inspire cause to be loaded. Because Defendants Sonic and Inspire control the Sonic Website's software code, and are capable of determining whether a user is accessing the Sonic Website from California, they have complete control over whether first-party and third-party cookies are placed on their California users' devices and/or transmitted to third parties.

97. Defendants Sonic and Inspire[10] explained the third-party cookies it used on the Sonic Website as follows, in the Sonic Website's Privacy Policy:[11]

> We collect information in the following ways:
>
> From you. We collect identifiers, demographic information, payment information, transaction history, account log-in, location or precise location, and professional information directly from you. When you purchase from our stores in-person, on our website, or in our app, we collect identifiers, payment information, and transaction history. If you purchase from a franchised drive-in, the franchisee may collect this information on our behalf. If you create an account, we will collect your account log-in. If you grant us permission on your device, we will collect your location or precise location. If you complete a survey, we may collect demographic data, including protected classifications, and professional information.
>
> From tracking technologies (like cookies). We collect usage information and demographic information through tracking technologies like cookies, web beacons, and pixel tags on our website or in emails we send. Third parties also collect usage information on our behalf when you use our website or apps.
>
> From third parties. We collect identifiers, demographic information, professional information, usage information, and protected classifications from our fellow brands (Arby's, Baskin-Robbins, Buffalo Wild Wings, Dunkin', and Jimmy John's), service providers, social media platforms, and third parties. Categories of service providers and third parties include advertising networks, data analytics providers, data brokers, and other vendors that provide order delivery, payment processing, promotions, contests, gift cards, loyalty program, sweepstakes, communications, marketing, and other services.
>
> We create inferences ourselves and collect inferences from data analytics providers.

**ii. <u>Defendants Sonic and Inspire Falsely Informed Users that They Could Decline the Sonic Website's Use of Cookies.</u>**

98. When Plaintiff Nino, as well as other Class Members in California, visited the Sonic Website, the Sonic Website immediately displayed to them a popup cookie consent banner that was similar in appearance, form, and function during the entire class period. As shown in the screenshot below, the cookie consent banner stated "We use cookies on our website. By clicking Accept you consent to the use of all cookies." The banner also indicated that, rather than

---

[10] Defendants Sonic and Inspire directed users with questions regarding the Sonic Privacy Policy "reach out to us at privacyrequests@inspirebrands.com." This demonstrates Inspire's involvement with managing privacy preferences on the Sonic Website.

[11] Sonic Website Privacy Policy, last updated July 2024.

choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies, and the banner purported to provide users the opportunity to "Decline" cookies or otherwise manage their "Cookie Settings."




99. Plaintiff Nino, and other users of the Sonic Website who clicked or selected the "Decline" button, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Sonic Website could then continue to browse the Sonic Website, as the popup cookie consent banner disappeared.

100. Defendants Sonic and Inspire's popup cookie consent banner led Plaintiff Nino, and all California users of the Sonic Website similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those associated with the Third Parties and targeted advertising. The banner further reasonably led Plaintiff Nino, and those users of the Sonic Website similarly situated, to believe that Defendants Sonic and Inspire would not allow third parties, through cookies, to access their Private Communications with the Sonic Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Decline" button.

101. Defendants Sonic and Inspire's representations, however, were false. In truth, Defendants Sonic and Inspire did not abide by Plaintiff Nino's or other users' wishes. When Plaintiff Nino, and other users, clicked or selected the "Decline" button, they provided notice to Defendants Sonic and Inspire that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Sonic Website. Nevertheless, even after receiving that notice, Defendants Sonic and Inspire

caused the Third-Party cookies to be placed on users' browsers and devices and/or transmitted to the Third Parties along with user data.

102. In particular, when users clicked or selected the "Decline" button, Defendants Sonic and Inspire nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, causing them to collect user data in real time that discloses Sonic Website visitors' Private Communications with the Sonic Website, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiff Nino tried to protect his privacy by declining cookies, Defendants Sonic and Inspire failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

103. Some aspects of the operations of the Third Parties' cookies on the Sonic Website can be observed using specialized tools that log incoming and outgoing website network transmissions. The following exemplar screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a user's device and browser to the Third Parties even after the user clicked or selected the "Decline" button on the Sonic Website's popup cookie consent banner.



104. The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with the Sonic Website. The screenshot depicts only network traffic occurring ***after*** the user declined all cookies using the "Decline" button on the cookie banner. As shown above, despite the user's declination of cookies, the user's interactions with the Jimmy Sonic resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like play.google.com, stats.g.doubleclick.net, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Sonic Website was programmed to cause third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after Plaintiff Nino, as well as Class members, declined or rejected cookies and tracking technologies by clicking or selecting the "Decline" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination or rejection of cookies.

105. Plaintiff Nino's and other users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

106. As Plaintiff Nino, along with other users, interacted with the Sonic Website, even after clicking or selecting the "Decline" button, more data regarding their behavior and communications was sent to third parties, alongside the cookie data. The third-party cookies that Defendants Sonic and Inspire wrongfully allowed to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Sonic Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and

across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

107. The Third Party code that the Sonic Website cause to be loaded and executed by the user's browser constitutes a wiretap, because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail in Section F *infra*.

### G. <u>The Private Communications Intercepted and Collected Through Third Party Cookies on Defendants' Websites.</u>

#### i. <u>Google Cookies</u>

108. Defendants cause third party cookies to be transmitted to and from users' browsers and devices on the Websites, even after users decline or reject all cookies to and from the **<u>google.com</u>**, **<u>doubleclick.net</u>**, and **<u>www.google-analytics.com</u>** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[12] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[13] Google's cookies help it track whether users complete specific

[12] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[13] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[14]

109. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[15] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

110. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[16] "To measure a website . . . [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect . . . information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page,

---

[14] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[15] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[16] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[17]

111. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[18]

112. For example, the Google software code that Defendants cause to be stored on and executed by the user's device when the user visits the Arby's website causes the following type of cookie data to be sent to Google's domain, at https://www.google-analytics.com:

[17] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[18] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| v | 2 |
| tid | G-MC1V90WEKG |
| gtm | 45je42c0v885456990z8832957763za200 |
| _p | 1707859547847 |
| gcd | 13l3l3l3l3 |
| npa | 1 |
| dma | 0 |
| cid | 1210184517.1707859310 |
| ul | en-us |
| sr | 2240x1260 |
| uaa | arm |
| uab | 64 |
| uafvl | Not%20A(Brand;99.0.0.0\|Google%20Chrome;121.0.6167.160\| Chromium;121.0.6167.160 |
| uamb | 0 |
| uam | |
| uap | macOS |
| uapv | 13.5.0 |
| uaw | 0 |
| are | 1 |
| pscdl | noapi |
| _s | 6 |
| sid | 1707858272 |
| sct | 1 |
| seg | 1 |
| dl | https://www.arbys.com/menu/ |
| dt | Arby's \| We Have The Meats® |
| en | user_properties |
| ep.is_web_oa | true |
| _et | 75 |
| tfd | 134516 |

113. The "cid" parameter above refers to "Client ID." It contains a unique identifier for the user's browser and device, that causes Google to link the user to their interactions with the website.[19]

[19] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/.

