UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Alex G. Tse, Magistrate Judge

PAUL DE AYORA, )
)
Plaintiff, )
)
vs. ) No. C 25-03645-AGT
)
INSPIRE BRANDS, INC., et al., )
)
Defendants. )
______________________________)

San Francisco, California
Friday, December 12, 2025

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 9:59 - 11:59 = 120 MINUTES

APPEARANCES:

For Plaintiff:

Gutride Safier, LLP
100 Pine Street, Suite 1250
San Francisco, California 94111
BY: SETH A. SAFIER, ESQ.

For Defendants:

Baker & Hostetler, LLP
1900 Avenue of the Stars
Suite 2700
Los Angeles, California 90067
BY: BETHANY G. LUKISCH, ESQ.
BY: KAMRAN B. AHMADIAN, ESQ.

Transcribed by: Echo Reporting, Inc
Contracted Court Reporter/
Transcriber
echoreporting@yahoo.com

Friday, December 12, 2025 9:59 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: All rise. This Court is now in session. The Honorable Alex Tse, presiding.

THE COURT: All right. Please be seated.

THE CLERK: Calling Civil Matter 25-3645, Paul de Ayora versus Inspire Brands, Inc. et al.

Counsel, please approach the lectern. State your appearances, beginning with Plaintiff's counsel.

THE COURT: Go ahead.

MR. SAFIER: Good morning, your Honor. Seth Safier on behalf of the Plaintiff.

THE COURT: Thank you.

MS. LUKISCH: Good morning, your Honor. Bethany Lukisch on behalf of Defendants. I also have Kamran Ahmadian here --

THE COURT: Okay.

MS. LUKISCH: -- also on behalf of Defendants.

THE COURT: Great. Thank you.

MR. AHMADIAN: Good morning, your Honor.

THE COURT: Good morning.

All right. We'll take argument from the podium. So if you want to remain, then you don't have to walk back and forth, that's great. Okay. All right. Let's begin with a

discussion about Inspire.

And my first question I guess I'll direct to you, Plaintiff's counsel. What and where in your complaint are the acts by Inspire, the alleged acts that form the basis for the claims --

MR. SAFIER: We --

THE COURT: -- that's sufficient for standing?

MR. SAFIER: -- we believe that Inspire is involved in all the claims. Inspire --

THE COURT: Did any of the Plaintiffs go on an Inspire website?

MR. SAFIER: I know that --

THE COURT: And, if so, where is that in the complaint?

MR. SAFIER: -- information about the Inspire website is in the complaint. I don't think any plaintiff visited the Inspire website.

THE COURT: Okay.

MR. SAFIER: But as to all the other websites --

THE COURT: Yes.

MR. SAFIER: -- in the private --

THE COURT: Sticking with Inspire, please.

MR. SAFIER: Okay. No --

THE COURT: So Inspire doesn't have any -- nobody's gone to the Inspire website. What is the basis for

Inspire's standing?

MR. SAFIER: Inspire --

THE COURT: Yeah.

MR. SAFIER: -- is the --

THE COURT: I know. I know what it is --

MR. SAFIER: Right.

THE COURT: -- it's the parent, but does -- you don't get to just allege claims against a parent.

MR. SAFIER: Understood. I understand that.

THE COURT: Right.

MR. SAFIER: Typically as a matter of pleading you don't just get alleged claims as a parent. But here it's very different because if you look at the guiding documents here, that is the privacy -- privacy policy --

THE COURT: Okay.

MR. SAFIER: -- that unlink on each of the cookie banners --

THE COURT: Right.

MR. SAFIER: -- on the subsidiary websites. Dunkin Donuts --

THE COURT: But no plaintiff has seen any of the cookie banners for Inspire. I can't even tell you what's on there. Nothing's been alleged about that.

MR. SAFIER: Correct, your Honor. I'm talking about the privacy policies for the other websites.

THE COURT: Right. But once again, I feel like you've conflated Inspire, parent and sub doesn't matter.

MR. SAFIER: We --

THE COURT: Where's -- how can I get there?

MR. SAFIER: -- we believe that Inspire has conflated them, because in context of it -- of addressing how each of the subsidiaries -- let's call Dunkin and Sonic a subsidiary. I don't know exactly what the corporate form is. Inspire and each of the subsidiaries say, this is what we do with your information.

THE COURT: Who's the "we"?

MR. SAFIER: Well, Inspire defined -- they define it as the subsidiary --

THE COURT: On their website, but --

MR. SAFIER: In each of the websites. In each of the privacy policies.

THE COURT: But -- okay. So you're actually talking about now the subs?

MR. SAFIER: Correct.

THE COURT: Right. I'm talking about Inspire.

MR. SAFIER: No. As to the --

THE COURT: Well, I'm sorry, but you've alleged claims against Inspire.

MR. SAFIER: Correct.

THE COURT: So you have to I believe show some

connection from Plaintiff to Inspire sufficient for standing.

MR. SAFIER: And maybe I'm just skipping one step ahead or maybe it's insufficient, and I'll take either, your Honor.

THE COURT: Yeah.

MR. SAFIER: Our allegation is as to each of the -- let's just take Arby's, for example. When each Plaintiff goes or any other consumer goes to --

THE COURT: Right.

MR. SAFIER: -- Arby's website --

THE COURT: I understand that.

MR. SAFIER: -- the privacy policy on the Arby's website --

THE COURT: Yeah.

MR. SAFIER: -- includes Inspire.

THE COURT: How?

MR. SAFIER: The privacy policy says "we," and defines we to include Inspire. This is in paragraph --

THE COURT: In the Arby's website?

MR. SAFIER: Correct, your Honor. This is in paragraph 45 of our complaint.

THE COURT: Okay.

MR. SAFIER: And I will --

THE COURT: Is that -- is that clear to the

customer?

MR. SAFIER: Well, I don't -- I don't know if it's clear to the customer, but that's what it says in there.

THE COURT: Okay.

MR. SAFIER: It says --

THE COURT: Let's go take a look. So it would be paragraph 45 --

MR. SAFIER: I believe --

THE COURT: -- page 11. I just want to clear just for the record. So, technically, this is not the first amended complaint. So when I say "complaint," I'm referring to the document that's docketed at 35, your class-action complaint, but it's not an amended complaint. So I don't want there to be any lack of clarity --

MR. SAFIER: Okay.

THE COURT: -- on the record. Okay. Going on 45. Let's see here.

MR. SAFIER: Let me just make sure I'm going with you, your Honor.

THE COURT: Sure.

MR. SAFIER: So, for example, we've stated -- we've set forth the Arby's privacy policy there.

THE COURT: Yes.

MR. SAFIER: And this privacy policy is the exact same on all of this --

THE COURT: Where are you reading from?

MR. SAFIER: -- the subsidiary.

THE COURT: You tell me where you want me --

MR. SAFIER: Yeah, I made a mistake.

THE COURT: -- to read and I'll read.

MR. SAFIER: Let me -- so if you look at paragraph 45 --

THE COURT: Okay.

MR. SAFIER: -- and, a, sub a --

THE COURT: That's Arby's.

MR. SAFIER: -- you see the -- yeah.

THE COURT: And it says, we use cookies --

MR. SAFIER: You see the -- you see the privacy policy --

THE COURT: Okay.

MR. SAFIER: -- that we link in there. And when you get to that privacy policy --

THE COURT: So, which I don't have in front of me.

MR. SAFIER: Correct --

THE COURT: I just have --

MR. SAFIER: -- but we've cited to it. And it says --

THE COURT: So the privacy -- if I were to hit on that hyperlink to privacy policy --

MR. SAFIER: Correct. And then you have to go

back up to 44.

THE COURT: Okay.

MR. SAFIER: And the add-in cookie policy, the -- and then the privacy policy says -- it says, "see our add-in cookie policy." And the add-in cookie policy is the same for all of the subsidiaries.

THE COURT: And that may be. That may be worded exactly the same --

MR. SAFIER: And then in --

THE COURT: -- but where do you connect to Inspire?

MR. SAFIER: Okay. And then in the 44, the add-in cookie policy, it says, "in this policy we and us refers to Inspire Brands and" --

THE COURT: Are you -- where does it say -- here we go.

MR. SAFIER: At the bottom here is --

THE COURT: "In this policy we and us refers to Inspire Brands and our brands and affiliates."

MR. SAFIER: Brands and affiliates. It includes our vendors and third parties --

THE COURT: So you're saying -- okay. We're talking over each other. Okay.

MR. SAFIER: Sorry, your Honor.

THE COURT: So you're saying -- well, we're still

talking over each other.

All right. So when I hit that hyperlink that shows up, and it shows -- and it points to, "in this policy we and us refers to Inspire Brands."

MR. SAFIER: And that is the basis, your Honor.

THE COURT: Okay.

MR. SAFIER: All of the add-in cookie policies are the same. All of the banners are similarly constructed. They obviously look different. They have, you know, pink --

THE COURT: Yes.

MR. SAFIER: -- for Baskin Robbins or --

THE COURT: Okay.

MR. SAFIER: -- whatever for Arby's, but all of them are done by Inspire. All of them. And Inspire says, when we reference these privacy policies, the add-in cookie policies, we means Inspire and our brand.

THE COURT: So when one of the Plaintiffs goes on to the Arby's website and clicks whatever, there's a link in -- on that website that will take me to this sentence --

MR. SAFIER: I believe that's correct.

THE COURT: -- "in this policy we and us refers to Inspire Brands and our brands and affiliates"?

MR. SAFIER: Yes, your Honor.

THE COURT: Okay.

MS. LUKISCH: Your Honor, if I --

THE COURT: Yes?

MS. LUKISCH: -- if I might respond?

THE COURT: Yes, of course.

MS. LUKISCH: The only paragraph that deal with Inspire specifically is paragraph 10, which just says what Inspire is, right. Plaintiff's counsel's representation that -- well, first of all, no plaintiff alleges that they clicked on the privacy policy link and reviewed the privacy policy of any of the subsidiaries. That is not alleged anywhere in the complaint.

The privacy policy that is referenced in paragraph 43 comes from 2024. Mr. de Ayora and Ms. Wiley visited websites in 2023.

THE COURT: Okay.

MS. LUKISCH: Plaintiff have not put forth any evidence or any specificity that --

THE COURT: As to what they actually --

MS. LUKISCH: As to --

THE COURT: And I do have issues --

MS. LUKISCH: -- as to what they saw or how this could possibly play into any misrepresentation or any fraud or any standing for them. And I think that's very important to talk about. Today is going to be all about details.

THE COURT: Yes.

MS. LUKISCH: Plaintiff's counsel is going to be

all about the law and lumping things together and details here really matter. And, in fact --

THE COURT: Can we -- can we go --

MS. LUKISCH: -- footnotes two and four --

THE COURT: -- can we go back to what their point as I understand it, that putting aside for a moment that there's no allegation that specifically says, I saw these words. I clicked this, I saw this policy and so forth. And I don't disagree that at some point it absolutely does matter for pleading, but I want to get an answer to this. Because as I understand counsel's argument, that in the policy is -- where does this language appear, this sentence exactly? "In this policy we and us refers to Inspire Brands and our brands and affiliates." Do you dispute that that language appears somewhere?

MS. LUKISCH: It at least appears on the add and cookie policy --

THE COURT: Okay.

MS. LUKISCH: -- from 2024 --

THE COURT: Okay. So it's --

MS. LUKISCH: -- for Arby's.

THE COURT: -- 2024 for Arby's. And would you -- what is your response to the argument that as a result of it appearing in the '24 Arby's policy, that it seems to say, hey, we, we're part of the Inspire Brands and brands and

affiliates.

MS. LUKISCH: Well, they don't -- they don't allege -- and I think they have a duty --

THE COURT: Yes.

MS. LUKISCH: -- to allege with specificity under 9(b) --

THE COURT: Yes.

MS. LUKISCH: -- this connection --

THE COURT: Yes.

MS. LUKISCH: -- right, that -- and I don't think they have the factual basis that Inspire Brands, Inc. is somehow requiring involved in the drafting, involved in the policy decision of this Arby's policy. There's likewise no allegations --

THE COURT: Well, how would they be able to do that? That's all discovery that's, quite frankly, in the custody of the Defendant. So, I'm not sure it's at that level that's required. The issue for -- under 9(b) is to provide specificity so that you know what the allegations of fraud are. I don't -- I'm trying to get to the connection of whether or not Inspire should even be here.

And this sentence that counsel's pointing to does seem to indicate in the light more favorable to him and his client, that there is some relationship between inspire and these other brands, these other people that they've sued.

And whether or not that's enough to keep Inspire in, I -- I'm -- that's what I'm trying to get to, because I'm not sure -- I totally agree, the complaint as drafted does not have clarity about how this all works.

I think it is critical, and you'll hear from my questions next regarding like what year are we talking about, because it seems that these -- these banners may have changed, and there's no sense of like when a particular plaintiff actually saw the banner in what year and when it applied. So there -- I, too, have concerns about that.

But let's take the issue about Inspire and the relationship with these affiliates, because my big question is, if Inspire doesn't have standing -- or there is no standing rather to bring a claim against Inspire, then what does this case look like? Because it doesn't seem like this case should be Arby's and all these others together. Maybe they're related, but it's not just one lean case anymore. If the parent is gone, then what's left with it? And that's kind of what I'm getting -- I want to get a sense of, where this is going to go.

If Inspire doesn't exist and it's just a case against Arby's, a case against the other Defendants, especially with the understanding that at least I have, that we may have different banners. We may have different years and they look different.

I'm not so -- well, let me stop there.

MS. LUKISCH: I think it does matter --

THE COURT: Okay.

MS. LUKISCH: -- and I think they are required to plead more than just Inspire Brands as the parent of these entities.

THE COURT: So they've -- they've done that, haven't they? Does this -- that's my -- that's my point.

MS. LUKISCH: They've done it in a single privacy policy which they allege in footnotes two and four --

THE COURT: Okay.

MS. LUKISCH: -- defers from subsidiary to subsidiary --

THE COURT: Okay.

MS. LUKISCH: -- that not all defendants have an add and cookie policy.

THE COURT: Okay.

MS. LUKISCH: This excerpt has no relationship to any specific plaintiff.