114. The "dl" and "dt" parameters tells Google which URL the user is visited, and the title of the page. Here, the url corresponds to the King's Hawaiian Fish Deluxe Medium Meal webpage.

115. Along with this data, the Google software code that Defendants cause to be stored on and executed by the user's device causes the following cookies to be sent to Google's domain:

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| NID | 511=dMm00vjFE3Oiuqx14rscONMy8k38FyKgRMuRuli_-XWB5dAmLXpz_ciQcxsxS_0SFpFV4CJLqgpdqlOlJ7bPSIf24_jCKdNk0mn-NrbhbCAgyAGVXZ-Geapgv387ndzyaRoukr1Lzg82220nvogEaskvVgHbvclPfcpbQT7LiaivZ3e_Wyy5z2aMjQ_JdLa4bgPDDheGbw |
| 1P_JAR | 2024-02-13-21 |

116. According to Google documentation, the "1P_JAR" cookie is used by Google for advertising purposes, on its Google Ads platform.[20]

117. The "NID" cookie is also used for Google advertising. Specifically, it is used to show Google ads to users.[21]

118. Further, along with all of this data, the Google software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google, which informs Google of the user's exact operating system and browser.

119. Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

120. The data that Defendants cause to be sent to Google after users visit the Arby's website and reject cookies is representative of the data Defendants cause to be sent to Google when users visit the other Websites and reject cookies. Each of the websites causes cookies and tracking data to be sent to Google, after users reject cookies.

---

[20] https://business.safety.google/adscookies/.

[21] https://policies.google.com/technologies/cookies?hl=en-US.

121. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

122. Thus, the Google cookies used on the Websites cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[22]

123. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to

[22] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[23] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**ii. Facebook Cookies**

124. When users browse the Arby's Website, Defendants cause third party cookies to be transmitted to and from users' browsers and devices to and from the facebook.com domain, even after users elect to decline or reject all cookies. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[24] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

125. The facebook.com cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Website causes the following data to be sent to Meta when the user views a page:

[23] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[24] https://www.facebook.com/privacy/policies/cookies/.

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| id | 3154817584831198 |
| ev | PageView |
| dl | https://www.arbys.com/menu/ |
| rl | |
| if | false |
| ts | 1707859680257 |
| sw | 2240 |
| sh | 1260 |
| v | 2.9.146 |
| r | stable |
| a | tmSimo-GTM-WebTemplate |
| ec | 2 |
| o | 4126 |
| fbp | fb.1.1707859680257.1314916916 |
| ler | empty |
| cdl | API_unavailable |
| it | 1707859548720 |
| coo | false |
| exp | e1 |
| rqm | FGET |

126. Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the "PageView" event above:

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| ps_n | 0 |
| sb | 0NLHZVa1OA_mkWrWrIE8Y1ZO |
| datr | 0NLHZVaP5JsYweXoHvN_6XUC |
| locale | en_US |
| c_user | 1345507951 |
| xs | 16%3A_Su0wKTDXj24Xg%3A2%3A1707594493%3A-1%3A2633 %3A%3AAcU_cV9iVRXJ5dBc-3JVu1LJr1DkVSrdb9XH6ae_ZQ |
| fr | 1Rrwi81UWeHs8swuY.AWXhyryGk-VXKtlrqKgUb0ZTlK8.Bly94C..AAA.0.0.Bly94C.AWWRilHTqo0 |

127. The "c_user" cookie shown above causes Facebook to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID causes Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking

"Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

128. In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies cause Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[25] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[26]

129. The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses), which allow Facebook to know that a user is located in California.[27]

130. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide

---

[25] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.

[26] https://allaboutcookies.org/what-data-does-facebook-collect.

[27] *Id.*

data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

### iii. TikTok Cookies

131. Defendants also cause third party cookies to be transmitted to and from the Jimmy John's Website users' browsers and devices, even after users have rejected all cookies, to and from the **tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing. The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[28]

132. TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[29] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies cause TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data across sessions and domains to observe and evaluate TikTok user behavior.

133. These cookies cause TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including

[28] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[29] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

*email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address, which allow TikTok to know that a user is located in California.[30]

134. For example, the TikTok software code that Defendants cause to be stored on and executed by the Jimmy John's Website user's device causes the following data to be sent to TikTok's domain, at https://analytics.tiktok.com:


```
{
  "event": "",
  "message_id":
  "messageId-1715115331534-3192398725239-CISLOCRC77U6AMT0C4K0",
  "event_id": "",
  "is_onsite": false,
  "timestamp": "2024-05-07T20:55:31.534Z",
  "context": {
    "ad": {
      "sdk_env": "external",
      "jsb_status": 2
    },
    "user": {
      "anonymous_id": "e2DH1EH_gULNfBzcLjfyJyM-Jqb"
    },
    "pixel": {
      "code": "CISLOCRC77U6AMT0C4K0",
      "runtime": "1",
      "codes": "CISLOCRC77U6AMT0C4K0"
    },
    "page": {
      "url": "https://www.jimmyjohns.com/menu/sides",
      "referrer": "https://www.jimmyjohns.com/menu",
      "load_progress": "2"
    },
    "library": {
      "name": "pixel.js",
      "version": "2.1.33"
    },
    "device": {
```


[30] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

```
      "platform": "pc"
    },
    "session_id":
    "891ac6ac-0cb3-11ef-8a54-08c0eb4a1822::x4KweRdJVZeJipMRAThe",
    "pageview_id":
    "pageId-1715115324941-3646031125883-CISLOCRC77U6AMT0C4K0",
    "variation_id": "control_1",
    "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
    AppleWebKit/537.36 (KHTML, like Gecko) Chrome/123.0.0.0 Safari/537.36",
    "index": 16
  },
  "_inspection": {},
  "signal_diagnostic_labels": {
    "raw_email": {
      "label": "missing"
    },
    "raw_auto_email": {
      "label": "missing"
    },
    "raw_phone": {
      "label": "missing"
    },
    "raw_auto_phone": {
      "label": "missing"
    },
    "hashed_email": {
      "label": "missing"
    },
    "hashed_phone": {
      "label": "missing"
    }
  },
  "properties": {
    "scroll_times": 7,
    "doc_height": 3126,
    "max_scroll_height": 3125.5
  }
}
```


135. The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[31]

136. The data further indicates, among other things, that the user has viewed the page on the Defendants' website at the url https://www.jimmyJohn's.com/menu/sides.