THE COURT: Right, because we have no proof -- or no allegation that the Plaintiffs even -- well, the Plaintiffs illegibly -- I didn't -- I don't have any allegation that they saw any policy.

MS. LUKISCH: No, no plaintiff --

THE COURT: Yeah.

MS. LUKISCH: -- alleges that they did anything more than hit decline.

THE COURT: Yes.

MS. LUKISCH: And that is very different from some of the other cases that you'll hear about --

THE COURT: Right.

MS. LUKISCH: -- from Mr. Safier I'm sure today. There is no allegation that they did more -- anything more than go to the home page and click on that decline.

THE COURT: So, let me ask you about the way this web page -- because there's many -- at least in my experience, personal experience, that as a user you get bombarded with all these, and at the end you have to accept or decline. And embedded in there is our policies and so forth that you can look at and see what they are. Is this website set up in such a way that you basically -- in order to hit decline, you have to have passed through something that suggests -- what happens if you object to the privacy issue?

MS. LUKISCH: Then -- then you can --

THE COURT: Yeah.

MS. LUKISCH: I mean, you can read the privacy policy --

THE COURT: Or not.

MS. LUKISCH: -- "or not."

THE COURT: Correct.

MS. LUKISCH: You can accept, you can leave the site, you can hit --

THE COURT: But by declining, what --

MS. LUKISCH: -- decline.

THE COURT: Yes. If you decline, what -- what does that mean for purposes -- from the company's perspective, that you -- by declining you warrant that you've read the policy and -- or do you do something else?

MR. SAFIER: Because you guys --

MS. LUKISCH: So, that is not pled here --

THE COURT: Right.

MS. LUKISCH: -- so I don't want to get outside what is pled here. There is -- if Plaintiff went to the cookie settings or the cookie preference center, which is not alleged here --

THE COURT: Okay.

MS. LUKISCH: -- there is more detail about what decline means.

THE COURT: Is there something on the website that says, if you don't accept or decline then the default is x? Like there's many times when you don't go through -- now there's all this requirement about going through -- do you have the necessary cookies or the optional? The marketing ones you opt out. It's horrifically confusing for people,

and people are just aggravated and just hit buttons. And so I -- what is going on here?

MS. LUKISCH: It has varied over time.

THE COURT: Sure.

MS. LUKISCH: And again, it's very much outside the four corners of this pleading --

THE COURT: Right.

MS. LUKISCH: -- which is part of our issue here today.

THE COURT: Right.

MS. LUKISCH: Is that, you know, it has changed over time, so we --

THE COURT: Yeah.

MS. LUKISCH: And each website --

THE COURT: Because the law I believe has changed over time.

MS. LUKISCH: -- has changed different.

THE COURT: Right.

MS. LUKISCH: For example, the cookie banner is -- for each one of these websites started at a different point in time, much into this -- if we're going outside all of the pleadings and talking about facts that are nowhere here in the complaint --

THE COURT: Yeah.

MS. LUKISCH: -- you know, each one of these

websites started using a cookie banner at a different time. Each one of these brands with their own designed website, with their own company and their own corporate policies, chose different actions. Some of these, for example, had different dispute resolution policies. Some of these defendants had different cookies. You can even see that in the pleadings that -- the sparse pleadings that they have. For example, they talked --

THE COURT: Well, it's sparse in some ways, but it is 70 pages.

MS. LUKISCH: Yes, it's very lengthy but --

THE COURT: Right.

MS. LUKISCH: -- but a lot of it without meaning. But like even when you talk about the Google cookies --

THE COURT: Yes.

MS. LUKISCH: -- the Google cookies are only specifically referenced on a certain page within the Arby's website. There's no discussion of it with respect to Baskin Robbins or Sonic or Inspire Brands. There's nothing there to even suggest that each one of these websites functioned the same. We have this massive problem of group pleading, which your Honor and many other judges in the Northern District --

THE COURT: Yes.

MS. LUKISCH: -- and even at the appellate level

have said is not proper.

THE COURT: Yes.

MS. LUKISCH: And so, all of these Defendants' allegations should be thrown out and disregarded when we are looking at, have they stated a sufficient cause of action? Have each of these Plaintiffs stated enough to get passed standing?

And if your Honor will indulge me --

THE COURT: Yes.

MS. LUKISCH: -- for just a minute. 9(b) here applies to everything, and that is not an issue that is decided or addressed in any one of the other opinions that Mr. Safier has had. And the reason that 9(b) applies to everything is that his way of getting past standing, right, the way he distinguishes his cases from all of these other cookie cases, is that there is some sort of lie or misrepresentation that no matter what is collected makes it get past the standing point.

If that is true, then that lie or misrepresentation as he alleges is also means that he has to plead 9(b), right. That that lie is part and parcel of every single one of those cases and every single one of those claims. If not, he is in the Khamooshi camp from Magistrate Kim down the hall, where you have this collection of information that doesn't arise to any sort of privacy level.

There are other reasons that I believe standing doesn't exist and why he hasn't pled sufficient actions to reach all of these different causes of action. But that 9(b) which requires specificity as to each Plaintiff, each Defendant --

THE COURT: Right.

MS. LUKISCH: -- and what each person saw, what happened to each person and their alleged injury applies to every single one of his claims, if he is relying on this notion that his case is different because of some alleged something in some banner that we, you know, have no representations about.

THE COURT: Let me -- getting to my -- my question that I had, is that if Inspire -- if we -- there is no standing over Inspire, and then we have all these individual defendants, what should the case look like? I mean, I know you have other issues with each individual Defendant, but it seems like they're all here just because Inspire is the parent.

MS. LUKISCH: They are all here because this has been a very convoluted journey, which we talked about in our last hearing --

THE COURT: Right.

MS. LUKISCH: -- where there were attempts very early on to just do Inspire, and not really make allegations --

THE COURT: That's what it looked like originally.

MS. LUKISCH: -- right --

THE COURT: Right.

MS. LUKISCH: -- against all of these various different defendants and not go to their websites and just clump everything together to add increased pressure for the group as a whole to, you know, perhaps capitulate to settlement.

So the case -- unless Plaintiff can make more specific allegations, and maybe Mr. Safier will claim that he can and that it should be them together, I -- from an efficiency standpoint, you know, it costs less for my clients --

THE COURT: Yes.

MS. LUKISCH: -- to have me come here and argue on time --

THE COURT: Right.

MS. LUKISCH: -- but I don't necessarily agree that they belong all in the same -- same case, you know, moving forward down the road, and that it's not just highly prejudicial that, you know, we're going to come up with all these different factual circumstances over time. But he wants to put them all in, you know, one class and try and do one thing and clump them all together with all of these differences, that's his prerogative.

THE COURT: Okay.

MR. SAFIER: Your Honor, if I may?
THE COURT: Yes.
MR. SAFIER: I've been accused of all manner of atrocities and --
THE COURT: There's nothing wrong with --
MR. SAFIER: -- that you're right --
THE COURT: -- if that's what you're -- yeah. I didn't interpret --
MR. SAFIER: Yeah, right. And --
THE COURT: -- that in any negative, that you're doing anything --
MR. SAFIER: -- that -- and it's actually our clients.
THE COURT: Yes, but --
MR. SAFIER: And there's actually a complaint here, and I actually think it's very well pled. And if you really look and figure out what's going on, it has been driven by efficiency.
Now if your Honor says that Inspire is not properly a defendant, and your Honor wants to break this into four cases, we'll do that of course, but what we have --
THE COURT: Well, I'm not necessarily there either because I am mindful of being efficient.
MR. SAFIER: Right.
THE COURT: I don't want to have --

MR. SAFIER: Efficiency is what's driven us.

THE COURT: But what I am persuaded thus far, just in the state of the pleadings and in arguments from the motion, is that each Defendant has fairly fact-intensive discussion. I know you claim that they don't, but as I'll get into later, I don't even see an allegation that links Plaintiff -- well, that links Plaintiff to the demand notice for the arbitration, to the Defendant, to what policy it is in my opinion --

MR. SAFIER: I understand.

THE COURT: -- pled like just generally. And we'll get into that for purposes of statute of limitations. Because I agree with counsel, that the lack of specificity must be examined now. Proof of whether or not there is something that is triable or whatever is for summary judgment. But right now, under 12(b), we are -- I am looking for whether or not there are claims that can survive --

MR. SAFIER: I --

THE COURT: -- scrutiny.

So right now I don't see as pled that there is -- well, there's no -- no plaintiff that you have has gone on to an Inspire website --

MR. SAFIER: Correct, your Honor, but --

THE COURT: -- right? So the issue is, you are

bringing Inspire in not by any plaintiff, you're bringing Inspire in by virtue of language in a policy that you want to argue -- argue, and it's not fact, that you want to argue incorporates Inspire.

MR. SAFIER: If I may?

THE COURT: And that I don't see is a way to get you to bring in Inspire.

MR. SAFIER: I understand your point as to Inspire.

THE COURT: Okay.

MR. SAFIER: But I want to back up what is actually pled in the complaint --

THE COURT: Okay.

MR. SAFIER: -- and what's actually happened here, and address your questions about what's in the complaint and not what happened in '23 or '24, these policies that are not in the complaint.

THE COURT: Well, actually I agree with counsel's take --

MR. SAFIER: I --

THE COURT: -- that you can't just mesh everything together and say, whatever the policy is here -- I understand that it's '24, but these Plaintiffs did they see this policy? You allege that they did.

MR. SAFIER: The add policy, no, I'm not saying --

alleging that the Plaintiffs read the add policy for the --

THE COURT: So they didn't even read this one?

MR. SAFIER: Most likely not. Very few people read those policies, your Honor.

THE COURT: Which I --

MR. SAFIER: Same with --

THE COURT: -- which I would agree, too, but --

MR. SAFIER: -- same with the privacy policy, which is why I want to go back to the cookie banner. What we have here, your Honor -- and your Honor asked this question specifically of opposing counsel, is --

THE COURT: Yes.

MR. SAFIER: -- what happens after you click decline in the cookie banner. The cookie banners for all of the subsidiaries are all similarly designed in -- with regard to the material aspects of them. They have the same exact language, accepting cookie -- we use cookies. Pressing accept you agree to use of cookies. They all offer three choices at that point. One is accept, one is decline theoretically all cookies, and one is manage cookies.

THE COURT: Right.

MR. SAFIER: All of the language and the verbiage on all the cookie banners say none of them for --

THE COURT: What happens if they don't hit accept or decline or anything?

MR. SAFIER: There's -- there's no difference, your Honor. That's the very point of this case.

THE COURT: What do you mean there's no difference?

MR. SAFIER: If you pick -- click decline or --

THE COURT: No, you don't click anything.

MR. SAFIER: -- or you --

THE COURT: There are many times where I blow through the cookie preference.

MR. SAFIER: -- or you click accept. If you clicked accept --

THE COURT: No, I'm -- my question is, what happens if you don't click anything?

MR. SAFIER: I'm getting there, your Honor.

THE COURT: Okay.

MR. SAFIER: It's the exact same thing if you do click accept.

THE COURT: Okay.

MR. SAFIER: If you just close the banner let's say for example --

THE COURT: Right.

MR. SAFIER: -- or navigate away, that's the function of accept.

THE COURT: Okay.

MR. SAFIER: The same function as accept. It

turns out --

THE COURT: And what does accept mean?

MR. SAFIER: It -- the same as decline. They put all the cookies on your device that they would if you have declined or if you'd gone through and managed it. That's the very nature of this case, and it's identical to all properties and all Plaintiffs here. Some of these Plaintiffs visit more than one of these websites, but that's the very crux of this case, is this cookie banner that was identical?

Opposing counsel is right. Sometimes it had different coloring, it had different maybe reference to Baskin Robbins as opposed to Sonic or Arby, but the crux of this matter is identical to all the other cases that -- that opposing counsel is referring to.

THE COURT: Yeah.

MR. SAFIER: The cases decided by Judge Orrick, Hallion, Judge Tigar, Motorola, all of the other judges who have dealt with this issue of the cookie banner as opposed to these drive-by -- that -- I visited your website and they were tracking devices on it and information about me. That's very different.

Here we have this determination. The way it worked for all these Plaintiffs is identical. Irrespective of which site they visited, as long as the cookie banner was up and

it was operating in a way we allege it was, I agree that after we sent them a demand letter, after we went to arbitration, after we dealt with this case, they corrected it. No question about that. That will be a determination of when the class period is.

Similarly, I agree that the banner went up on different -- one of these pages at different times. No question. And we may have to do subclasses or whatever, or your Honor may want different cases, whatever we want to do. But fundamentally, this case is about the same exact thing. When you land on the page, tracking devices are put on your -- tracking software is put on your device. You are then, unlike the Khamooshi case Ms. Kim -- Judge Kim had, you are then given this option -- all those other cases it becomes a question of consent. Did the privacy policy say that if you continue navigating or browsing the website we're going to track you in the following x, y and z?

This much of the --

THE COURT: But isn't that critical to know at the pleading stage?

MR. SAFIER: It is. You know it. You know and it's alleged in the complaint. They said they gave you a choice.

THE COURT: Not in a very clear fashion, I will tell you.

MR. SAFIER: Okay. Your Honor, I'll take -- I'll take the criticism. That's a lot -- that's a 70-page complaint.

THE COURT: Correct.

MR. SAFIER: We can go into -- for example --

THE COURT: Why, I don't know.

MR. SAFIER: -- Ms. Lukisch -- because there's a lot of tracking devices, there's a lot of websites and there's a lot of background that needs to be explained, because we did that -- we can (indiscernible), of course, your Honor. And -- but other than -- other than the fact --

THE COURT: Yeah.

MR. SAFIER: -- that there's this -- there's this -- there's these four brands, as opposed to, for example, the Hallion case that was before Judge Orrick, there weren't four brands. Hallion, but there were probably 14 different websites, Tums, and I'm going to forget the other products --

THE COURT: Yeah.

MR. SAFIER: -- that they did. It's no different here. The fundamental facts are the same. They gave --

THE COURT: You make it sound so easy.

MR. SAFIER: It is very easy. And, your Honor, the --

THE COURT: I will tell you, if it was so easy,

this complaint would not look the way that it is.