137. Along with this data, the TikTok software code that Defendants cause to be stored on and executed by the user's device causes the "_ttp" and "ttwid" cookies to be sent to TikTok's domain:

[31] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

Request Header Query Body Cookies Raw | Summary +

| Key | Value |
|---|---|
| _ttp | 2b0IelxoLWjT77Rhw4oMCbiahPw |
| passport_csrf_token | 26ab460adad7f907ac0642c6b5519b9e |
| ttwid | 1%7C9gWjm0YzUtfEg_eeKtGJx6imkiTgoiCxzdGG7Fk3Als%7C1711480368%7C54de8174b8e959d578459a1adb6b53b2e64e18c600f7cf39b41b941b1008014a |
| s_v_web_id | verify_lu8r80kn_KsaUonC6_XJtX_4gxm_B2S8_7QMyAkdP6b6X |

138. According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[32]

139. According to TikTok's documentation, "[t]he 'ttwid' first-party cookie is for analytics and web optimization."[33]

140. Along with all of this data, the TikTok software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok.

141. Finally, the data sent to TikTok includes the user's IP address—including whether a user is located in California.

142. By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyzing user responses to ads and content).[34]

143. Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields . . . . TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute

[32] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[33] https://www.tiktok.com/legal/page/global/tiktok-website-cookies-policy/en.

[34] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[35]

### iv. <u>**Microsoft Clarity Cookies**</u>

144. Defendants also cause third party cookies to be transmitted to and from the Arby's Website users' browsers and devices, even after users elect to decline or reject all cookies, to and from the **<u>clarity.ms</u>** domain. This domain is associated with Clarity, Microsoft's "cutting-edge behavioral analytics tool that helps you understand user interaction with your website or app."[36] Clarity is a Microsoft Advertising tool, which is described as "crucial for successful marketing."[37] "Clarity's tracking code . . . uses a cookie to obtain user session data."[38]

145. Clarity allows Defendants to "watch live users in action" via "recordings of live user interactions" on the website, including a user's "clicks or taps, scrolling, navigation, and more."[39] Indeed, Clarity boasts that it "tracks all visitor clicks and scrolls on mobile, desktop, and tablet[.]" These "session recordings" track each and every consumer's individual actions on the website.[40]




[35] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

[36] https://learn.microsoft.com/en-us/clarity/setup-and-installation/about-clarity.

[37] https://about.ads.microsoft.com/en/blog/post/october-2021/introducing-microsoft-clarity-insights-for-microsoft-advertising.

[38] https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-consent.

[39] https://clarity.microsoft.com/session-recordings.

[40] https://clarity.microsoft.com/session-recordings.

146. Further, Clarity permits Defendants to aggregate individual users' session recordings into "heatmaps" for Defendants' financial gain. Heatmaps are "visualization tool[s]" aimed at "aggregat[ing] information about how users interact with the website."[41] This allows Defendants to "See at a glance which areas on [web site owner's] page drive the most engagement," a crucial element to increasing advertising revenue.[42] Clarity also permits Defendants to "track a specific subset of users," including tracking metrics like what browser users visited from, what type of device, the date, and more. Clarity even permits the use of specific "Clarity user ID[s]" which permits Clarity to track users across their devices, and identify when the same user visits multiple times to the website.[43] Businesses use Clarity to "make data-driven decisions" to "improve overall conversion rates" of clicks, engagement, or sales.[44] Microsoft notes in a Clarity case study that Clarity cookies permitted businesses to see a "substantial increase" in "purchases."[45] In one instance, "following just five days after implementing Clarity, the [business] saw an uplift of 19% in conversion rate."[46] Businesses consider Clarity a "must-have tool for any business serious about optimizing their website and increasing online revenue."[47]

147. Microsoft collects data from Clarity,[48] which "Microsoft retains . . . for as long as necessary[.]"[49] Clarity cookies allow Microsoft to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) interests and preferences; (iv) shopping

[41] https://learn.microsoft.com/en-us/clarity/heatmaps/heatmaps-overview.

[42] https://clarity.microsoft.com/heatmaps.

[43] https://clarity.microsoft.com/insights; https://learn.microsoft.com/en-us/clarity/setup-and-installation/identify-api.

[44] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.

[45] *Id.*

[46] *Id.*, emphasis in original.

[47] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.

[48] https://www.microsoft.com/en-us/privacy/privacystatement.

[49] *Id.*

behavior; (v) device information; (vi) demographic data; (vii) geolocation data; (viii) referring URL; and (ix) session information. [50]

**v. Additional Third-Party Cookies**

148. Defendants also cause third-party cookies to be transmitted to and from users' browsers and devices on the Websites, even after users elect to decline or reject all cookies, to and from other domains, including (i) snapchat.com; (ii).pinterest.com; and (iii) bam.nr-data.net.

149. The subdomain **tr.snapchat.com** is associated with Snap Inc. (SnapChat), a social media company that uses its cookies to measure users' conduct across distinct websites to help advertisers target ads.[51] SnapChat uses tr.snapchat.com cookies to collect data on browsing history, choices, and interactions with advertisements.[52] This data helps Snapchat personalize ad content and track users across the internet.[53]

150. The **pinterest.com** domain is associated with Pinterest, Inc., a popular social media platform that allows users to discover, save, and share ideas as pins in the form of photos and videos. Businesses can upload and showcase their products through "Shop the Look" pins or Product Pins that directly link to e-commerce websites. Businesses install the Pinterest tag on their websites to track ad conversions. As Pinterest explains, "The Pinterest tag is a piece of code that you add to your website. It lets Pinterest track visitors to your site, as well as the actions they take on your site after seeing your Pinterest ad. This means you can measure how effective your Pinterest ads are by understanding the actions people take on your website after seeing or engaging with your ad."[54] Pinterest cookies can be used to identify and track people who

[50] https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-data.

[51] *See* https://snapdiscoveries.com/what-is-tr-snapchat-com-is-used-for.

[52] *Id.*

[53] *Id.*

[54] Pinterest Help Center: Install the Pinterest Tag (available at https://help.pinterest.com/en/business/article/install-the-pinterest-tag).

purchase products, add items to a shopping cart, visit specific pages on the website, and/or search for specific items on the website.[55]

151. These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data.

### H. The Third Parties Intercept User Communications While in Transit

152. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendants' Websites. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

153. First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

154. Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[56] Third Party platforms encourage this redundant configuration and automatically

---

[55] *See, e.g.*, Pinterest Help Center: Add event codes (available at https://help.pinterest.com/en/business/article/add-event-codes); Pinterest Help Center: View tag parameters and cookies (available at https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies).

[56] For example, Google's server-to-server API is the **Google Ads Conversion API**. Facebook's is the **Meta Conversions API**. TikTok uses the **TikTok Events API**. Snapchat's is the **Snapchat Conversions API**. Pinterest's uses the **Pinterest Conversions API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action.[57] This deduplication occurs as the communications are received, before they are stored.

155. Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

156. Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

157. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

158. For example, Meta (formerly Facebook) has publicly described its proprietary real-time stream processing platform that ingests data transmitted from users' devices and

[57] For example, Facebook recommends that websites use a "redundant setup" whereby "advertisers implement the Conversions API alongside their Meta Pixel." *See* "Handling Duplicate Pixel and Conversions API Events," available at https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events. Facebook confirms that its system automatically deduplicates events using various parameters included with the data, such as "event_id," "event_name," "fbp," and "external_id." *Id.*

websites, applies real-time transformations and personalization, and only thereafter stores the data in backend data warehouses, as illustrated in the following diagram created by Facebook:[58]




As the diagram confirms, the data is sent from consumers' "Devices" and from the "Web," and then goes through the Stream Processing Pipelines ***before*** being stored in the data "Warehouse."

159. Facebook's Stream Processing Pipelines perform a wide variety of real-time analytics, transformations, and AI and machine learning on the data prior to storage:[59]

[58] XStream: Stream Processing Platform at Facebook (video) at 1:07 (available at https://www.youtube.com/watch?v=DNI54vc1ALQ).

[59] *Id.* at 2:05.




As the diagram confirms, Facebook does not merely store incoming data for later review; rather, before the data is stored, Facebook contemporaneously reads and processes it—including by reading the data, cleaning it, applying "real-time personalization" to associate it with a particular user, and analyzing its contents as necessary to generate real-time responses.

160. On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[60] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[61] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, ***transform the data***, and write the data to a destination."[62] One use for Dataflow

[60] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.

[61] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.

[62] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).

is the "[r]eal-time machine learning (ML) analysis of streaming data."[63] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[64]

161. Pinterest uses Apache Kafka, a third-party real-time stream processing platform.[65] The Kafka system streams events in real time to "many applications, such as native Kafka clients, Kafka Streams, Flink, and Spark streaming, which are consumers of a subset of Kafka topics that build several real-time pipelines."[66] These systems "include but are not limited to monetization, safety and spam detection, metrics processing, and experimentation use cases."[67]

162. Microsoft's Clarity also uses real-time stream processing software, which "processes millions of user sessions every day."[68] Although not as much is publicly disclosed about Microsoft's system, Microsoft confirms that the real-time data "is then sent to Clarity's backend, where it flows through a complex processing pipeline ***before*** ultimately being stored in ClickHouse—the powerful database that fuels Clarity's dashboards and visual reporting."[69]

163. Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendants' Websites.

---

[63] *Id.*

[64] *Id.*

[65] Confluent, "Lessons Learned from Running Apache Kafka at Scale at Pinterest," https://www.confluent.io/blog/running-kafka-at-scale-at-pinterest/.

[66] *Id.*

[67] *Id.*

[68] Clarity Blog, "Building a Scalable Analytics Platform: Why Microsoft Clarity Chose ClickHouse," https://clarity.microsoft.com/blog/why-microsoft-clarity-chose-clickhouse/.

[69] *Id.* (emphasis added).

**I. The Private Communications Collected Are Valuable.**

164. As part of their regular course of business, Defendants target California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendants' and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendants cause to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendants knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

165. The Private Communications tracked and collected through cookies on the Websites are valuable to Defendants and the Third Parties. Defendants use this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendants can identify California users who visit webpages related to particular fast food products and then target those users with advertisements for similar products both on the Websites and across unrelated third-party websites.

166. Data reflecting users' browsing activity allows Defendants to identify behavioral patterns, preferences, and interests relating to Defendants' products. At scale, this data enables Defendants to assess trends across its brands and within the broader consumer fast food restaurant market. Defendants monetize this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

167. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Websites can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[70] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

---

[70] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

168. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

169. By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendants unjustly enrich themselves at the expense of consumer privacy and autonomy. Defendants deprive consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Benjamin Paul de Ayora**

170. Plaintiff Ayora visited the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites to seek and obtain information about Defendants' products, while located in California, on one or more occasions during the last four years.

171. Plaintiff Ayora's visits to the Websites were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Ayora is not a consumer advocate, a "tester," or a compliance auditor that visited the Websites to test or evaluate Defendants' privacy practices.

172. Specifically, Plaintiff Ayora visited the Arby's Website multiple times between 2021 and May 2023. When Plaintiff Ayora visited the Arby's Website, the Website detected that he was a visitor in California and immediately presented him with the Arby's Website popup cookie consent banner as shown and described in Paragraph 46 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Ayora viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Ayora also viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

173. Specifically, Plaintiff Ayora visited the Baskin Robbins Website multiple times between 2021 and May 2023. When Plaintiff Ayora visited the Baskin Robbins Website, the Website detected that he was a visitor in California and immediately presented him with the Baskin Robbins Website popup cookie consent banner as shown and described in Paragraph 59 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Ayora viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Ayora also viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

174. Specifically, Plaintiff Ayora visited the Dunkin Website multiple times between 2021 and May 2023. When Plaintiff Ayora visited the Dunkin Website, the Website detected that he was a visitor in California and immediately presented him with the Dunkin Website popup cookie consent banner as shown and described in Paragraph 72 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Ayora viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Ayora also viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

175. Specifically, Plaintiff Ayora visited the Jimmy John's Website multiple times between 2021 and May 2023. When Plaintiff Ayora visited the Jimmy John's Website, the Website detected that he was a visitor in California and immediately presented him with the Jimmy John's Website popup cookie consent banner as shown and described in Paragraph 85 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Ayora viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Ayora also viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

176. Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Ayora selected and clicked the "Decline" button on each of the Websites' cookie consent banners. Plaintiff Ayora believed that selecting the "Decline" button on the popup cookie consent banners found on the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks for the purpose of providing targeted advertising, among other things).

177. In selecting the "Decline" button, Plaintiff Ayora gave Defendants notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites. Further, Plaintiff Ayora specifically rejected those cookies used for targeted advertising and those that share user information with third parties for targeted advertising and other purposes. In reliance on these representations and promises, only then did Plaintiff Ayora continue browsing the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites.

178. Even before each of the popup cookie consent banners appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiff Ayora's devices and/or transmitted to the Third Parties along with user data, without Plaintiff Ayora's knowledge. Accordingly, the popup cookie consent banners' representations to Plaintiff Ayora that he could decline the use and/or placement of all cookies and tracking technologies while he browsed the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites were false. Contrary to what Defendants made Plaintiff Ayora believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendants had already caused that to happen.

179. Then, as Plaintiff Ayora continued to browse the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites in reliance on the promises Defendants made in the cookie

consent banners and despite Plaintiff Ayora's clear rejection of the use and/or placement of cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of such cookies along with user data, including those involved in providing targeted advertising from the Third Parties, on his devices. In doing so, Defendants caused the Third Parties to track and collect Plaintiff Ayora's Private Communications as he browsed the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites.