MR. SAFIER: It's hard because -- it's hard because you have to show in context what the -- And they --

THE COURT: You make it sound like we don't need to do that. You're just arguing to me we don't need to. You're making it sound like they're all the same.

MR. SAFIER: They are.

THE COURT: It's very -- why are you taking 70 pages to say that?

MR. SAFIER: There are different cookies on each website.

THE COURT: Okay.

MR. SAFIER: Not all of them, for example, used -- use --

THE COURT: And you would agree, you would -- can see that all the cookies are different, different time, and, therefore, your case may look different. I'm not -- I'm not suggesting that you may never have a case, but what you've pled here is completely confusing. If you want to spend court resources and Defendants have to pull it apart, this is why we're here pulling it apart.

MR. SAFIER: But I'm --

THE COURT: Do you think you can make a better complaint, as simple and streamline as your presenting it to me today?

MR. SAFIER: We can do better describing it, but fundamentally the case is no different. The case is as follows -- is exactly as I take -- they said that --

THE COURT: Well, that is what --

MR. SAFIER: -- they said that --

THE COURT: -- that is what defense counsel's foreshadowed. Your strategy is going to be, this is so easy. We can just generally do this. But in order for us to go down the path we're -- this gatekeeping function that I have at the pleading stage is not all about, you know, just like a state court complaint. It is not.

MR. SAFIER: I --

THE COURT: You are under 9(b), so you do have to have particularity to show each Plaintiff and how there's fraud and how each Defendant is implicated by that, not just generally.

MR. SAFIER: What we've done, your Honor, we have given exactly as a proffer --

THE COURT: I don't see it.

MR. SAFIER: I understand, your Honor.

THE COURT: I don't see it.

MR. SAFIER: And we can -- and --

THE COURT: But it doesn't mean that I'm going to flush the complaint because there's something that I think could be here, but as you plead it here, I don't think you

have.

MR. SAFIER: This was plead the exact same as the Hallion case, and I --

THE COURT: Okay.

MR. SAFIER: -- and I understand your Honor when you're saying --

THE COURT: Should I just go away and get that judge in here?

MR. SAFIER: No. No, your Honor, that's not what I'm saying.

THE COURT: Right.

MR. SAFIER: What I am saying is this. Defendants doing a very good job of throwing up all these potential individual issues and differences, and those --

THE COURT: The rules allow them to do that.

MR. SAFIER: Of course, your Honor. They --

THE COURT: Right.

MR. SAFIER: And I'm grateful they've done a very nice job. But at the end of the day --

THE COURT: Yes.

MR. SAFIER: -- in this complaint, we will figure out what information -- we know what information it was tracking, but for each --

THE COURT: So you do have that information? You know what's being tracked --

MR. SAFIER: It's in the complaint.

THE COURT: But you have it? You know, for example, when your Plaintiffs went on the website, when they hit decline or whatever, did you have that?

MR. SAFIER: We know roughly when they went on the website.

THE COURT: Okay.

MR. SAFIER: Like in a month, two period.

THE COURT: Right. In fact, that's how some of your Plaintiffs were -- were here in the case. I'm not saying that's inappropriate, but you do have that? You do have that detail --

MR. SAFIER: Okay.

THE COURT: -- of when it is because I think that's going to be critical.

MR. SAFIER: We do have the detail.

THE COURT: Right.

MR. SAFIER: The detail's in those -- in the page there --

THE COURT: Okay. So give me an example where -- I just want to make sure that -- although we unfortunately have some statute issues, but that's okay. When does Wiley visit the site?

MR. SAFIER: Your Honor, you're -- I'm not going to be able to tell you --

THE COURT: Okay.

MR. SAFIER: -- chapter and verse. I can tell you that --

THE COURT: But don't you think you need to put that kind of contents in the complaint?

MR. SAFIER: We put that in -- on paper. We have a class --

THE COURT: Okay. So show me, where's Wiley?

MR. SAFIER: -- we have this class period of when this thing was not operating properly. And we -- I don't have a specific date for each defendant.

THE COURT: But how am I going to evaluate the complaint? I think that is what Defendants have been asking for, is like you've got to have it. Why don't -- why don't you have it? Isn't it easy?

MR. SAFIER: We don't -- we don't have -- the way that this operated is -- take Wiley, for example.

THE COURT: Okay.

MR. SAFIER: I don't remember exactly when she visited, but --

THE COURT: Well, now how are you going to defend that Wiley is even timely and the statute doesn't bar Wiley? How can you -- how can you do this?

MR. SAFIER: Because Wiley said as part of the -- this arbitration that took place before. But we know within

a month or two of when these Plaintiffs --

THE COURT: That's fine.

MR. SAFIER: Right.

THE COURT: I mean, I'm not going to say -- but --

MR. SAFIER: And we can put that in if your Honor wants that. We also --

THE COURT: Do you understand why I need to have that kind --

MR. SAFIER: I understand your --

THE COURT: -- of detail in there?

MR. SAFIER: I understand, your Honor's --

THE COURT: So in 70 pages that particular fact doesn't cross your mind, but yet I have all this other extraneous detail in here that we do have to pour over? That when you say things like, well, it's all in the complaint, it's like, really? Where -- are you asking us to go and find anything and put together the complaints? I don't know what you think we do all day.

MR. SAFIER: That I -- your Honor, I very much appreciate that.

THE COURT: Right.

MR. SAFIER: But what I am saying is the allegation is, is when the -- each of these Plaintiffs visited, they were told they could decline cookies --

THE COURT: Okay.

MR. SAFIER: -- and that was law. Their visits were during the class period which is alleged in there.

THE COURT: Okay.

MR. SAFIER: And their visit -- each of their visits were at a time that the banner was up and miss --

THE COURT: What banner?

MR. SAFIER: The click -- each --

THE COURT: The ones that are in your complaint?

MR. SAFIER: -- each of the click banners that was up. Right.

THE COURT: Right.

MR. SAFIER: There was banners --

THE COURT: Counsel has -- counsel has proffered that the banners change over time.

MR. SAFIER: I agreed with that, yes.

THE COURT: Yes.

MR. SAFIER: They incorporate --

THE COURT: But how do you account for that in this complaint?

MR. SAFIER: We don't account for that --

THE COURT: And is that a problem?

MR. SAFIER: -- because we don't know the exact dates that they changed. But is not a --

THE COURT: Fair enough.

MR. SAFIER: It's like any product case. There is

examples --

THE COURT: But then don't you see why it's critical then for you to allege when they --

MR. SAFIER: We don't know exactly.

THE COURT: No, no, no. No, when they saw the banner, when they hit decline? When they actually trigger liability under your theory? How is the Defendant supposed to be able to defend that?

I realize that you're not going to have all of the facts about when it changed, but the facts that you should have that are within your control is when you're client, that you warrant is an appropriate plaintiff, went to the website, so that we can get -- how am I supposed to mediate discovery disputes? At this point I can't.

MR. SAFIER: No --

THE COURT: And so if you were to say, I want them to respond to all of the changes in the policy. My response to you is, you've got to give them more information than that, information that you should have about your plaintiff.

MR. SAFIER: I understand.

THE COURT: Right. And are you prepared to do that?

MR. SAFIER: Sure.

THE COURT: I don't see that in the complaint. I just see a bunch of general discussion about here's what all

the cookies like, here are Plaintiffs, here you go. Here's what our case would look like. And I think I can demand more than what I'm seeing here. And I think that -- so, I do generally -- and I am testing you to see if you can amend, and to get better. But the amendment isn't going to be 140-page complaint, I will tell you that. I mean, more facts doesn't mean more pages --

MR. SAFIER: All right. I --

THE COURT: -- it means more facts.

MR. SAFIER: -- I understand that.

THE COURT: Right.

MR. SAFIER: And it sounds to me like what you want is the specific facts about Ms. Wiley for example.

THE COURT: Yes.

MR. SAFIER: She visited at approximately October or May of '23.

THE COURT: Okay. Well, let's talk about Ms. Wiley because Wiley and Ayora -- I'm not going to ask this correctly.

MR. SAFIER: Ayora.

THE COURT: "Ayora." Thank you. They have statute issues. All right. So let's stick with Wiley. So Defendants argue that both of these main plaintiffs are untimely and that claims should be dismissed. The position you take is that they're entitled to equitable tolling. So

for Wiley, the statute has run. You can see that I think. And Wiley argues that she is entitled to equitable tolling, but there's this eight-month delay from the arbitrator's decision until being added to the suit or being a named Plaintiff. So how do you reconcile that delay and equitable tolling?

MR. SAFIER: First off, I want to make sure that we're discussing this in context.

THE COURT: Okay.

MR. SAFIER: This is only as to the CIPA claim, which has a one-year statute of limitation.

THE COURT: Okay.

MR. SAFIER: There are other plaintiffs that have filed a claim.

THE COURT: Let's stick with Wiley.

MR. SAFIER: Okay.

THE COURT: Okay. Let's stick with Wiley and CIPA.

MR. SAFIER: I don't -- I don't know how to reconcile that.

THE COURT: Okay.

MR. SAFIER: Your Honor, I don't know. It may be that --

THE COURT: So you can see that Wiley's CIPA claim is untimely and not entitled to equitable tolling?

MR. SAFIER: She is entitled to equitable tolling because --

THE COURT: Why? Especially under Pemperton. Especially under Judge Portley's opinion, were found -- which I think she found under very similar circumstances --

MR. SAFIER: She did and she --

THE COURT: -- no equitable tolling.

MR. SAFIER: -- and she granted leave to amend to add additional time and we're in the process if doing that.

THE COURT: Okay, but here order still says there's no equitable tolling.

MR. SAFIER: Based on those facts.

THE COURT: Okay. So you have more facts out there for Wiley --

MR. SAFIER: I was --

THE COURT: -- that why Wiley's entitled to equitable tolling?

MR. SAFIER: I don't -- I don't know that -- your Honor, to that --

THE COURT: Well --

MR. SAFIER: But it's not being --

THE COURT: -- you better come up with them right now because I'm going to decide whether or not leave should be -- leave to amend for her on equitable tolling. Because it's unacceptable for you to say, I don't know. In fact, I

take your response that you don't know as you can see that there's no ability to add facts --

MR. SAFIER: As to why we --

THE COURT: -- for her.

MR. SAFIER: Your Honor can dismiss her CIPA claim.

THE COURT: Okay. So you can see, Wiley is dismissed -- the CIPA claim for Wiley.

Counsel, do you have anything about Wiley's other -- time limits on her other claims, other than CIPA? I think -- I think counsel's correct. CIPA -- I am concerned about that one-year claim.

MS. LUKISCH: I believe that any claim that would have required a two-year statute of limitations, obviously CIPA was the most prevalent there because of the statutory damages --

THE COURT: Yeah.

MS. LUKISCH: -- which is why we specifically addressed that. But even, you know, the fraud claims which are two years, invasion of privacy which is two years, intrusion upon seclusion which is two years, she also ran those statutes of limitation. Ms. Wiley learned that her 2023 visit --

THE COURT: Okay.

MS. LUKISCH: -- allegedly was problematic when

she hired her lawyer in July -- on July 22nd, 2023 --

THE COURT: Okay.

MS. LUKISCH: -- and no complaint regarding the substance of her claims was filed until August. De Ayora has the same issue --

THE COURT: Except Ayora was able to file a complaint sooner, but I'm still -- I still have questions --

MS. LUKISCH: he was but that's still outside of the --

THE COURT: Yes. And --

MS. LUKISCH: -- statute of limitations.

THE COURT: But I feel -- I still think that the Plaintiff's entitled to assert equitable tolling applies.

MS. LUKISCH: We disagree with that.

THE COURT: That there's -- you don't think they're entitled to equitable tolling or at least to try to get equitable tolling?

MS. LUKISCH: I do not believe they're entitled to equitable tolling.

THE COURT: Either one?

MS. LUKISCH: "Either one."

THE COURT: Okay. Under what authority?

MS. LUKISCH: Under -- they have not demonstrated that they intended by filing the arbitration demand --

THE COURT: Okay.

MS. LUKISCH: -- to actually litigate a substance of their claims. In fact, the arbitration demand -- and I --

THE COURT: Well, I will agree. The arbitration demand was whether or not they can arbitrate. It was very limited to that, but the entire -- there is no daylight between what was going to be done in arbitration, if it had gone there or here. I mean, right, the allegations are the same. It's about the --

MR. SAFIER: Yes, your Honor.

THE COURT: Right?

MS. LUKISCH: No, your Honor. There are differences in terms of the Defendants that were named --

THE COURT: Yes. Okay.

MS. LUKISCH: -- in those complaints.

THE COURT: Okay.

MS. LUKISCH: For example, you know, Ms. Wiley's complaint did not sue Baskin and Robbins. She did not sue Dunkin. She did not -- de Ayora did not sue Baskin, Dunkin or Jimmy John's --

THE COURT: Right.

MS. LUKISCH: -- in the underlying arbitration.

THE COURT: Well, and that -- so, that's the problem is that there's no link between demand letter and -- that they -- that they put anyone on notice, especially

these new Defendants that you're raising, and here we are today.

MS. LUKISCH: And we addressed this at the last hearing, your Honor.

THE COURT: Yes.

MS. LUKISCH: There was -- if they were concerned -- first of all, Plaintiffs have been represented by counsel for years.

THE COURT: Yes.

MS. LUKISCH: Sophisticated counsel who does --

THE COURT: Yes.

MS. LUKISCH: -- class action matters --

THE COURT: Yes.

MS. LUKISCH: -- and is in these courtrooms all of the time.

THE COURT: Yes.

MS. LUKISCH: If there was a concern about statute of limitations --

THE COURT: Yes.

MS. LUKISCH: We discussed this last time, there was nothing preventing them, other than their own strategic --

THE COURT: Well, they wanted to --

MS. LUKISCH: -- desire --

THE COURT: -- to hurry up and go through --

MS. LUKISCH: Hurry up for two years --

THE COURT: Right. Right.

MS. LUKISCH: -- and go through this long arbitration process --

THE COURT: Right.