180. Defendants' representations that consumers could "Decline" all cookies while Plaintiff Ayora and users browsed the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites, or at least "Decline" those cookies and tracking technologies involved in providing targeted advertising, were untrue. Had Plaintiff Ayora known this fact, he would not have used the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites. Moreover, Plaintiff Ayora reviewed the popup cookie consent banners prior to using the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites. Had Defendants disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline cookies, Plaintiff Ayora would have noticed it and would not have used the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites or, at a minimum, he would have interacted with the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites differently.

181. Plaintiff Ayora continues to desire to browse content featured on the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites. Plaintiff Ayora would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Ayora would likely browse the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites again in the future, but he will not do so until then. Plaintiff Ayora regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Ayora does not know how the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Arby's, Baskin Robbins,

Dunkin, and Jimmy John's Websites honor users' requests to decline all cookies and tracking technologies, Plaintiff Ayora will be unable to rely on Defendants' representations when browsing the Arby's, Baskin Robbins, Dunkin, and Jimmy John's Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Ayora is not a software developer and has not received training with respect to HTTP network calls.

**Christine Wiley**

182. Plaintiff Wiley visited the Jimmy John's, Baskin Robbins, and Dunkin Websites to seek and obtain information about Defendant's products, while located in California, on one or more occasions during the last four years.

183. Plaintiff Wiley's visits to the Websites were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Wiley is not a consumer advocate, a "tester," or a compliance auditor that visited the Websites to test or evaluate Defendant's privacy practices.

184. Specifically, Plaintiff Wiley visited the Jimmy John's Website in or around January 2025. When Plaintiff Wiley visited the Jimmy John's Website, the Website detected that she was a visitor in California and immediately presented her with the Jimmy John's Website popup cookie consent banner as shown and described in Paragraph 85 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Wiley viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Wiley also viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

185. Specifically, Plaintiff Wiley visited the Baskin Robbins Website in or around April 2025. When Plaintiff Wiley visited the Baskin Robbins Website, the Website detected that she was a visitor in California and immediately presented her with the Baskin Robbins Website popup cookie consent banner as shown and described in Paragraph 59 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Wiley viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Wiley also viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

186. Specifically, Plaintiff Wiley visited the Dunkin Website in or around September 2024. When Plaintiff Wiley visited the Dunkin Website, the Website detected that she was a visitor in California and immediately presented her with the Dunkin Website popup cookie consent banner as shown and described in Paragraph 72 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Wiley viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Wiley also viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

187. For each of the Jimmy John's, Baskin Robbins, and Dunkin Websites, consistent with her typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Wiley selected and clicked the "Decline" button. Plaintiff Wiley believed that selecting the "Decline" button on the popup cookie consent banners found on the Jimmy John's, Baskin Robbins, and Dunkin Websites would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks for the purpose of providing targeted advertising, among other things).

188. In selecting the "Decline" button, Plaintiff Wiley gave Defendants Jimmy John's, Dunkin, and Inspire notice that she did not consent to the use or placement of cookies and

tracking technologies while browsing the Jimmy John's, Baskin Robbins, and Dunkin Websites. Further, Plaintiff Wiley specifically rejected those cookies used for targeted advertising and those that share user information with third parties for targeted advertising and other purposes. In reliance on these representations and promises, only then did Plaintiff Wiley continue browsing the Jimmy John's, Baskin Robbins, and Dunkin Websites.

189. Even before the popup cookie consent banners appeared on the screen, Defendants Jimmy John's, Dunkin, and Inspire nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiff Wiley's devices and/or transmitted to the Third Parties along with user data, without Plaintiff Wiley's knowledge. Accordingly, the popup cookie consent banners' representations to Plaintiff Wiley that she could decline the use and/or placement of all cookies and tracking technologies while he browsed the Jimmy John's, Baskin Robbins, and Dunkin Websites were false. Contrary to what Defendants Jimmy John's, Dunkin, and Inspire made Plaintiff Wiley believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendants Jimmy John's, Dunkin, and Inspire had already caused that to happen.

190. Then, as Plaintiff Wiley continued to browse the Jimmy John's, Baskin Robbins, and Dunkin Websites in reliance on the promises Defendants Jimmy John's, Dunkin, and Inspire made in the cookie consent banners and despite Plaintiff Wiley's clear rejection of the use and/or placement of cookies and tracking technologies, Defendants Jimmy John's, Dunkin, and Inspire nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising from the Third Parties, on her devices. In doing so, Defendants Jimmy John's, Dunkin, and Inspire caused the Third Parties to track and collect Plaintiff Wiley's Private Communications as she browsed the Jimmy John's, Baskin Robbins, and Dunkin Websites.

191. Defendants' representations that consumers could "Decline" all cookies while Plaintiff Wiley and users browsed the Jimmy John's, Baskin Robbins, and Dunkin Websites, or

at least "Decline" those cookies and tracking technologies involved in providing targeted advertising, were untrue. Had Plaintiff Wiley known this fact, she would not have used the Jimmy John's, Baskin Robbins, and Dunkin Websites. Moreover, Plaintiff Wiley reviewed the popup cookie consent banners prior to using the Jimmy John's, Baskin Robbins, and Dunkin Websites. Had Defendants disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline cookies, Plaintiff Wiley would have noticed it and would not have used the Jimmy John's, Baskin Robbins, and Dunkin Websites or, at a minimum, she would have interacted with the Jimmy John's, Baskin Robbins, and Dunkin Websites differently.

192. Plaintiff Wiley continues to desire to browse content featured on the Jimmy John's, Baskin Robbins, and Dunkin Websites. Plaintiff Wiley would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Jimmy John's, Baskin Robbins, and Dunkin Websites were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Wiley would likely browse the Jimmy John's, Baskin Robbins, and Dunkin Websites again in the future, but he will not do so until then. Plaintiff Wiley regularly visits websites that feature content similar to that of the Jimmy John's, Baskin Robbins, and Dunkin Websites. Because Plaintiff Wiley does not know how the Jimmy John's, Baskin Robbins, and Dunkin Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Jimmy John's, Baskin Robbins, and Dunkin Websites honor users' requests to decline all cookies and tracking technologies, Plaintiff Wiley will be unable to rely on Defendants' representations when browsing the Jimmy John's, Baskin Robbins, and Dunkin Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to

whom. Plaintiff Wiley is not a software developer and has not received training with respect to HTTP network calls.

**Mikhail Gershzon**

193. Plaintiff Gershzon visited the Baskin Robbins and Arby's Websites to seek information about Arby's products, while located in California, on one or more occasions during the last four years.

194. Plaintiff Gershzon's visits to the Websites were consistent with a typical Website user's visits seeking information about Baskin Robbins and Arby's products. Specifically, Plaintiff Gershzon is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendants' privacy practices.