MS. LUKISCH: -- before we ever get to an actual complaint here. And --

THE COURT: Well, but I think --

MS. LUKISCH: -- that doesn't show --

THE COURT: -- that they were hoping to streamline what they feel like would have been the defense position and just get right to where they should go. Instead of fighting over arbitration, go to arbitration, get it resolved here, but -- that was my memory. I don't know we need to go --

MS. LUKISCH: But I can understand --

MR. SAFIER: Well, and also --

MS. LUKISCH: -- I can understand issues of equitable tolling --

THE COURT: Yes.

MS. LUKISCH: -- if this Plaintiff were pro se, and this was like they, you know, blindly went and accidentally filed -- or they filed an arbitration because they thought they were under the arbitration clauses, and then didn't come here and file a complaint. That's not the circumstance here.

The circumstance here is you have sophisticated represented counsel who have not pled the reasons why they had -- did not come here to court to file their complaint.

THE COURT: When they could have.

MS. LUKISCH: When they absolutely could have.

THE COURT: Right, right. And that is the essence of equitable tolling. Why should --

MR. SAFIER: So --

THE COURT: -- why should these particular Defendants that we're focusing in on now be entitled to equitable tolling?

MR. SAFIER: Again, I harken back to efficiency. And opposing counsel knows this because it's been explained the whole time.

THE COURT: Yes.

MR. SAFIER: We filed the arbitrable litigation before the arbitrator --

THE COURT: Well, you could have gotten -- for example, you knew who these Defendants were. I mean, you -- you knew the Defendants -- you knew some of the defendants maybe.

MR. SAFIER: Correct.

THE COURT: You knew who the Plaintiffs are.

MR. SAFIER: Yup.

THE COURT: There are ways to protect statute.

You could have easily gone to them and got some tolling agreement.

MR. SAFIER: Not if they won't give them.

THE COURT: So you could have done any of that.

MR. SAFIER: Not if they won't agree to them.

THE COURT: Well --

MR. SAFIER: The reason we went to --

THE COURT: Okay.

MR. SAFIER: -- the arbitration --

MS. LUKISCH: We were never asked.

THE COURT: Well --

MR. SAFIER: That is correct.

THE COURT: So that wasn't to analysis on equitable tolling.

MR. SAFIER: Right. But the analysis of equitable tolling --

THE COURT: Yes.

MR. SAFIER: -- is to be done on the facts --

THE COURT: Yes.

MR. SAFIER: -- and what's not pled in the complaint. Again, equitable tolling and statute of limitations defenses are affirmative defenses.

THE COURT: Sure.

MR. SAFIER: They don't -- you don't have to plead around them in the complaint. If your Honor wants more on

it, we will provide more. But the rationale behind the arbitrability was not to have to delay or anything or -- it was efficiency. And not just because theoretically arbitrators move faster, but because if there was an arbitration motion here that was won, there is an automatic stay under Bielski v. Coinbase, and that is 18 months, then it goes up to the 19th -- the Ninth Circuit, and that is what we were trying to avoid by going to the arbitrator.

THE COURT: Okay.

MR. SAFIER: We thought -- because going back to the whole -- to the complaint, the cookie banner makes no incorporation of the terms of service or privacy policy or of any stuff like that.

THE COURT: Okay.

MR. SAFIER: We thought it was an easy question.

THE COURT: Can we -- can we try to keep it on the statute issue.

MR. SAFIER: Right.

THE COURT: So that the statute is the issue -- well, 12(b) is -- I mean, the statute is appropriately raised in 12(b), you would agree to that?

MR. SAFIER: As other things, yes.

THE COURT: So this is a perfectly valid time to address the statute of limitations. Issues of factual dispute may not be appropriate to resolve on a motion to

dismiss, but I think it's prudent to do so, because otherwise you're going to be doing a lot of work that's going to go nowhere if it comes out on summary judgment that everything is untimely and that there's no equitable tolling.

MR. SAFIER: I --

THE COURT: So what is -- what are the factors that you think would persuade me that there's equitable tolling? We've already conceded for Wiley's CIPA, done, but what about the other --

MR. SAFIER: The only reason that I conceded Wiley's CIPA claim is --

THE COURT: Yes.

MR. SAFIER: -- because of the eight-month gap --

THE COURT: Correct.

MR. SAFIER: -- before the complaint was (indiscernible), but that's not the same issue for Ayora.

THE COURT: Yeah. So what -- why is Ayora entitled to equitable tolling?

MR. SAFIER: Because I believe that the gap between the time that the arbitration --

THE COURT: Because the gap isn't as long as eight months?

MR. SAFIER: Correct, your Honor. Yes.

THE COURT: But where's the authority that it's --

that's -- that's not -- that's not where the inquiry begins and ends. It begins and ends is like, what is the reason why --

MR. SAFIER: The --

THE COURT: No, no. Why there was a delay and why did the delay, it should be entitled to -- you know, as an excuse, I can forgive the delay.

MR. SAFIER: The three factors are timely notice --

THE COURT: Yes.

MR. SAFIER: -- lack of prejudice --

THE COURT: And was there timely notice? Because, as counsel points out, it's not clear -- all the Defendants in the case say they got the demand notice puts them on notice.

MR. SAFIER: The demand notice includes all of the websites, all of the --

THE COURT: I know that's what you want, but that's -- how can we do that if they never got it? So how are these Defendants put on notice if they never got the demand?

MR. SAFIER: Because it -- because it goes to the parent.

THE COURT: That I'm not convinced is an appropriate way to get everybody --

MR. SAFIER: I understand.

THE COURT: -- right? Right?

MR. SAFIER: They were --

THE COURT: So --

MR. SAFIER: Plain and simple, your Honor.

THE COURT: -- so that's where you're basically relying on is because the parent sub-relationship, they're all on the hook. It doesn't matter --

MR. SAFIER: Well, it's not that they're all on notice.

THE COURT: -- even the plan to -- well, yes. So, why are they notice for something just because the parent had notice? Now you're flipping it. Now you're flipping it that if the parent has notice, which the parent doesn't, therefore, the sub can't have notice. You can't -- you can take advantage of this -- you -- one gets it they all get it, because you conceded that Inspire didn't get it. They don't have to.

MR. SAFIER: Your Honor, I'm not -- I'm talking about -- not the actual arbitration demand. Before any of this started, we sent demand letters.

THE COURT: Right, to some.

MR. SAFIER: But in sum, it was talking about the websites and it included language regarding, this is the entity and all of your parents and affiliates --

THE COURT: Right. So if a demand letter went to Arby's, but to not go to Jimmy John --

MR. SAFIER: I understand.

THE COURT: -- your position is it doesn't matter because they have the same parent, and, therefore, they both get it?

MR. SAFIER: If the -- if the demand -- for example, if they -- if you have a scenario where Arby's got a demand letter that said, www.arbys.com is at issue here, and it only sent to Arby's --

THE COURT: Yes.

MR. SAFIER: Let's just end that. Of course not. that's not efficient as to -- to Sonic --

THE COURT: Well then so some -- so, the Plaintiffs here -- again, I don't know what demand letters went out from the Plaintiff, the named Plaintiff, to these various Defendants. Would you concede that they're -- that not all of them got the demand notice?

MR. SAFIER: I will not concede that, your Honor, because I don't know. But what I can tell you --

THE COURT: Well, I'm going to tell you, it's not alleged in the complaint what they got.

MR. SAFIER: Okay. I can tell you, if you want more on this --

THE COURT: Well, I do want clarity on it because

I do think it makes a difference --

MR. SAFIER: I understand, your Honor.

THE COURT: -- as to what you can do. Because right now you've taking the position numerous times that it doesn't matter because they're all part of the Inspire family.

MR. SAFIER: Right. And --

THE COURT: And that's how we -- and that's how you seem to get out of a lot of the efficiency. And I'm telling you that that's not going to do it with respect to -- as we're analyzing specific issues and whether or not they even have a claim.

MR. SAFIER: We would -- we will provide that clarity is what I'm saying, your Honor. And I know your Honor said you don't want 140 pages, but this stuff is helpful to know what you want clarity on so we can just be surgical about it with regard to an amendment.

THE COURT: Okay.

MS. LUKISCH: Your Honor --

THE COURT: Yeah, you want to be heard on this? Go ahead.

MS. LUKISCH: Just one -- you know, again, details matter.

THE COURT: Yes. No, I agree.

MS. LUKISCH: By -- so, it's not even with Mr. de

Ayora. I think your Honor is going from the date that the arbitrator closed the file or JAMS or AAA closed the file. We raised the issue of incorrect parties very early on --

THE COURT: Okay.

MS. LUKISCH: -- in the de Ayora --

THE COURT: Okay.

MS. LUKISCH: -- arbitration. So there was an amendment that occurred in the de Ayora arbitration. They only amended to bring a different Inspire entity and Arby's. they didn't name, for example, Baskin, Dunkins, Jimmy John's. But that decision was made -- you know, even Judge Nadler's decision, which is incredibly confusing and, you know, we petitioned to appeal. That was made in February of 2025, and they didn't file their complaint. They decided first to file something to confirm the arbitration award. They didn't file their complaint until your Honor ordered them to do so, and that was in August. That's another -- that's six months of delay. And we still don't have the specificity about even Mr. de Ayora as compared to Baskin Robbins, Dunkins and Jimmy John's.

If you look at paragraphs 105 through 113, and 141 to 46, which are the only paragraphs that deal with Mr. de Ayora's specific interactions with the website, there is nothing there in detail about what he did on any website, including Arby's, which is the only entity that is named in

detail other than I visited the other websites, that could put us on notice. And again, going back to the --

THE COURT: Well, put you on notice of what?

MR. SAFIER: What --

THE COURT: I mean, that is -- that is probably --

MS. LUKISCH: We --

THE COURT: -- still, you know -- your position is that all we had notice of up until the first hearing is -- that all we were talking about is the -- what should be arbitrated. We didn't have a complaint. We just have that here's the arbitrator's award, we want that affirmed.

MS. LUKISCH: I don't want him to think that that is --

THE COURT: That decision.

MS. LUKISCH: I'm not going to go that far, your Honor.

THE COURT: Yeah, you can't because there's certainly so much that was before that --

MS. LUKISCH: There --

THE COURT: -- that time. Okay.

MS. LUKISCH: -- there is --

THE COURT: Yes.

MS. LUKISCH: -- but again, like -- I'll just take an example.

THE COURT: Yes.

MS. LUKISCH: Plaintiffs take, that if you look at the paragraphs under 50, right, that supposedly have demonstrated something is firing, some cookie is firing on the website --

THE COURT: Yes.

MS. LUKISCH: -- right. We don't have any allegations that Plaintiff -- about Plaintiff's cookies, and their specific devices and their specific harm, which again goes back to this standing issue.

But assuming that, for example, paragraph 50(b), which deals with Kings Hawaiian fish deluxe meal page, and that at some point in time on Google Chrome you get this list from this sub-page, right. Plaintiffs want to conflate that that gives standing to every single one of their plaintiffs that potentially went on the Arby's website, right. That that cookie, that Google cookie or whatever it is fired in that -- that page. But no plaintiff said that they went to --

THE COURT: Yeah.

MS. LUKISCH: -- the Kings Hawaiian fish deluxe meal sub-page that's buried somewhere on a menu sometime in this, you know, large four-year statute of limitations. And they don't allege, for example, that they had some sort of harm that followed it. And I think that this is why it's important to have these details about Plaintiff's --

THE COURT: Well, okay. Here --

MS. LUKISCH: -- specific events --

THE COURT: And here --

MS. LUKISCH: -- and what happened to them.

THE COURT: And I don't disagree with that. I'm trying to think of a way -- here's one of the problems that I have with a complaint that looks like this. Is that I'm also managing if I believe that the complaint should survive.

I don't want to come back in the middle of discovery and say, we want all of this information. And the reason why we want it is because we alleged it in paragraph 135(a) and (b), when I don't even know if any of that pertains to the case. I do think a lot of this is unnecessary to get there.

I don't know why their complaint be as simple as, here are our plaintiffs, this is what they did. They went on to the site on this day -- or maybe a date range. Whatever data that you have that you can allege appropriately, and then take that to, here are the defendants that are applied.

And if you want to make the argument that you already have, that all of these defendants are, that at least it's clear what you're tracking from plaintiff to defendant. That is totally all over the place in this complaint. That you have to dance around all of it to put it all together in what you claim is a very easy case.

MR. SAFIER: With one exception, your Honor.
THE COURT: Yes.
MR. SAFIER: Backing up. Can we do it more cleanly and clearly? Of course --
THE COURT: Yes.
MR. SAFIER: -- we will, your Honor. With the exception of the date range, that is precisely what we've done. We've explained to your Honor from x date to y date. We didn't drill in, for example, Ms. Wiley or Ms. Ayora (sic), or any of the other claims.
THE COURT: Okay. Now I'm going to order --
MR. SAFIER: I know exactly --
THE COURT: -- that you have to do that because they're vulnerable on statute.
MR. SAFIER: I understand.
THE COURT: Right.
MR. SAFIER: But let's just say that we give you -- they visited in October of '24 or'23, or whatever they --
THE COURT: Whatever they did --
MR. SAFIER: Right.
THE COURT: -- whatever you're going to allege the facts show.
MR. SAFIER: Whatever they did, and we provide that.
THE COURT: Right.

MR. SAFIER: Once we've provided that --

THE COURT: Yes.

MR. SAFIER: -- the rest of the stuff is -- is in this complaint. Not as clearly or as cleanly as your Honor may like or as we could have done, but the allegations are there. They visited. They were presented with this banner. They clicked decline and they cookied with x, y and z.

THE COURT: But it doesn't have it where -- what they actually visited.

MR. SAFIER: It does have the -- what they visited. Each one of them says they --

THE COURT: What you have -- you have all of the various websites.

MR. SAFIER: Yeah. Each one of them in their allegations state which --

THE COURT: Okay. Well, let me --

MR. SAFIER: -- which website they -- they visited --

THE COURT: -- let me review that. Take me through.

MR. SAFIER: Okay. Let me get to there.

THE COURT: Ayora, let's -- where's a paragraph that -- what's the paragraph that says where she has --

MR. SAFIER: all of those he --

THE COURT: -- or he has been.