195. Specifically, Plaintiff Gershzon visited the Arby's Website in or around September 2024. When Plaintiff Gershzon visited the Arby's Website, the Website detected that he was a visitor in California and immediately presented him with the Arby's Website popup cookie consent banner as shown and described in Paragraph 46 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Gershzon viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Gershzon also viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

196. Specifically, Plaintiff Gershzon visited the Baskin Robbins Website in or around September and/or October 2024. When Plaintiff Gershzon visited the Baskin Robbins Website, the Website detected that he was a visitor in California and immediately presented him with the Baskin Robbins Website popup cookie consent banner as shown and described in Paragraph 59 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Gershzon viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Gershzon also

viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

197. For each of the Arby's and Baskin Robbins Websites, consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Gershzon selected and clicked the "Decline" button. Plaintiff Gershzon believed that selecting the "Decline" button on the popup cookie consent banners found on the Arby's and Baskin Robbins Websites would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks for the purpose of providing targeted advertising, among other things).

198. In selecting the "Decline" button, Plaintiff Gershzon gave Defendants Arby's, Dunkin, and Inspire notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Arby's and Baskin Robbins Websites. Further, Plaintiff Gershzon specifically rejected those cookies used for targeted advertising and those that share user information with third parties for targeted advertising and other purposes. In reliance on these representations and promises, only then did Plaintiff Gershzon continue browsing the Arby's and Baskin Robbins Websites.

199. Even before the popup cookie consent banners appeared on the screen, Defendants Arby's, Dunkin, and Inspire nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiff Gershzon's devices and/or transmitted to the Third Parties along with user data, without Plaintiff Gershzon's knowledge. Accordingly, the popup cookie consent banners' representations to Plaintiff Gershzon that he could decline the use and/or placement of all cookies and tracking technologies while he browsed the Arby's and Baskin Robbins Websites were false. Contrary to what Defendants Arby's, Dunkin, and Inspire made Plaintiff Gershzon believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendants had already caused that to happen.

200. Then, as Plaintiff Gershzon continued to browse the Arby's and Baskin Robbins Websites in reliance on the promises Defendants Arby's, Dunkin, and Inspire made in the cookie consent banners and despite Plaintiff Gershzon's clear rejection of the use and/or placement of cookies and tracking technologies, Defendants Arby's, Dunkin, and Inspire nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising from the Third Parties, on his devices. In doing so, Defendants caused the Third Parties to track and collect Plaintiff Gershzon's Private Communications as he browsed the Arby's and Baskin Robbins Websites.

201. Defendants' Arby's, Dunkin, and Inspire's representations that consumers could "Decline" all cookies while Plaintiff Gershzon and users browsed the Arby's and Baskin Robbins Websites, or at least "Decline" those cookies and tracking technologies involved in providing targeted advertising, were untrue. Had Plaintiff Gershzon known this fact, he would not have used the Arby's and Baskin Robbins Websites. Moreover, Plaintiff Gershzon reviewed the popup cookie consent banners prior to using the Arby's and Baskin Robbins Websites. Had Defendants Arby's, Dunkin, and Inspire disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline cookies, Plaintiff Gershzon would have noticed it and would not have used the Arby's and Baskin Robbins Websites or, at a minimum, he would have interacted with the Arby's and Baskin Robbins Websites differently.

202. Plaintiff Gershzon continues to desire to browse content featured on the Arby's and Baskin Robbins Websites. Plaintiff Gershzon would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Arby's and Baskin Robbins Websites were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Gershzon would likely browse the Arby's and Baskin Robbins Websites again in the future, but he will not do so until then. Plaintiff Gershzon regularly visits websites that feature content similar to that of the Arby's and Baskin Robbins Websites. Because Plaintiff Gershzon does not know how the Arby's and Baskin Robbins Websites are programmed, which

can change over time, and because he does not have the technical knowledge necessary to test whether the Arby's and Baskin Robbins Websites honor users' requests to decline all cookies and tracking technologies, Plaintiff Gershzon will be unable to rely on Defendants' representations when browsing the Arby's and Baskin Robbins Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Arby's and Baskin Robbins Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Gershzon is not a software developer and has not received training with respect to HTTP network calls.

**George Nino**

203. Plaintiff Nino visited the Arby's, Baskin Robbins, Dunkin, Jimmy John's, and Sonic Websites to seek and obtain information about each restaurant's products, while located in California, on multiple occasions during the last four years.

204. Plaintiff Nino's visits to the Websites were consistent with a typical Website user's visits seeking information about Defendants' fast food products and restaurant locations near him. Specifically, Plaintiff Nino is not a consumer advocate, a "tester," or a compliance auditor that visited the Websites to test or evaluate Defendants' privacy practices.

205. Specifically, Plaintiff Nino visited the Arby's Website frequently, including in or around August and/or September 2021. When Plaintiff Nino visited the Arby's Website, the Website detected that he was a visitor in California and immediately presented him with the Arby's Website popup cookie consent banner as shown and described in Paragraph 46 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Nino viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Nino also viewed the additional

representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

206. Specifically, Plaintiff Nino visited the Baskin Robbins Website multiple times between 2023 and 2024. When Plaintiff Nino visited the Baskin Robbins Website, the Website detected that he was a visitor in California and immediately presented him with the Baskin Robbins Website popup cookie consent banner as shown and described in Paragraph 59 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Nino viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Nino also viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

207. Specifically, Plaintiff Nino visited the Dunkin Website multiple times between 2023 and 2024. When Plaintiff Nino visited the Dunkin Website, the Website detected that he was a visitor in California and immediately presented him with the Dunkin Website popup cookie consent banner as shown and described in Paragraph 72 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Nino viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Nino also viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

208. Specifically, Plaintiff Nino visited the Jimmy John's Website multiple times between 2023 and 2024. When Plaintiff Nino visited the Jimmy John's Website, the Website detected that he was a visitor in California and immediately presented him with the Jimmy John's Website popup cookie consent banner as shown and described in Paragraph 85 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Nino viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Nino also viewed the additional

representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

209. Specifically, Plaintiff Nino visited the Sonic Website multiple times between 2023 and 2024. When Plaintiff Nino visited the Sonic Website, the Website detected that he was a visitor in California and immediately presented him with the Sonic Website popup cookie consent banner as shown and described in Paragraph 98 of this Complaint, which provided the option to select the "Decline" button. Plaintiff Nino viewed the representation on the popup cookie consent banner that, "We use cookies on our website. By clicking Accept you consent to the use of all cookies." Plaintiff Nino also viewed the additional representation indicating that, instead of choosing to "Accept…the use of all cookies[,]" users could instead "Decline" cookies.

210. For each of the Websites, consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Nino selected and clicked the "Decline" button. Plaintiff Nino believed that selecting the "Decline" button on the popup cookie consent banners found on the Websites would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks for the purpose of providing targeted advertising, among other things).