MR. SAFIER: Mr. Ayora, the paragraphs in the website that he visited, other than the dates, and I will agree you get -- that the dates we have are just during the class period. But that the way that each of the --

THE COURT: And the way you remedy that is you can have whatever class and make the allegations, but with respect to the allegation for him, it's like --

MR. SAFIER: Yes, I understand.

THE COURT: -- on this day he went here.

MR. SAFIER: Yeah. Well, it will not this day or this time, it will be close. And this -- you know, approximately this date, something like that.

The -- those allegations for each of the Plaintiffs are in paragraph -- hold on. So, for example, it starts at 105 for Mr. de Ayora.

THE COURT: Okay. Okay. Let me go to 105. Let me go to 105 before you start talking.

MR. SAFIER: Arby's website for Ayora. That's it.

THE COURT: Okay.

MR. SAFIER: For mister --

THE COURT: So, it's not just Arby's. Ayora went to Arby's, Baskin Robbins, Dunkin, Jimmy John's --

MR. SAFIER: Well, and I missed that.

THE COURT: -- is that accurate?

MR. SAFIER: So, yeah. So I must have missed

that. Yes. Ayora, Arby's, Baskin Robbins, Dunkin and Jimmy John's.

Wiley, right in the first paragraph --

THE COURT: Or is that -- you're taking that position because they're all part of the Inspire --

MR. SAFIER: No. They visited each one of those separate websites.

THE COURT: Okay.

MR. SAFIER: And the above, we show how they -- the websites operated when they did go.

THE COURT: Okay.

MR. SAFIER: And we -- we can add more as to that. And we also further allege, each of them when they visited were presented with the identical banner. They were given the option accept, decline, manage. Each clicked decline, and then we explain in this 70 pages -- and I understand your Honor's point, and I'm not arguing with it. We explain what happened to each of them with regard to what information was tracked from that point. And --

THE COURT: And were they -- and there were -- that's different information that's tracked as -- from Arby's to Baskin Robbins, Dunkin, are you saying -- are you alleging --

MR. SAFIER: Yes. It is different --

THE COURT: -- that the same information is

tracked?

MR. SAFIER: Each website had a different set of cookies that were being --

THE COURT: No, that I understand.

MR. SAFIER: Yes.

THE COURT: But in terms of what they're actually tracking, which gets to the guts of the case --

MR. SAFIER: No.

THE COURT: -- are they the same or they're different?

MR. SAFIER: No. Each -- each cookie -- so, for example, if it was a Meta pixel that was put on, let's say for example at Arby's --

THE COURT: Okay.

MR. SAFIER: -- and Baskin, they were tracking the exact same thing. Same two for clarity purpose. They were tracking the exact same thing --

THE COURT: Okay.

MR. SAFIER: -- for all of these Plaintiffs.

Now, the Defendant will argue, and I don't think their --

THE COURT: And your position is that will be contrary to the privacy policy?

MR. SAFIER: Contrary to the privacy policy again, and contrary and against the law. Violations of CIPA

because each said, don't do this. I decline. No.

The best way I can describe it, your Honor, is you have these two -- two Baskin Robbins, one here and one here. The first one says, come on in, order, we track you. Everything that you do in the Baskin Robbins we track. The other one says, decline. These people chose to decline. Some of them only went to Arby's and Baskin Robbins, some of them went to more sites. That's in there.

You're correct, and it doesn't say I -- I visited in October '25 or October of '24. Your Honor is correct as to that. But once they go into that store, the exact same thing happened to all of them. They had the tracking technologies placed on their devices. And those tracking technologies tracked them in the manner which is described in the complaint.

Defendant says, wait, wait, wait, wait, wait. You don't get specific enough and tell us that Ms. Wiley, for example, looked at or had them say, do you have cups or do you have cones? Or I -- she was interested in the vanilla based flavors or she looked at shakes. True, we don't have that level of detail. That level of detail is not required in any of the cases, right?

THE COURT: At the motion to dismiss stage.

MR. SAFIER: Correct, your Honor. Correct.

THE COURT: Right.

MR. SAFIER: That's only -- that's the only one I'm talking about is the -- but as to all these Plaintiffs, as to all these sites, the representation, decline, the cookie banner and what happened to them is alleged to have been -- I understand that they visited at different times, and we clean it.

THE COURT: But is your position that if one of your Plaintiffs only went to Arby's, that the analysis for that Plaintiff should be limited to Arby's. You shouldn't be talking about what is on the other banners and the other -- because they don't apply to this Plaintiff, would you agree with that?

MR. SAFIER: One-hundred-percent. And if that's not clear from the complaint, that's a shortcoming, but it only matters as to what site they visited. What doesn't --

THE COURT: Correct. I do think what the complaint lacks is clarity as to this Plaintiff only does this conduct. And all I'm asking for is that you allege with clarity what this Plaintiff did.

MR. SAFIER: We won't need 70 more pages to do that.

THE COURT: No, I don't think -- I don't think you needed all those pages to do that now. Now you -- if you have plaintiffs for all the other ones, you may need to figure how you're going to get the other ones in, or some

other theory. But it -- but just throwing everything together and saying that, okay, all of these banners --

MR. SAFIER: I'm sorry, your Honor. I don't understand. If you have plaintiffs for some other -- you mean outside these Plaintiffs, or these Plaintiffs cover all the websites?

THE COURT: I want to know if there are some -- if there's some defendants here for which you have no plaintiffs for.

MR. SAFIER: That no plaintiffs look --

THE COURT: No named plaintiff has gone to -- is that the -- do I have that case here? I don't know. Maybe I should ask the Defendants.

MS. LUKISCH: Yes.

THE COURT: Is that possible.

MR. SAFIER: Yes.

MS. LUKISCH: You have Inspire and you have incredibly weak allegations as to Baskin, Dunkin and Sonic. You have --

THE COURT: Such that they would fail under Rule 9?

MS. LUKISCH: Absolutely.

THE COURT: Right.

MS. LUKISCH: Absolutely. And --

THE COURT: But that's -- but that's what I'm

trying to evaluate. Do you have a plaintiff that can show the link to each Defendant, and that is very hard if we're all able to come to that conclusion.

MR. SAFIER: So, your Honor -- okay.

THE COURT: Well, let me just put it to you this way. I don't think I should have to put it all together. It should very easy to say, here's the plaintiff, here's the defendant. This is their banner, and this -- no, no. The way you've done it is you've gone down all of defendants in this section, all of the banners, and maybe you've done it through here --

MR. SAFIER: What we've done and tried to do is --

THE COURT: So, for Ayora is --

MR. SAFIER: -- for example, plaintiff --

THE COURT: -- one-o-five through -- so I should be able to find everything 105 to 113?

MR. SAFIER: No -- for Ayora, correct.

THE COURT: Yeah.

MR. SAFIER: All the way through Nino. But if you look at Plaintiff Nino, for example --

THE COURT: Okay.

MR. SAFIER: -- the websites that he is -- has visited, I list it, right --

THE COURT: Right.

MR. SAFIER: -- Arby's, Baskin, Dunkin and Jimmy

John and Sonic. Now I would agree with your Honor, no one visited Inspire.com, correct.

THE COURT: Right.

MR. SAFIER: As to the quote-unquote "weakness of the allegations" as to Baskin Robbins or something like that, I totally disagree. The allegation is the exact same, with one difference.

THE COURT: What does that mean? If I don't like the allegations, the fact that they're the same doesn't make it better.

MR. SAFIER: With the one difference.

THE COURT: Yes.

MR. SAFIER: Every -- every claim -- every site that was visited by him --

THE COURT: Okay.

MR. SAFIER: -- had a banner. It said decline. They all clicked decline. There were cookied identically --

THE COURT: Okay. I --

MR. SAFIER: -- as if they would have accepted.

THE COURT: This -- this -- yes.

MR. SAFIER: And the only difference is, Baskin may not have had -- and I don't know. I don't have encyclopedia recollection of the complaint. Baskin, for example, may not have placed (indiscernible) cookie to the Plaintiff that visited Baskin. But it may have placed that

same tip-top cookie on the Arby, and if that --

THE COURT: Who places it on Arby's?

MR. SAFIER: Arby's placed it on our -- we think it's Inspire all together placing all of them, but Arby's placed it when they just did it on --

THE COURT: No, but you were talking about Baskin.

MR. SAFIER: So far. I -- let me --

THE COURT: Yeah.

MR. SAFIER: -- restate that. Arby's allowed the third parties to place them all.

THE COURT: Okay.

MR. SAFIER: At Baskin, for example, they may have not had have Snapchat and Meta and clarity. I don't have that encyclopedia recollection, but it's in the complaint. It may have just been --

THE COURT: Right.

MR. SAFIER: -- you know, Snapchat was --

THE COURT: Well, you put so much in the complaint, I'm sure it is somewhere in the complaint --

MR. SAFIER: Yes.

THE COURT: -- whether or not it's -- it's done appropriately.

MR. SAFIER: But that's the allegation. The Defendant is right and your Honor is right. There are no alleged visits to Inspire other than us doing the

investigation. There are no specific dates other than during the class period. Again, I'm not saying that your Honor --

THE COURT: So what -- so let's stick with that, because you're right, there's no -- there's no visits to Inspire. So -- and your theory for keeping Inspire in, which you're entitled to make legal theories at the pleading stage, is that because they're the parents?

MR. SAFIER: It's the -- they're the parent, and as the relevant policy documents, they say we're involved. If you look at Shopify, Briskin v. Shopify, there is this --

THE COURT: Well, how does it say that they're involved? Because the only thing that you've pointed me to is that the policy of one of the subs, is that we are an Inspire Brand.

MR. SAFIER: Well, it says -- it says, "when we refer to we" --

THE COURT: We means us. We are Inspire Brand. We are one of Inspire.

MR. SAFIER: We -- yeah, that's it. That's --

THE COURT: But that doesn't go to like, well, but Inspire had anything to do with any of this --

MR. SAFIER: I mean, well -- but this --

THE COURT: -- other than they are in fact stating a corporate structure.

MR. SAFIER: I understand that, your Honor. And again, we can clean this up and do better. Maybe it will be sufficient --

THE COURT: Well, but how -- what are you going to add? I mean, that's the question. So if I give you leave to amend on Inspire, what are you going to be able to plead?

MR. SAFIER: So we'll go back and look. But the -- but the allegations we made --

THE COURT: Well, you've got to do more than that at this stage.

MR. SAFIER: Right. We -- the allegations --

THE COURT: You've got to be able to tell me and persuade me that an amendment is not futile.

MR. SAFIER: Okay. There's no coincidence --

THE COURT: Yes.

MR. SAFIER: -- in my mind that all of the subsidiaries are using substantially similar policies.

THE COURT: So you're making the argument that because they all look similar, well then they must all be the same, and they all must be taking direction from Inspire to do the same thing, is that -- is that the allegation that's not in here?

MR. SAFIER: The allegation -- that type of allegation will be made. The class --

THE COURT: But what is that based on, just

because I said it? I'm trying to figure out, can you say it.

MR. SAFIER: We can say it because if you look at the banner -- at issue is the banner. This is about the banner.

THE COURT: Right.

MR. SAFIER: And the banners are all identical in verbiage with minor variation, material. The choice is given to consumers and what befell consumer across all these brands, not different than all of the Hallion sub-brands, Tums and Advil or Ibuprofen -- whatever it was. I don't remember the exact brands, is the same issue, it's the same privacy violations --

THE COURT: I understand.

MR. SAFIER: -- that were orchestrated --

THE COURT: Now I understand. Then I understand.

MR. SAFIER: That's what -- that's the -- what we have.

THE COURT: Yeah, yeah. No, that I understand. I'm not sure that's --

MR. SAFIER: And that's the same as the allegations in Shopify versus -- Briskin v. Shopify -- I got it backwards. And the Ninth Circuit said, yeah --

THE COURT: All right. I want to move on. I want to move on.

Okay.

MS. LUKISCH: Your Honor --

THE COURT: Yes?

MS. LUKISCH: -- can I just touch very briefly --

THE COURT: Yes.

MS. LUKISCH: -- on this issue of -- I think there is more that -- when he goes back to re-plead, if you allow him to re-plead --

THE COURT: Yes.

MS. LUKISCH: -- that is necessary than just, you know, I visited the website --

THE COURT: They all look the same.

MS. LUKISCH: "They all look the same."

THE COURT: Yeah, yeah, yeah.

MS. LUKISCH: You know, whatever. So some of these claims are very factually tied, intrusion upon seclusion, invasion of privacy. Even the 631(a) claim which depends on content. And the only pleading that we have in here that talks about what possibly could have been collected from some combination of these trackers, which we don't know apply to each different site, is this group pleading stuff that exists in the beginning of the complaint.

I think it is necessary for each Plaintiff -- they should know, did they enter content into a form, that

somehow then resulted in injury. If they can't remember, how can there be injury? If they can't remember, for example, if they bought something, if they entered in a zip code, you know, those are the things that the courts when looking at this have looked at to determine, is this record information? Is this information private at all? Does this ever get to the level of these causes of action?

So, in addition to just saying, I visited the Arby's website --

THE COURT: Yeah.

MS. LUKISCH: -- there is going to be a difference from somebody who perhaps visited the Arby's website and like paragraph 110, he says, even before the pop-up cookie consent banner appeared, Defendants nonetheless caused cookies and tracked. So, what is the distinction between that, which is totally -- totally separate and apart from any representation, and then what happened, you know, when -- did they even go past the home page?

THE COURT: Right.

MR. SAFIER: Was there anything collected? Did they get to the Kings Hawaiian fish page, and that button click somehow got entered? And how is that different than walking into a store, right, and somebody going up to order from a kiosk and having everybody else around --

THE COURT: Well, I think -- and I think you're

getting into the -- the Ninth Circuit case, Pulia v. Microsoft (phonetic).

MR. SAFIER: Popa.

MS. LUKISCH: "Popa."

THE COURT: Popa v. Microsoft.

MS. LUKISCH: Yeah. But it -- so the content and what they did --

THE COURT: Yes.

MS. LUKISCH: -- and what fired and what was specifically collected from Plaintiffs --

THE COURT: Yeah.