211. In selecting the "Decline" button, Plaintiff Nino gave Defendants notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Websites. Further, Plaintiff Nino specifically rejected those cookies used for targeted advertising and those that share user information with third parties for targeted advertising and other purposes. In reliance on these representations and promises, only then did Plaintiff Nino continue browsing the Websites.

212. Even before the popup cookie consent banners appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiff Nino's devices and/or transmitted to the Third Parties along with user data, without Plaintiff Nino's knowledge. Accordingly, the popup cookie

consent banners' representations to Plaintiff Nino that he could decline the use and/or placement of all cookies and tracking technologies while he browsed the Websites were false. Contrary to what Defendants made Plaintiff Nino believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendants had already caused that to happen.

213. Then, as Plaintiff Nino continued to browse the Websites in reliance on the promises Defendants made in the cookie consent banners and despite Plaintiff Nino's clear rejection of the use and/or placement of cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising from the Third Parties, on his devices. In doing so, Defendants caused the Third Parties to track and collect Plaintiff Nino's Private Communications as he browsed the Websites.

214. Defendants' representations that consumers could "Decline" all cookies while Plaintiff Nino and users browsed the Websites or at least "Decline" those cookies and tracking technologies involved in providing targeted advertising, were untrue. Had Plaintiff Nino known this fact, he would not have used the Websites. Moreover, Plaintiff Nino reviewed the popup cookie consent banners prior to using the Websites. Had Defendants disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline cookies, Plaintiff Nino would have noticed it and would not have used the Websites or, at a minimum, he would have interacted with the Websites differently.

215. Plaintiff Nino continues to desire to browse content featured on the Websites. Plaintiff Nino would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Nino would likely browse the Websites again in the future, but he will not do so until then. Plaintiff Nino regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Nino does not know how the Websites are programmed, which can change over time, and because he does not have the

technical knowledge necessary to test whether the Websites honor users' requests to decline all cookies and tracking technologies, Plaintiff Nino will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Nino is not a software developer and has not received training with respect to HTTP network calls.

**AYORA TOLLING**

216. The delayed discovery rule applies to Plaintiff Ayora's claims. Plaintiff Ayora was unaware that even though he declined all cookies on the Arby's Website, the Baskin Robbins website, the Dunkin Website, and the Jimmy John's Website, Defendants caused cookies, including the Third Parties' cookies, to be sent to his browsers, stored on his devices, and transmitted to the Third Parties along with his private user data until on or around October 15, 2023 when he learned of Defendants' privacy violations from his counsel. As alleged above, Plaintiff Ayora does not have the expertise to test whether the Websites honored users' requests to opt out of cookies and tracking technologies.

217. On or about October 30, 2023, Plaintiff Ayora notified Defendant Inspire Brands, Inc. that he alleged that each of the Websites caused third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the Websites despite consumers' clear rejection or declination of such third-party cookies. Plaintiff Ayora further represented that he intended to pursue his claims on behalf of himself and other similarly situated class members for each of the Websites.

218. The Arby's Website's Terms of Use contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendants before the JAMS.

219. Accordingly, Plaintiff Ayora subsequently filed an arbitration demand against Defendants Inspire Brands and Arby's Restaurant Groups with the JAMS, in which he provided Defendants with further notice of the claims asserted in this Complaint and his intent to pursue those claims on behalf of himself and other similarly situated class members.

220. The JAMS issued a closing later (dated April 4, 2025), after the Arbitrator issued a final order/award (dated February 24, 2025) concluding: (a) Plaintiff Ayora did not waive his right to contest arbitrability; (b) the Arbitrator had authority to decide threshold arbitrability issues; and (c) the Arbitrator did not have jurisdiction to hear the case. Exhibit A.

221. Despite exercising reasonable diligence, Plaintiff Ayora was unaware of Defendants' fraudulent and unlawful conduct alleged herein due to their active concealment of material facts, which prevented Plaintiff Ayora from discovering his claims within the statute of limitations. Further, Plaintiff Ayora's claims were equitably tolled by his demand letter and his filing of the JAMS arbitration proceeding because Defendants had notice of the claims (and Plaintiff Ayora's intent to pursue them in court as a putative class action). Defendants were not prejudiced in their ability to gather evidence for Plaintiff Ayora's claims since his claims asserted in this Complaint are substantially similar to those raised in the demand letter and arbitration proceeding. These extraordinary circumstances, including Defendants' intentional misrepresentations and Plaintiff Ayora's pursuit of his claims in the arbitration proceeding, warrant tolling of the statute of limitations to allow Plaintiff Ayora to pursue his claims in this forum. Plaintiff Ayora acted in good faith and engaged in reasonable conduct in filing his Complaint in this action.

**WILEY TOLLING**

222. The delayed discovery rule applies to Plaintiff Wiley's claims. Plaintiff Wiley was unaware that even though she declined all cookies on the Jimmy John's Website, Defendants caused cookies, including the Third Parties' cookies, to be sent to her browsers, stored on her devices, and transmitted to the Third Parties along with her private user data until on or around July 22, 2023 when she learned of Defendants' privacy violations from her counsel. As alleged

above, Plaintiff Wiley does not have the expertise to test whether the Jimmy John's Website honored users' requests to opt out of cookies and tracking technologies.

223. On or about February 13, 2024, Plaintiff Wiley notified Defendant Inspire Brands, Inc. that she alleged that its Websites caused third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the Websites despite consumers' clear rejection or declination of such third-party cookies. Plaintiff Wiley further represented that she intended to pursue her claims on behalf of herself and other similarly situated class members.

224. The Jimmy John's Website's Terms of Use contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendants before the JAMS.

225. Plaintiff Wiley subsequently filed an arbitration demand against Defendant Inspire Brands, Inc. and Defendant Jimmy John's Franchisor SPV, LLC with the JAMS on May 10, 2024, in which she provided them with further notice of the claims asserted in this Complaint and her intent to pursue those claims on behalf of herself and other similarly situated class members.

226. The Arbitrator issued a final order/award (dated January 3, 2025) concluding: (a) Plaintiff Wiley did not waive her right to contest arbitrability; (b) the Arbitrator had authority to decide threshold arbitrability issues; and (c) the Arbitrator did not have jurisdiction to hear the case. *See* Ex. D. JAMS subsequently issued a closing letter, dated April 29, 2025, confirming that it had closed the arbitration. *See* Ex. F.