MS. LUKISCH: -- is something that we contend has to be alleged with specificity more than just, I visited the website.

THE COURT: Well, I agree. I mean, the wiretap claim does -- what is the contents?

MR. SAFIER: Your Honor --

THE COURT: Yes.

MR. SAFIER: -- the content is set forth in those 70 pages. This --

THE COURT: I got -- so we are here -- I do not like this complaint --

MR. SAFIER: Okay. I --

THE COURT: -- because this is -- this -- I will tell you, you're not the only lawyer that does this, which

is, I don't expect you to have a photographic memory of your complaint --

MR. SAFIER: Correct.

THE COURT: -- but the fact is, you expect there to be everything that you've pled comes in and is somehow material and answers your question. I'm telling you right now, what is the content that you're alleging the wiretap, because I don't think you've done it.

MR. SAFIER: The --

THE COURT: Because there's a huge distinction that's made on what is being captured there in order to qualify for a claim.

MR. SAFIER: All of the content is set forth in --

THE COURT: What is all? Is it record, which is not part of a wiretap.

MR. SAFIER: It is all -- it is all -- first off --

THE COURT: Give me an example of a content that is inappropriate under the wiretap?

MR. SAFIER: The content that is set forth that is inappropriate --

THE COURT: That one of your Plaintiffs put in there.

MR. SAFIER: All of the Plaintiffs allege that they browsed the website. None of the Plaintiffs allege

that they went to the website, saw --

THE COURT: Right. They went on the website, but that doesn't answer the question of what is the content that was captured.

MR. SAFIER: Right. I'm telling you the content.

THE COURT: Okay.

MR. SAFIER: It's alleged --

THE COURT: Why can't you just tell me what the content is?

MR. SAFIER: -- it's alleged in paragraph --

THE COURT: Okay.

MR. SAFIER: -- thirty-nine.

THE COURT: Okay. Let's take a look at that.

MR. SAFIER: It is --

THE COURT: Let me look at 39 first. All right.

MR. SAFIER: So, for each Plaintiff they went on to the website --

THE COURT: Right.

MR. SAFIER: -- and they browsed.

THE COURT: Okay.

MR. SAFIER: That's the allegation. It is a general allegation. There is not specifics about, I had browsed for strawberry ice cream or I browsed, you know, roast beef sandwich. I will -- I will grant that to your Honor. But once you click decline -- first off, which the

follow-on don't -- once you get on the website you're immediately -- you're immediately trapped. When you decline, the Plaintiff made -- the reason we made that point is, is that they don't stop what they did when you first got there --

THE COURT: Right.

MR. SAFIER: -- once you say decline.

THE COURT: That's -- that's the whole part of it. That's the case, right.

MR. SAFIER: Yeah. Right. And then once you hit decline, they obviously put more -- in fact, in the Meta instance, they actually sent Meta the fact that you clicked decline, right. And then they continue to track you after you click decline.

So these button clicks that are going on in this browser, what you browse, where you're browsing, the manner in which you're browsing, the clarity, the session refresh. How long, for example, you're looking at a same --

THE COURT: Well, let's stick to one thing that I think is -- is an issue that I think also ties into the Popa case, like the referring URL.

MR. SAFIER: Yeah.

THE COURT: So that is like where you were before you came to the site as I understand it. So that I think is something that if that's content, that's captured.

MS. LUKISCH: I don't know if it was captured. I don't know if they came from a different URL, if that --

THE COURT: Well, but that's their allegation that I would have to treat --

MS. LUKISCH: But they don't allege that for their named Plaintiff. They have the paragraph 39 that is identical in every single complaint that they have filed.

THE COURT: Understand. Understand. Yes.

MS. LUKISCH: They have not alleged -- Wiley hasn't alleged that she put any user input data into the website. For all we know, they went to the homepage and then they left.

THE COURT: Well, but I think the argument for this is that they don't have to put in anything, just by virtue of coming on to your website, this is what's captured.

MS. LUKISCH: But they don't capture user identified data unless you put in data. So I can't capture a name, an address, a gender. There's no place to put that on an Arby's website, your gender. That's not a Rule 11, you know --

THE COURT: Right.

MS. LUKISCH: -- factual allegation --

THE COURT: So you're telling me that there's --

MS. LUKISCH: -- as to my clients.

THE COURT: So there's no way that if they hit decline, that the referring URL is not going to be anywhere -- you're not going to have that data?

MS. LUKISCH: We potentially would for --

THE COURT: I think -- yeah.

MS. LUKISCH: -- certain kinds of cookies.

THE COURT: That their position is that that cookie's installed on that website.

MR. SAFIER: And just -- and just to go back --

MS. LUKISCH: We don't know what cookie.

MR. SAFIER: -- just to go back, we do.

THE COURT: Well, but the --

MR. SAFIER: They're in the complaint. Just to go back to the --

MS. LUKISCH: They're not.

MR. SAFIER: Popa is very different. The reason that that case marks are different, and the reason that Judge Orrick, for example, distinguished it in Hallion, in this context, there's two points. One is, in Popa there was not this cookie banner that says decline. Don't do any of this. That's a difference.

The second difference is, Popa was all first party. Judge Rakoff -- I had his brother in law school. He -- Judge Rakoff says, look, they're just looking at where you are in these stalls, you know, in these isles, and to try

and make a determination whether there's a bottleneck here for -- and when I'm over (indiscernible) book, and that seems fine, there's a very, very big difference.

First off, you tell them decline, as with what I already said. Here, it's not just in their store, and they're not just keeping it for their own information, they're spreading it, out as they admit in their privacy policy and their cookie policy. We're spreading it out. We're telling other thing -- people about this. We're tracking you before you got here, where you were before you came, and we're tracking here. They do cross-tracking between Arby's and Baskin Robbins, and why all of this is very different than Popa. And what they do by virtue of the fact that you visit and click, for example, decline, and we know they all did that, they passed that information along and all the other information that they have.

THE COURT: So your allegation is that the referring URL is passed on as -- by virtue of hitting decline, it's gone on?

MR. SAFIER: Correct.

THE COURT: So you could -- you could make an allegation, and you believe that you can allege that Plaintiff acts once hit decline, that you believe that that information here has been passed on and kept?

MR. SAFIER: Yes. And it is made. All of this

information, rich URL --

THE COURT: Well, they disagree with that.

MR. SAFIER: So, your Honor, Judge Linn just dealt with this in another case.

THE COURT: Right now. Right. Yes.

MR. SAFIER: Judge Linn just dealt with this in another case. And the same argument gets made time and time again. You need to tell us more about what information they put into the search bar. Did they look at strawberry or vanilla? You know, how old were they when they did that? Why does the geolocation matter, all of that stuff. And Judge Linn says that that's not -- that's not required of a CIPA. And what is required is all that they have to do is allege -- and she did this in the Sovereign (phonetic) case --

THE COURT: Right.

MR. SAFIER: -- I believe that that -- in October. And she says that post-stream URL's can include search terms inputted, divulge user personal interests and query. And we've alleged that. And at the very minimum, that is what they are passing along, but there's much more here, too. It's not only their search screen --

THE COURT: Well, there's much more than is listed here, but I think counsel's point is, how much of this do you allege?

MR. SAFIER: Well, but --

MS. LUKISCH: Well --

MR. SAFIER: -- see, your Honor --

MS. LUKISCH: -- none of it was connected to their Plaintiff. And we've got to get past, can their named Plaintiff, who's not --

THE COURT: Well, okay. So but -- so but --

MS. LUKISCH: -- just some hypothetical --

THE COURT: Well, that's what -- their allegation is that once Plaintiff hits decline, that all of it is. You may totally disagree with that, that that's not what's happened.

MS. LUKISCH: That some search term that they never put into a -- into a website somehow got collected. How is that even possible? What search term would have been collected?

THE COURT: Well, the referring URL is not a search term, it's just that that's what they've done.

MR. SAFIER: Yeah. And the exact same --

THE COURT: Whether or not that's true, that is maybe not for the pleading. If they can allege that this is what's done.

MR. SAFIER: The exact same allegations were made before Judge Orrick and Judge Tigar, and the allegation --

THE COURT: Again, you want me to go get them?

MR. SAFIER: No. No, your Honor. That's not what I'm --

THE COURT: Yeah. Yeah, yeah, yeah.

MR. SAFIER: -- that's not what I'm --

THE COURT: Yeah.

MR. SAFIER: I'm not -- that's not what my -- my thinking. But the -- it's -- we can get more specifics. For example --

THE COURT: Well, it's not just -- I mean, again, I'm not impressed by the quantity. I am discouraged by the quality. That is what I am looking for.

MR. SAFIER: I appreciate that, and the clarity.

THE COURT: It is -- it is not -- you know, the more pages you dump at us, the longer these hearings go because the more questions we have --

MR. SAFIER: Yeah. I understand.

THE COURT: -- and the more arguments you're going to be had -- have to defend against. It is more like, can you track Plaintiff to the actual facts sufficient to raise a colorable claim that's reasonable at this stage. You -- you're telling me that you can. It is very difficult to do that and pick that apart here.

But I do want to give you an opportunity to say that Popa gets rid of this whole case, because I think that's your position is that these claims don't survive under Popa.

MS. LUKISCH: Correct.

THE COURT: Yeah. So, go ahead and --

MS. LUKISCH: Irregardless of the fact --

THE COURT: Yes.

MS. LUKISCH: -- that like Plaintiff likes to make this big distinction about the decline button --

THE COURT: Yes.

MS. LUKISCH: -- and what the decline button does or doesn't mean. Popa, which is the only --

THE COURT: But what do I have to assume the decline button means? What have they -- they have alleged that? That's the --

MS. LUKISCH: They haven't alleged --

THE COURT: Well --

MS. LUKISCH: I mean, they allege some sort of thing that they believe that it meant. They don't allege that they saw the privacy policy and that their decision --

THE COURT: But I can't disregard them, can I? Can I say that, I'm sorry, what you think is what the decline button means is wrong. What would that be based on, other than your argument?

MS. LUKISCH: So, I think it takes us back to even before Popa.

THE COURT: Yes.

MS. LUKISCH: But Popa talks about this with the

TransUnion case --

THE COURT: Okay.

MS. LUKISCH: -- right. And you can think about it in the data breach context, too, right. There are times that a statutory violation might occur, right. So, similarly, there might be times that an error occurs, a misrepresentation occurs. But if there is no injury that arises from that, and they cannot --

THE COURT: And are you saying that --

MS. LUKISCH: -- allege --

THE COURT: -- there has not been an injury alleged here?

MS. LUKISCH: No. There has not been an injury alleged here. What is the injury? They haven't received a single advertisement. They haven't -- you know, there's nothing that has crippled their computer.

THE COURT: They -- they don't want any of their information --

MR. SAFIER: Shared.

THE COURT: -- "shared." That's the injury. That doesn't have to result in a pecuniary injury. They just made it very clear by hitting decline that -- what does decline mean? It means I don't want it.

MR. SAFIER: Don't do it.

MS. LUKISCH: They don't want what?

THE COURT: Whatever you said, do you accept or decline? So, all we have to say is, everything that you warrant or decline means, no. And so the issue is, you are going against my directive --

MS. LUKISCH: But --

THE COURT: -- on saying, no.

MS. LUKISCH: -- but --

THE COURT: And your response is, well, you don't really say no by hitting this. You're entitled to that argument. Absolutely.

MS. LUKISCH: But how does that comport with TransUnion, for example.

THE COURT: Okay.

MS. LUKISCH: TransUnion said, I don't want any of this information collected about me in my credit report, right.

THE COURT: Okay.

MS. LUKISCH: And the court there drew a distinction between what was collected in the -- in the report and then was it then used and misused? Data breach cases are the same. I can guarantee that every plaintiff in a data breach --

THE COURT: And TransUnion was on pleading stage?

MS. LUKISCH: I believe so.

MR. SAFIER: I don't believe so, your Honor.

MS. LUKISCH: I would have to -- I would have to confirm that.

THE COURT: But you can see that that's a big difference.

MS. LUKISCH: I do think that that is a difference.

THE COURT: Yeah.

MS. LUKISCH: Correct. But I do think --

THE COURT: I mean, I'm not suggesting that they have --

MS. LUKISCH: But I --

THE COURT: -- a claim --

MS. LUKISCH: But TransUnion also wasn't a 9(b) case. Where here is a 9(b) case, and I do think that that is a difference, right. And they are alleging --

THE COURT: So TransUnion is not a 9(b) case. Then maybe I should not even listen -- you know, that's not really something I should focus on. I see.

MS. LUKISCH: Well, I think even in that non-9(b) case --

THE COURT: Yes.

MS. LUKISCH: -- you had to have some sort of, you know, specific injury that is pled and misuse of the data.

THE COURT: I think they have a better argument. The injury is I say, no, and you went ahead and did it

anyway.

MS. LUKISCH: But that would be then any statutory violation. Every statutory violation --

THE COURT: Yeah. I can't speak to all, but in terms of surviving dismissal on a pleading?

MS. LUKISCH: But Popa says that's not appropriate. Popa says have to have something more than just -- you know, you say one thing, I do another --

THE COURT: But the facts in Popa are very different than the facts here, aren't they?

MS. LUKISCH: The facts in Popa are not all that different. Popa says, I did not consent to this, right.

THE COURT: Yeah. Because it's the same thing as going -- I'm -- you may have very fond feeling for Judge Raykoff, but I -- but going into the grocery store and saying it's the same thing, and looking what's down the isle, the one thing I focus on the URL, because that is not the same thing as going down a grocery store.

Where I went to before I went to the grocery store, I don't want you to know that. I don't want you to know that I read the New Yorker. I don't want anything to be told about what I do not here. And the question is, if they state a claim that says, I'm alleging that, you know, I say no, but they went ahead and did something, that's -- a reasonable jury can come and say, yeah, that's a problem.

MR. SAFIER: Your Honor --

THE COURT: So I -- so --

MS. LUKISCH: But I don't -- I don't think they get -- I don't think they have alleged that we have gone ahead and done something to their Plaintiffs. That's the difference here. I don't think they have alleged --

THE COURT: Other than they -- they disregarded what I made very clear by hitting decline.