227. Despite exercising reasonable diligence, Plaintiff Wiley was unaware of Defendants' fraudulent and unlawful conduct alleged herein due to their active concealment of material facts, which prevented Plaintiff Wiley from discovering her claims within the statute of limitations. Further, Plaintiff Wiley's claims were equitably tolled by her demand letter and her filing of the JAMS arbitration proceeding because Defendants had notice of the claims (and Plaintiff Wiley's intent to pursue them in court as a putative class action). Defendants were not

prejudiced in their ability to gather evidence for Plaintiff Wiley's claims since her claims asserted in this Complaint are substantially similar to those raised in the demand letter and arbitration proceeding. These extraordinary circumstances, including Defendants' intentional misrepresentations and Plaintiff Wiley's pursuit of her claims in the arbitration proceeding, warrant tolling of the statute of limitations to allow Plaintiff Wiley to pursue her claims in this forum. Plaintiff Wiley acted in good faith and engaged in reasonable conduct in initiating this action.

## CLASS ALLEGATIONS

228. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed any of the Websites in the State of California after clicking or selecting the "Decline" button in the popup cookies consent banner or otherwise declining cookies in the cookie preferences window.

229. This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

230. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

231. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendants would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to decline all cookies and tracking technologies on the Websites, nor would

Defendants permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

232. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendants' actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

233. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited one or more of the Websites, declined all cookies, and had their confidential Private Communications intercepted by the Third Parties.

234. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendants' liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

235. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the

impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy (all Plaintiffs)

236. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

237. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendants constituting a serious invasion of privacy.

238. Defendants have intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

239. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendants affirmatively promised users they could "Decline" all cookies and tracking technologies before proceeding to browse the Websites. Plaintiffs and other Class members directed their electronic devices to access the Websites and, when presented with the

popup cookies consent banner on the Website, Plaintiffs and Class members declined cookies and reasonably expected that their declination of cookies and tracking technologies would be honored. That is, they reasonably believed that Defendants would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Websites. Plaintiffs and Class members also reasonably expected that, if they declined cookies and/or tracking technologies, Defendants would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Websites.

240. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

241. Defendants, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendants allowed third parties to collect enables the Third Parties to (and they in fact do), inter alia, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and

other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

242. Defendants' actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

243. Defendants' intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

244. Defendants lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

245. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

246. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

247. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion (All Plaintiffs)**

248. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

249. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

250. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendants' representations otherwise in the popup cookie consent banner, Defendants intentionally intruded upon the solitude or seclusion of their Websites' users. Defendants effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

251. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Websites using third-party cookies that Defendants caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Websites' users specifically chose to "Decline" cookies.

252. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Websites based on Defendants' promise that users could "Decline" cookies, as well as state criminal and civil laws designed to protect individual privacy.

253. Defendants' intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendants represented that their Websites' users could "Decline" cookies, when, in fact, Defendants caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers declined cookies. Indeed, Plaintiffs and Class members

reasonably expected, based on Defendants' false representations, that when they declined all cookies and tracking technologies, Defendants would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

254. Defendants' conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Websites.

255. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

256. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

257. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**<u>Third Cause of Action</u>: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) (Plaintiffs other than Wiley)**

258. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

259. California Penal Code § 631(a) provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things

> mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

260. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

261. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360–61 (emphasis supplied; internal citations omitted).

262. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192–93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendants, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

263. CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

264. Each Defendant is a "person" within the meaning of California Penal Code § 631.

265. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

266. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendants' deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

267. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendants, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

268. Under § 631(a), Defendants must show they had the consent of all parties to a communication.

269. At all relevant times, the Websites caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Websites in this manner, Defendants willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

270. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

271. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, that the Third Parties automatically intercepted directly communicates the Websites' user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

272. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

273. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of

Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendants aiding, agreeing with, employing, permitting, or otherwise causing the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to decline all cookies in the consent banner.

274. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Websites and where the Third Parties—as caused by Defendants—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

275. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

276. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendants' violations of CIPA § 631(a), as well as injunctive relief.

277. Unless enjoined, Defendants will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with

Defendants. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to fast food and casual restaurants. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to decline cookies and tracking technologies will be honored and/or whether Defendants will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Further, Defendants have already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) (Plaintiffs other than Wiley)**

278. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

279. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

280. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

281. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

282. The Third Parties' cookies and the corresponding software code installed by Defendants on their Websites are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

283. At all relevant times, Defendants caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15–16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5–11 (N.D. Cal. Oct. 21, 2024).

284. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Websites. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication . . .") (cleaned up).

285. Plaintiffs and Class members did not provide their prior consent to Defendants' use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendants that they did not consent to the Websites' use of third-party cookies by clicking or selecting the "Decline" button in the cookie consent banner.

286. Defendants did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

287. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

288. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendants' violations of § 638.51(a).

**<u>Fifth Cause of Action</u>: Common Law Fraud, Deceit and/or Misrepresentation (All Plaintiffs)**

289. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

290. Defendants fraudulently and deceptively informed Plaintiffs and Class members that they could "Decline" all cookies.

291. However, despite Defendants' representations otherwise, Defendants caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected the "Decline" button in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Decline" cookies.

292. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendants, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendants knew, or should have known, how the Websites functioned, including the Third Party's resources it installed on the Websites and the third-party cookies in use on the Websites, through testing the Websites, evaluating their performance metrics by means of their accounts with the Third Parties, or otherwise, and knew, or should have known, that the Websites' programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to "Decline" cookies, which Defendants promised their Websites' users they could do. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Websites. In misleading Plaintiffs and Class members and not so informing them, Defendants breached their duty to Plaintiffs and Class members. Defendants also gained financially from, and as a result of, their breach.

293. Plaintiffs and Class members relied to their detriment on Defendants' misrepresentations and fraudulent omissions.

294. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendants' unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

295. Defendants' actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

296. Defendants' representation that consumers could "Decline" all cookies (including those cookies associated with targeted advertising) if they clicked or selected the "Decline" button was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Websites. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Websites. Had Defendants disclosed that it caused third-party cookies to be stored on the Websites' visitors' devices that are related to targeted advertising and/or share information with third parties even after they choose to decline cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Websites.

297. By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Websites under the mistaken belief that Defendants

would not permit third parties to obtain users' Private Communications when consumers chose to decline cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

298. Plaintiffs and Class members justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants' conduct.

299. As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

300. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Sixth Cause of Action: Unjust Enrichment (All Plaintiffs)**

301. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

302. Defendants created and implemented a scheme to increase their own profits through a pervasive pattern of false statements and fraudulent omissions.

303. Defendants were unjustly enriched as a result of their wrongful conduct, including through their misrepresentation that users could "Decline" all cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members declined cookies.

304. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendants.

305. Defendants have been unjustly enriched at the expense of Plaintiffs and Class members, and Defendants have unjustly retained the benefits of their unlawful and wrongful conduct.

306. Defendants appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendants at their detriment. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of Plaintiffs and Class members.

307. It would be unjust for Defendants to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

308. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

309. Plaintiffs and Class members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

310. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendants as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendants to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Dated: February 6, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

Patrick J. Branson (*pro hac vice*)
patrick@gutridesafier.com
305 Broadway, 7th Floor
New York, NY 10007
Telephone: 415-639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*