MS. LUKISCH: But they have not alleged that for their specific Plaintiffs --

THE COURT: Yeah.

MS. LUKISCH: -- things have happened since. There is no -- there is no allegation that for Ms. Wiley when she visited the website in 2023 --

THE COURT: Okay.

MS. LUKISCH: -- right, that the Facebook cookie fired, and she knows that because her Facebook -- Facebook activity showed it, or that it actually fired on her device because it can fire on her device, that she didn't have GPC signal or something else on it.

THE COURT: Right. And is there --

MS. LUKISCH: So --

THE COURT: Can she know that at that point? All she knows is that I hit decline, and yet I find out that they capture --

MS. LUKISCH: Well, then how is she injured? If she doesn't know, right, that her information was misused, what is injury? If I don't know and I can't remember what page I visited, what I clicked, whether I entered content --

THE COURT: Well, that's a different inquiry. The inquiry is the injury. So I could think -- there could be various injuries that are related to, when I say, no, I don't want to. That you only find out after you realize that they've been capturing the information.

MR. SAFIER: Your Honor, that's precisely the point. TransUnion actually supports that because TransUnion permits standing, Article III standing for traditional -- or harms traditionally recognized as providing a basis for lawsuits in American courts, including, for example, reputational harm, disclosure of private information, intrusion upon seclusion. That comes down to the common law issues that we have here of highly offensive (indiscernible).

And unlike in Popa, in virtually all of these other drive-by type CIPA claims, what we've alleged -- again, not as clearly or as concisely as we could have, is that unlike those case, people said, no. People said, decline. I want to sit here and do what I do on your website without you watching and telling everybody else, and that was disregarded. In fact, it was outright false. And every one

of these Plaintiffs has clearly alleged as to a sub-set of these websites are abusive things, some more than others. They went to the website during this time period. We will be clear about exactly when, as to when. They said no, and all of these tracking technologies were placed onto their devices, where they allowed third parties to place all these tracking technologies onto their devices, against their wishes.

THE COURT: But counsel is saying, "We don't even know if the" -- it hasn't been alleged that the Plaintiff knew any of even that, other than the only thing we know is that she said no.

MR. SAFIER: Well --

THE COURT: So how is it that we -- how -- what's the Plaintiff -- I guess the injury -- I don't know if the injury has to be a pecuniary -- you have to hit all of these marks to be injured. You can have an injury like, "I just don't want my information out there, because I don't know what they're going to do with that.

MR. SAFIER: Correct, your Honor.

THE COURT: No, I'm asking --

MR. SAFIER: I'm sorry.

THE COURT: I'm trying to get some idea about, like, what are you setting in terms of the injury component? And why isn't injury something -- I mean, I guess that is an

element of the claim, so they have to be able to show what the injury was.

MS. LUKITSCH: Well, they have to be able to show that it went to somebody other than Inspire, and that a cookie dropped during their visit. What we have here --

THE COURT: So the fact that she has --

MS. LUKITSCH: -- is counsel saying --

THE COURT: -- has no idea where -- what the information is done -- so it's just kept, but nothing is done with that.

MS. LUKITSCH: And we have no idea. I mean, what Plaintiff -- what counsel is doing here -- right? And you can see it by their delayed discovery rule, right? At some point, some Plaintiff visits a website, right? We have no idea what they did on the website, right? We don't know if information was collected. So, for example, if Facebook is only attached to the King's Hawaiian Fish page, right, and Plaintiff doesn't go and visit the King's Hawaiian Fish page, nothing is going to be collected there, right?

And even counsel's testing, which occurred months after Plaintiffs' visit, we don't know if that happened during Plaintiffs' -- this evidence isn't coming from Plaintiffs, and what we're saying is that, because this is a 9(b) fraud misrepresentation, what they saw, what happened, what fired, where they went on the website, that matters to the content

of the communication. Is there some offense that is highly offensive?

Maybe, if it only collected -- do all of these cookies collect all of the same information? Do they collect URLs? Even the page that they have here doesn't have a referring URL. I think they talk about one on Arby's that has a referring URL. They say the referring URL --

THE COURT: So you're saying in terms of, on paragraph 39, that none of the -- like, demographics aren't captured?

MS. LUKITSCH: I mean, they weren't as -- I don't know --

THE COURT: Well, there's nothing alleged.

MS. LUKITSCH: -- if they were captured as to Plaintiffs.

THE COURT: You just don't have anything alleged --

MS. LUKITSCH: Correct.

THE COURT: -- which I think is a fair point. It's like -- where is it -- is your belief -- or that -- based on what -- you know how these work, that all of this is captured, was captured for this particular Plaintiff, a particular Plaintiff? How do you get to that? Because I think that's a fair question.

MR. SAFIER: Okay.

THE COURT: It's like, this may happen in the abstract, and this would be a problem if this was true, and you allege that this is all the information that was capture post-decline. Then that may be, certainly, a reasonable claim that a jury could find liability, but the issue is, how do we know right here that the Plaintiff had this information captured post-decline --

MR. SAFIER: So let me give you --

THE COURT: -- without giving discovery first that this is what happened?

MR. SAFIER: Well, we know that, as to every single one of (indiscernible), at least --

THE COURT: That it went to the website and they hit "Decline." We know that, but how do --

MR. SAFIER: Correct, and then they continued --

THE COURT: How do you know the next step?

MR. SAFIER: And they continued -- well, we don't have the specifics as to (indiscernible), because they didn't -- when they went there, they didn't know that it was happening.

THE COURT: Right.

MR. SAFIER: So they don't have records of their actual visits.

THE COURT: But how do you know --

MR. SAFIER: So we did a --

THE COURT: -- to say that that's what happened?

MR. SAFIER: Because we did an investigation. Can I give you one example, your Honor?

THE COURT: Sure.

MR. SAFIER: So, for example, just take -- in paragraph 39, look at website interactions. So it said this is the type of stuff that was captured --

THE COURT: Yes.

MR. SAFIER: -- and transferred after the decline was -- before and after the decline.

THE COURT: But that -- but, so how do we know that?

MR. SAFIER: I'm going to --

THE COURT: Okay.

MR. SAFIER: Because we did the investigation. That's how we know, and that's the way that --

THE COURT: And without necessarily divulging all that you would have, how would -- how do you -- what are you investigating?

MR. SAFIER: We're investigating the operability of these websites, and the network that is passed -- I can explain, your Honor, how this is done. I'm not as technical as people that --

THE COURT: Sure, but that's what was done, is some technical investigation was done with respect to these

websites, and this is what was done?

MR. SAFIER: Correct. Yes, your Honor.

THE COURT: But the Plaintiffs don't know that?

MR. SAFIER: Of course the Plaintiffs don't know that, no.

THE COURT: Right, because they're not --

MR. SAFIER: They're not technical --

THE COURT: That's not the -- right.

MR. SAFIER: They didn't know that it was going on when they visited.

THE COURT: Right, right.

MR. SAFIER: They only found out about it later. But take website interaction. They don't -- on which --

THE COURT: So that asks the question, well, how do they know they were injured, then? It's only because when they realized -- did you know? If we told you -- if we represent to you that all this information was capture, even though you said no --

MR. SAFIER: That's an injury. That's highly offensive.

THE COURT: -- what is the -- and how is that proved? The person just has to stand up and say, "I'm injured" --

MR. SAFIER: You mean, how will it -- how is it proved?

THE COURT: -- "I'm offended"? How would they do that? Well, how do you prove the injury, I guess is the issue?

MR. SAFIER: Well --

THE COURT: And, again, I'm not sure that is required at the pleadings stage. That sounds very much down the road.

MR. SAFIER: It's definitely not required at the pleadings stage. And I tell you -- but I wanted -- I want to make sure that I'm being very clear with your Honor.

THE COURT: Sure.

MR. SAFIER: So it says, "Website interaction," date on which click -- on which link buttons or ads on the website that a user clicks on. It is not the case that every user, for example, clicked an -- every Plaintiff clicked an ad. That is 100 percent accurate. We don't know that. But we, as a matter of certainty, know for sure that they clicked certain buttons, all of the --

THE COURT: Because they continued to browse.

MR. SAFIER: Correct, and they clicked, at a minimum, the "Decline." So how will we prove this? Well, your Honor, we will do so in a manner that's actually quite simple and elegant. We will go to the third parties who this information was passed to after a decline was clicked, and we will see what information was passed. We know it

from the screenshots in the complaint, because that information is looking at the network calls that existed and were made for certain by and to certain third parties after the decline.

Let me give you one just hypothetical example, and I'm not saying -- Mr. Nino (phonetic), for example. Let's just say hypothetically that we knew he visited Arby's on X date at Y time. On X date at Y time, Mr. Nino went to that website and clicked "Decline." One of the tracking devices that was placed on Mr. Nino's, you know, computer or phone or something to that point -- at that point -- would have been (indiscernible).

THE COURT: And how do you determine that?

MR. SAFIER: Because that's what happened to everybody that visited while this cookie banner was not operating on the Arby (indiscernible).

THE COURT: But he doesn't know that.

MR. SAFIER: He doesn't.

THE COURT: Right.

MR. SAFIER: Of course not. He's not looking. He's not sophisticated. He's not using, you know, (indiscernible) tools or tracking these things, not button click, along with the URL information, assuming he was signed in for the Facebook and he was a Facebook member, (indiscernible) Facebook ID (indiscernible) the time, will

be passed to Facebook. Facebook will have a record that this user, at X date at Y time, said, "No, don't track me," and then, for that session, it will have all the information that --

THE COURT: But that hasn't been done yet.

MR. SAFIER: That hasn't been done yet -- well, that's not true. It has been done by the investigator. We don't know what Facebook ultimately --

THE COURT: Has it been done for the Plaintiffs, so that you can --

MR. SAFIER: We couldn't do it for the Plaintiffs, your Honor, because we weren't there when they visited.

THE COURT: No, but this forensic kind of going back. You can go there now.

MR. SAFIER: It may be able to be doable. They were obviously preserving all of --

THE COURT: And it's your position that that's not required before you can survive a dismissal?

MR. SAFIER: It's not.

THE COURT: And why is that?

MR. SAFIER: It's not required. It's (indiscernible).

THE COURT: For the -- for showing injury?

MR. SAFIER: Because we can -- what we've alleged is this (indiscernible). It's no different than, for

example, if I purchased a bag of chips that said, "All natural" on it, and I ate the chips, and I don't have the bag anymore. But you don't have to keep the banana peel that you slipped on.

THE COURT: Sure.

MR. SAFIER: No. If we had that information, I'm sure my esteemed opposing counsel would be saying, "They put that banana out. That's why they were there tracking it while they were looking at this website." We don't have that.

THE COURT: To survive pleading. Okay.

MR. SAFIER: Correct.

MS. LUKITSCH: Your Honor?

THE COURT: Yes.

MS. LUKITSCH: There's so much here.

THE COURT: Yes, that's a problem. Yes, yes.

MS. LUKITSCH: I do think, though, they do have things under their control. They have the devices under their control --

THE COURT: Sure.

MS. LUKITSCH: -- which they are claiming we so bogged down that they somehow had injury.

THE COURT: But they don't have to prove their case at the pleading stage.

MS. LUKITSCH: No, but they know what they saw,

what they visited. Did they go past that home page? Did certain -- did they enter, even, in information that could potentially have been collected? We don't even know here, because they have group pled which cookies are on which website, right? Google is talked about with Arby's, but it's not talked about with the other sides. You know, all of this, though, goes to our last point, which is this individualized --

THE COURT: Can you point me to a case in which this case was brought in the same group pleading, but that the case was dismissed?

MS. LUKITSCH: This is the first that is like this, with this --

THE COURT: Is it?

MS. LUKITSCH: For --

THE COURT: I don't think so.

MS. LUKITSCH: For this cookie banner.

THE COURT: Well, for this cookie banner, but the same concept. These arguments that you're raising seem to apply in most of these cases that have already gone through 12(b).

MS. LUKITSCH: No, your Honor.

THE COURT: Really?

MS. LUKITSCH: So, for example --

UNIDENTIFIED SPEAKER: She's just wrong. Haleon

(phonetic) is the prime example. It's not --

THE COURT: I mean, they're --

MS. LUKITSCH: But Haleon is a single defendant that has multiple different websites --

THE COURT: But the arguments that are --

MS. LUKITSCH: -- and 9(b) was only alleged to have applied in Haleon to --

THE COURT: Okay. So you're saying there's no case, that this is --

MS. LUKITSCH: -- to fraud and misrepresentation.

THE COURT: So this is the first case that has ever been brought in this district where you are making these arguments?

MS. LUKITSCH: No. For example, like the Volkswagen Clean Diesel case --

THE COURT: Right, right. So you have raised these arguments, or others have raised these arguments, and what is the opinion that has given you -- that you can tell me, "You must dismiss, because this other judge has dismissed it"?

MS. LUKITSCH: So, for example, Volkswagen Clean Diesel is a case --

THE COURT: Yes.

MS. LUKITSCH: -- and I can -- hold on a second.

THE COURT: Is that the Breyer one?

MS. LUKITSCH: That is Judge Breyer.

THE COURT: Yes, that's the MDL (phonetic)?

UNIDENTIFIED SPEAKER: Yes. There is (indiscernible).

MS. LUKITSCH: That talks about, you know, the specific allegations must be pled against each different defendant.

THE COURT: Okay. So that's a 9(b), but what under this kind of case?

MS. LUKITSCH: A cookie and pixel case?

THE COURT: Yes, yes. I want to know -- I want to know -- I want to know where the line can be drawn. You want me to draw the line, and bar, at a level that I don't think any other judge has reached in (indiscernible).

MS. LUKITSCH: Well, for example --

THE COURT: I don't know, but maybe you'll persuade me to do that.

MS. LUKITSCH: Judge van Keulen, for example, dismissed the 631(a) claim --

THE COURT: Yes.

MS. LUKITSCH: -- because there wasn't specificity about the user inputs by Plaintiffs.

THE COURT: Right, on the wiretap.

MS. LUKITSCH: We have cited --

THE COURT: That's the wiretap claim, right?

MS. LUKITSCH: That is the wiretap claim.

THE COURT: Yes, and I think that is (indiscernible). What about just the main case?

MS. LUKITSCH: We have other cases, Culligan (phonetic). We cite to our --

THE COURT: Because van Keulen also let the case go. The whole case wasn't dismissed, correct?

MR. SAFIER: RBI, your Honor. (Indiscernible) Brands International, Judge Corley, is sub-defendant issue.

MS. LUKITSCH: It is not the same sub-defendant issues. In that case, you had restaurant brands --

THE COURT: Yes.

MS. LUKITSCH: -- ink, and services, and they flowed through, and they talked about, in that case, the various different operations that they had. No, but it was different there. There was a cookie preference center that they claimed that they interacted with.

THE COURT: Yes, but I don't think that distinction matters in terms of whether or not there's a claim.

MS. LUKITSCH: But 9(b) there, again, was not an issue as to every single -- we are --

THE COURT: So why is -- why is 9(b) so pervasive here, but not pervasive in Corley's case?

MS. LUKITSCH: Because they didn't argue it.

Defendants did not argue this common -- if everything is based on fraud, and everything is based on a misrepresentation, as you claim -- because that's what gets you the difference between this case and, allegedly, Popa (phonetic), where they're collecting all of this information. Popa dealt with text that was allegedly input. It dealt with, you know, all of these various different factors, geolocation, referral URLs, search terms, right? That is the crux and the difference, and it is like -- we had a case that --

THE COURT: I think that's demanding too much at the pleadings stage. I quite frankly do. I do think that this complaint certainly needs work, but the fact that you think the case should go away on it, from what you're raising, I don't think that that's a pleading deficiency, and certainly not one that I think I can't find a way to get there, to some of the claims.

So I am not convinced that this case completely goes away, and you still haven't pointed me to a case in which -- because your position is that (indiscernible) haven't argued that. These cases have been tested --

MS. LUKITSCH: Correct.

THE COURT: -- and none of them have been completely dismissed.

MS. LUKITSCH: Talkspace, completely dismissed.

THE COURT: Okay.

MS. LUKITSCH: That is --

MR. SAFIER: Not a cookie (indiscernible) case. (Indiscernible.)

UNIDENTIFIED SPEAKER: Yes. Sure. They've been dismissed on various grounds.

THE COURT: That's not a distinguishing factor?

MS. LUKITSCH: Well, and, again, we only have trial court cases, since there are a --

THE COURT: Well, you cite to me state cases that I -- in out-of-state cases on -- the Penn Register (phonetic) case, and I think you cited other cases. I mean, there's -- you are asking me to dismiss a case that no other court has done, on your argument that, because of the 9(b) requirement, that has to hit every element, that they have to have this very high bar at every point.

MR. SAFIER: Every Defendant has argued not -- the who, why, where, when of 9(b).

THE COURT: Sure, sure.

MR. SAFIER: Every Defendant has.

THE COURT: As they should. As they should. I'm not faulting the argument. I just don't think --

MR. SAFIER: Has she done a better job?

MS. LUKITSCH: But, your Honor --

THE COURT: -- this applies in a way to get rid of

everything.

MS. LUKITSCH: -- like, if we look at the cases, so, for example --

THE COURT: I don't have -- I've already spent over two hours with you.

UNIDENTIFIED SPEAKER: Two hours.

THE COURT: But I do -- let me -- because I don't want you to leave with the impression that "Oh, great. You're going to have a case," because I have concerns about the way that it's been pled. I don't have -- you're losing Plaintiffs for statute reasons. I think we already talked (indiscernible) should be gone.

MR. SAFIER: Prosipa (phonetic).

THE COURT: Well, I mean, (indiscernible) that should apply to all of her claims.

MR. SAFIER: If, for example, one of them has a four-year statute of limitations, why would it?

THE COURT: But when does that statute run? It doesn't -- hasn't run yet? Because the complaint was just filed. So you could file a new claim today for her.

MR. SAFIER: Assuming there was a statute of limitations, she didn't discover it until she contacted us, and that was within four years.

MS. LUKITSCH: Which claim has a four-year statute of limitations?

MR. SAFIER: I'm just assuming. I'm just assuming (indiscernible).

THE COURT: Well, the most -- two years, I think, is what Defendants are representing.

MS. LUKITSCH: Yes.

THE COURT: Well --

MR. SAFIER: Anyway --

THE COURT: So here's the problem with Wiley (phonetic). I mean, if you -- well, you're going to -- and if you think that you can add more claims, then you can have an opportunity, I guess. We're really kind of -- this is wasting precious resources, to do all of this. I would like -- if the case survives, I want to know what the case is, but I want it organized in a way that we can easily evaluate it, not in way where you basically come in here and say, "We pled it in the complaint."

MR. SAFIER: So how do we --

THE COURT: I'm not hunting through hundreds of allegations to piece together your claim. You make it sound like this case is easy and clean. Prove it to me.

MR. SAFIER: Okay. So, your Honor, we are happy to do that. What's the most efficient manner of doing that? Do you want to issue an order and say, "I want more here on X, Y" -- I understand --

THE COURT: Well, let me go through, because there

are some arguments that I may be able to give more guidance on, that I will have to do because this is more -- this is the problem. The problem is that the complaint is --

MR. SAFIER: You provide guidance, we'll respond --

THE COURT: Yes, yes.

MR. SAFIER: -- and we'll do so quickly, and we'll clean it up, your Honor.

THE COURT: I mean, I don't want to do an order that just says, "The motion to dismiss is granted, with leave to amend."

MR. SAFIER: I understand. You want to give us some guidance.

THE COURT: That's my hope, is not to do that, but I want -- I want product that comes back such that you have your Plaintiffs and you have your claims. Then we can easily track what it is that you are contending that you have.

MR. SAFIER: I understand.

THE COURT: I know you believe that you've done it, but -- and maybe the way that you can do it is you can have all of your complaints, and put it in a summary paragraphs for these plaintiffs and how you get there.

MR. SAFIER: I think that that's actually my (indiscernible).

THE COURT: And if it turns out that that doesn't match the allegations, we'll hear it, and then we'll figure it out, but you have to actually show with clarity what it is that each Plaintiff -- you allege what their claim is, and what they have and they don't have.

MR. SAFIER: As to which side and what --

THE COURT: Right.

MR. SAFIER: I understand. And one more question, your Honor, because this -- let me --

THE COURT: Yes.

MR. SAFIER: If your Honor says this should be four separate cases, one as to Arby's, one as --

THE COURT: I'm not suggesting it is. I'm just testing what it is.

MR. SAFIER: Right. That's very easy to do in that --

THE COURT: Yes.

MR. SAFIER: -- in that Arby's case, in that Baskin-Robbins case, and we're happy to do that. If your Honor wants us to get rid of Inspire, which theoretically ties this all together, then, as to Arby's, we could have, you know, two Plaintiffs here, (indiscernible) X and Y, and why are these one (indiscernible), so be it. We can do that. It will be much cleaner and much easier, and we can break this into four cases, and we can (indiscernible) on

it, or even consolidate it. That may be the easiest way to do this, your Honor --

THE COURT: Do you have any comments on that?

MR. SAFIER: -- because the way that we've pled this is to show what's going on on all these websites, show which Plaintiff visited which website, and track that (indiscernible). And I understand that it's unwieldy, your Honor. It's (indiscernible) in terms of (indiscernible).

THE COURT: Well, I'm also thinking about discovery and what that's going to look like, because, if you're going to come in here and have just one discovery request, I'm sure they're going to come back and say, like, "It's irrelevant for this Defendant."

MR. SAFIER: Well, we would -- and it is.

THE COURT: Right. You can fight it, but -- well, I know that's what you're going to argue, but the issue is maybe it's not.

MR. SAFIER: Well, what happened on the Sonic website, we would not ask of our -- we would ask it of Inspire, if they were still in, but we would never ask it of Arby's. Why would we --

THE COURT: Well, I mean, I hope not, but I don't know. The point is, I am thinking beyond --

MR. SAFIER: Yes, so let's go to --

THE COURT: -- of what this case should look like.

MR. SAFIER: -- to the four-complaint idea. I mean, that would make it much easier.

THE COURT: Well, I'm not going to tell you how to draft it. I'm giving you critique on what is workable with this, and I've thrown out that what happens if Inspire doesn't? Are you conceding there's no standing for Inspire?

MR. SAFIER: No, I wouldn't concede that, but it may make it much easier.

THE COURT: Okay. So you haven't even determined how you're going to handle Inspire. You might have additional facts, and Inspire can be brought back in.

MR. SAFIER: If your Honor says Inspire is out -- let's just assume that for a second.

THE COURT: Well, it's --

MR. SAFIER: (Indiscernible.)

THE COURT: So that is what I'm testing you on. I'm pointing out what I see problems about Inspire, and your response shouldn't be, like, "Well, whatever you want." No. It's like, "What do you have?"

MR. SAFIER: We've discussed Inspire. That's not sufficient, and you --

THE COURT: Right.

MR. SAFIER: -- want us to amend. It may be that we have enough, it may not be, but I don't really think that -- look. Inspire, as a stand-alone Defendant, doesn't

matter from the perspective of somebody visiting Inspire.com. That's not why they're (indiscernible). So, if you want --

THE COURT: Yes, but if it's -- but they're a party. So you're going to --

MR. SAFIER: They're --

THE COURT: Are they going to be -- what, jointly and severally liable? What's -- what are we talking about?

MR. SAFIER: Well, they're liable because they say we're -- we --

THE COURT: Right, but what --

MR. SAFIER: This is us, your Honor. Yes.

THE COURT: I didn't understand your last comment, which is like, "How are they going to be used?" You do have to think about what their role is in the case, and it could be that their role in the case is that they put everything together. That seems to be -- my takeaway is that's why you brought -- that's why they're here.

MR. SAFIER: That's right.

THE COURT: There are parents, and here are the subs, and my point is, what are you going to attack? What is there -- what is the extent of Inspire's liability?

MR. SAFIER: I understand, your Honor.

THE COURT: Are they going to -- are they -- what is the answer to that? They're liable because of the

parent?

MR. SAFIER: No. They're liable because they're the ones that put this all together. All the banners for their subs are the same. We already went over this, and then the policy --

THE COURT: And that's based on what? That's based on their corporate structure, or is that based on facts that your Plaintiff knows, or what is that --

MR. SAFIER: That (indiscernible).

THE COURT: -- or public records search, or whatever you may have done? I mean, I do --

MR. SAFIER: (Indiscernible) case on the ad and cookie policy.

THE COURT: Looking the same?

MR. SAFIER: And all of this stuff being basically boilerplate or, you know, cookie cutter, all of the banners on (indiscernible).

THE COURT: And that may be. And that may be.

MR. SAFIER: I know. I understand, your Honor.

THE COURT: But I don't know, and I have to take --

MR. SAFIER: Yes. I understand, your Honor.

THE COURT: -- what you allege is true, and give you the benefit --

MR. SAFIER: So, but, you know, you want to -- to

make it easy, maybe we dismiss Inspire without prejudice.

THE COURT: I don't want you to workshop what you want to do in terms of amendment, but I think I owe you an order on what is done.

MR. SAFIER: Okay. All right.

THE COURT: So let me do that, and then, if you want to -- how you want to -- it's up to you to come up with a complaint --

MR. SAFIER: Okay. All right. Okay.

THE COURT: -- that will be tested, that they have an opportunity to respond to what they think the complaint is.

MR. SAFIER: Okay. Great. I think that makes sense.

THE COURT: Okay. Anything you want to add?

MS. LUKITSCH: Only that, you know, for efficiency purposes, if he is alleging this, and there is a Plaintiff that visits multiple different Defendants' websites, it would seem that it would at least make sense to relate the cases so that, you know, Mr. De Ayora isn't testifying in three different cases.

THE COURT: I totally agree with that.

MS. LUKITSCH: There is some -- you know, what he visited, when, and what he knew, when, is going to be, you know, relevant.

THE COURT: I'm very receptive to --

MS. LUKITSCH: So I'm not sure the splitting the cases all up makes efficiency sense, but it certainly could be pled better, even if segmented, in the complaint, you know, "These are all of the allegations as to Arby's. These are all of the allegations" -- or "These are all the allegations as to this Plaintiff," versus this whole group pleading effort.

THE COURT: Yes. I would agree with that, and I think there's a better way to -- and if it is -- I'm not suggesting this was your -- by design, but for all of us to track -- they're entitled to bring their motion to dismiss. They're entitled to test the pleading. And in order for me to do what I think is my job, to make a decision on that, I don't want to be flipping through hundreds of allegations, trying to figure out where they go. It should all be organized in a way that we can track, Plaintiff, Defendant, claim, so that everything can be attacked and grouped in one way for the argument, and, hopefully, today shows -- I know you know what the arguments are, because you have other cases, but, in particular in this case, there's a lot of arguments going back and forth, so you know what you are going to be vulnerable to from the Defendants' perspective. So that's clearly something to consider, and if you don't think that their point is well taken, well, then, obviously,

you don't need to do anything. But, hopefully, the discussion that we've had today, two hours, to go through that --

MR. SAFIER: Yes, two hours.

THE COURT: But that is by design. I hope that's a sense of, like, what you didn't do is your job, or me not doing what is my job, but the true lack of clarity, or the way that it's organized, has led to a whole bunch of issues that are coming up that need to be resolved.

MR. SAFIER: I understand, your Honor. I appreciate the Court's comments.

THE COURT: I feel that that's my function, to do that before it goes on, and I'm prepared to do that.

MR. SAFIER: I appreciate it, your Honor. We definitely appreciate it.

THE COURT: So -- okay. So, in terms of -- let us work on an order, and see how quickly to get an order, so that you can turn back to what claims we can amend, and then we'll just track all the deadlines from that.

MR. SAFIER: Okay.

MS. LUKITSCH: Thank you, your Honor.

THE COURT: But I would like to get this --

MR. SAFIER: Thank you, your Honor.

THE COURT: -- on its way. We're now almost round three. (Indiscernible.)

MS. LUKITSCH: Thank you, your Honor.

MR. SAFIER: Thank you, your Honor.

THE CLERK: Court is adjourned.

(Proceedings adjourned at 11:59 a.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Wednesday, February 18, 2026